**THE SHAPIRO FIRM, LLP**
Jonathan S. Shapiro (JS-3068)
Robert J. Shapiro (RS-3220)
500 Fifth Avenue, 14th Floor
New York, New York 10110
Telephone: 212-391-6464

*Local Counsel for Plaintiffs*

**SCHIFFRIN BARROWAY**
 **TOPAZ & KESSLER, LLP**
David Kessler
Stuart L. Berman
Darren J. Check
John A. Kehoe (JK-4589)
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: 610-667-7706

*Counsel for Plaintiffs*



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**07 CIV  8156**

| | |
|---|---|
| ALLIANZ GLOBAL INVESTORS KAPITALANLAGEGESELLSCHAFT MBH; ALLIANZ GLOBAL INVESTORS LUXEMBOURG S.A.; ALLIANZ GLOBAL INVESTORS IRELAND LIMITED; ALECTA PENSIONSFÖRSÄKRING, ÖMSESIDIGT; SJUNDE AP-FONDEN; VARMA MUTUAL PENSION INSURANCE COMPANY; DANSKE INVEST ADMINISTRATION A/S; AFA LIVFÖRSÄKRINGSAKTIEBOLAG; AFA TRYGGHETSFÖRSÄKRINGSAKTIEBOLAG; AFA SJUKFÖRSÄKRINGSAKTIEBOLAG; AND AFA SJUKFÖRSÄKRINGSAKTIEBOLAG ON BEHALF OF KOLLEKTIVAVTALSSTIFTELSEN TRYGGHETSFONDEN TSL; AMF PENSION FONDFÖRVALTNING AB; ARBETSMARKNADSFÖRSÄKRINGAR, PENSIONSFÖRSÄKRINGSAKTIEBOLAG; and PENSIONSKASSERNES ADMINISTRATION A/S. | CIVIL ACTION NO. <br><br> **JURY TRIAL DEMANDED** <br><br><br> **COMPLAINT** |
| Plaintiffs, <br><br> v. <br><br> VIVENDI, S.A., JEAN-MARIE MESSIER and GUILLAUME HANNEZO, <br><br> Defendants. | |

## Table of Contents

I.   NATURE OF THE ACTION..................................................................................2

II.  JURISDICTION AND VENUE..........................................................................8

III. PARTIES.........................................................................................................14

    A.   Plaintiffs..................................................................................................14

    B.   Vivendi ...................................................................................................15

    C.   Individual Defendants.............................................................................16

IV.  FACTUAL BACKGROUND ...........................................................................19

    A.   Vivendi's Unrestrained Growth through Acquisitions ...........................19

    B.   Vivendi's Use of Improper Accounting to Artificially
        Inflate Its Stock Price .............................................................................23

        1.   Accounting Rules Applicable to Foreign Issuers.........................23

        2.   Defendants Failed to Timely Write Down Impaired Goodwill ..................26

            (i)    Canal+..................................................................................28

            (ii)   U.S. Filter ...........................................................................35

        3.   Defendants Improperly Consolidated Vivendi's Balance Sheet..................36

        4.   Defendants Improperly Recognized Revenue...............................42

        5.   Defendants Improperly Inflated Canal+'s Assets ........................44

        6.   Defendants Improperly Manipulated Vivendi's Reported EBITDA ..........45

            (i)    Improper EBITDA Adjustments during the
                 Second Quarter of 2001 .......................................................46

            (ii)   Improper Adjustments of UMG's EBITDA........................47

        7.   Defendants Failed to Disclose Vivendi's 2% Interest
            in Elektrim Telekomunikacja.......................................................49

C.  Defendants Concealed Vivendi's Growing Liquidity Crisis .................................. 50
    1.  Defendants Failed to Disclose Vivendi's Inability to Generate
        Expected Cash Flows from the Company's Costly Acquisitions ................ 51

    2.  Defendants Failed to Disclose the Insufficiency of
        Vivendi's Working Capital .......................................................................... 51

    3.  Defendants Failed to Disclose Certain Off Balance Sheet Liabilities ......... 52

    4.  Defendants Failed to Disclose Acceleration Clauses in Vivendi's Loans ... 55

    5.  Defendants Failed to Disclose Material Commitments Concerning
        Cegetel and Maroc Telecom ....................................................................... 56

        (i)   Cegetel's Current Account ................................................................. 56

        (ii)  The Maroc Telecom Side Agreement .................................................. 58

    6.  Defendants Failed to Disclose Vivendi's 2001 Stock Buybacks ................. 59

    7.  Magnitude of the Undisclosed Liquidity Crisis .......................................... 60

D.  The Truth Begins to Emerge ..................................................................................... 62

V.    FALSE AND MISLEADING STATEMENTS ............................................................. 71

VI.   DEFENDANTS' SCIENTER ...................................................................................... 117

VII.  LOSS CAUSATION .................................................................................................... 123

VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .................................. 126

IX.   PRESUMPTION OF RELIANCE ............................................................................... 127

X.    TOLLING OF THE STATUTE OF LIMITATIONS .................................................... 128

XI.   CLAIMS FOR RELIEF ............................................................................................... 129

FIRST CLAIM FOR RELIEF Violations of Section 11 of the Securities Act
(Against All Defendants) ...................................................................................................... 129

SECOND CLAIM FOR RELIEF Violations of Section 12(a)(2) of the Securities
Act (Against All Defendants) ............................................................................................... 131

THIRD CLAIM FOR RELIEF Violations of Section 15 of the Securities Act
(Against Defendants Messier and Hannezo) ......................................................................... 133

iii

FOURTH CLAIM FOR RELIEF Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder (Against All Defendants).....................................135

FIFTH CLAIM FOR RELIEF Violation of Section 18 of the Exchange Act
(Against All Defendants) ........................................................................................137

SIXTH CLAIM FOR RELIEF Violation of Section 20(a) of the Exchange Act
(Against Defendants Messier and Hannezo).........................................................................138

SEVENTH CLAIM FOR RELIEF Common Law Fraud (Against All Defendants) .............139

EIGHTH CLAIM FOR RELIEF Common Law Negligent Misrepresentation
(Against All Defendants) ........................................................................................141

NINTH CLAIM FOR RELIEF Unjust Enrichment (Against All Defendants)......................143

XII.   PRAYER FOR RELIEF...........................................................................................144

820154.1

(1.) Allianz Global Investors Kapitalanlagegesellschaft MbH;  (2.) Allianz Global

Investors Luxembourg S.A.,  (3.) Allianz Global Investors Ireland Limited,  (4.) Alecta

Pensionsförsäkring, Ömsesidigt,  (5.) Sjunde AP-Fonden,  (6.) Varma Mutual Pension Insurance

Company,  (7.) Danske Invest Administration A/S,  (8.) AFA Livförsäkringsaktiebolag, AFA

Trygghetsförsäkringsaktiebolag, AFA Sjukförsäkringsaktiebolag, and AFA

Sjukförsäkringsaktiebolag On Behalf Of Kollektivavtalsstiftelsen Trygghetsfonden TSL  (9.)

AMF Pension Fondförvaltning AB and Arbetsmarknadsförsäkringar,

Pensionsförsäkringsaktiebolag, and  (10.) Pensionskassernes Administration A/S ("Plaintiffs"),

by their undersigned attorneys, allege the following upon personal knowledge as to themselves

and their own acts, and upon information and belief as to all other matters.  Plaintiffs'

information and belief is based on, *inter alia*, an investigation made by and through their

undersigned counsel, which included, among other things, a review of (1) Vivendi Universal,

S.A. (now known as Vivendi, S.A. and hereafter referred to as "Vivendi" or the "Company")

filings with the Securities and Exchange Commission ("SEC") and the Commission des

Operations des Bourse ("COB") (now part of the Autorité des marchés financiers), the French

equivalent of the SEC; (2) Vivendi press releases; (3) public statements by or on behalf of

Vivendi and/or the other Defendants; (4) analyst reports concerning Vivendi; (5) newspaper and

other media coverage regarding Vivendi, its business, and/or the Individual Defendants (as

defined below); and (6) pleadings in litigation naming Vivendi as a defendant, including *In re*

*Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH) (S.D.N.Y.) (the "Securities Class

Action"); *SEC v. Vivendi Universal, S.A., Jean-Marie Messier and Guillaume Hannezo*, No. 03

Civ 10195 (PKC) (S.D.N.Y.) (the "SEC Action"); *Capitalia Asset Management SGR, S.p.A. and*

*Capitalia Investment Management S.A. v. Vivendi, S.A., Jean-Marie Messier and Guillaume*

*Hannezo*, No. 07 Civ. 5742 (RJH) (S.D.N.Y); and *Norges Bank v. Vivendi, S.A., Jean-Marie Messier and Guillaume Hannezo*, No. 07 Civ. 7370 (RJH) (S.D.N.Y) (the "Norges Bank Action").

Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. Plaintiffs' investigation into the factual allegations contained herein is continuing, and many of the facts related to Plaintiffs' allegations are known only by the Defendants named herein or are exclusively within their custody or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after Plaintiffs have had a reasonable opportunity for discovery.

## I.    **NATURE OF THE ACTION**

1.    Between at least October 30, 2000 and August 14, 2002 (the "Relevant Period"), defendant Jean-Marie Messier ("Messier"), Vivendi's Chief Executive Officer ("CEO") and Chairman (until he was forced to resign on July 3, 2002), and defendant Guillaume Hannezo ("Hannezo"), Vivendi's Chief Financial Officer ("CFO") (until he resigned on July 9, 2002), issued materially false and misleading statements and caused Vivendi to file materially false and misleading financial statements with the SEC in violation of the federal securities law and common law.

2.    Immediately before and during the Relevant Period, defendant Messier caused Vivendi to embark on an extraordinary $77 billion acquisition binge that rapidly transformed Vivendi from a small centuries-old French-based water utility into a huge international media and telecommunications conglomerate. In pursuit of this rapid transformation, Messier and Hannezo (collectively the "Individual Defendants") reported the Company's strong revenue and earnings, and portrayed Vivendi as a company that was generating sufficient cash flow and

2

earnings to satisfy its debt obligations on approximately $21 billion in debt that it amassed to finance its massive $77 billion acquisition spree. As a result of the Individual Defendants' repeated upbeat earnings announcements and assurances concerning the Company's growth and its ability to meet its debt obligations, the price of Vivendi's American Depository Shares ("ADSs") traded on the New York Stock Exchange ("NYSE"), and ordinary shares traded on Compartment A of Eurolist (formerly the *Premier marché*) by Euronext Paris S.A. (hereinafter referred to as the "Paris Bourse"), was artificially inflated throughout the Relevant Period.

3.    As the Individual Defendants knew but did not disclose, Vivendi's operations and financial results were dramatically weaker than what their public statements portrayed. For example, immediately prior to and during the Relevant Period, Vivendi (using its increasingly inflated stock as currency to finance many of its acquisitions) bid aggressively for several large companies, and substantially overpaid for them. Subsequent events (unbeknownst to investors) confirmed that these acquired entities could not generate sufficient cash flow to justify their high acquisition cost, with the result being that Vivendi's balance sheet was bloated with tens of billions of dollars of inflated "goodwill" whose value had been materially impaired and should have been written down. The failure of the Vivendi conglomerate to generate earnings in line with its publicly-touted estimates further threatened the Company's liquidity and its ability to generate the amount of cash flow from operations necessary to satisfy its obligations on over $21 billion worth of debt.

4.    To conceal the deteriorating state of Vivendi's newly constructed corporate empire, Defendants engaged in a variety of improper asset and revenue inflating practices immediately prior to and during the Relevant Period that enabled the Company to artificially inflate its reported assets, revenue, income and earnings per share ("EPS"), thereby rendering

3

Vivendi's publicly filed financial statements and other communications regarding the Company's financial performance complained of herein to be materially false and misleading.

5.      Vivendi's improper accounting (as detailed in Section IV.B, *infra*) included, *inter alia*, failing to timely write-off of over €29 billion in goodwill associated with Vivendi's acquisitions, including its acquisitions of U.S. Filter Corp. ("U.S. Filter") and Canal+ S.A. ("Canal+"). Defendants' failure to take timely write-offs for impaired goodwill in violation of U.S. generally accepted accounting principles ("U.S. GAAP") caused Vivendi to improperly delay recognizing offsetting charges of over €29 billion against the Company's earnings during the Relevant Period. As a result, Vivendi's reported earnings and EPS were artificially inflated under U.S. GAAP by tens of billion of dollars during the Relevant Period.

6.      In addition to its failure to properly account for goodwill, Vivendi also engaged in a variety of improper revenue recognition and expense-deflating practices, and other related misconduct, to artificially inflate its reported financial performance during the Relevant Period. These practices included, *inter alia*, (a) reporting and consolidating into its own reported financial results billions of dollars of revenue from entities such as Cegetel and Telecom (both defined below) in which Vivendi held only a minority stake and in which Vivendi did not control, in violation of U.S. GAAP (as detailed in Section IV.B.3, *infra*); (b) recognizing 100% of the revenue "upfront" (*i.e.* in contract year one) on billions of dollars of multi-year contracts in a practice internally referred to as "booking backlog," even though Vivendi had not yet performed its obligations under those multiyear contracts and U.S. GAAP required that the revenue on such contracts be recognized ratably over time when Vivendi actually performed the contracted-for services (as detailed below in Section IV.B.4, *infra*); (c) improperly inflated Canal+'s assets (as detailed below in Section IV.B.5, *infra*); (d) improperly manipulated

4

Vivendi's reported EBITDA (as detailed below in Section IV.B.6, *infra*); and (e) failed to disclose a 2% interest in Elektrim Telekomunikacja (as detailed below in Section IV.B.7, *infra*).

7.      The foregoing improper accounting practice not only allowed Vivendi to keep its stock price artificially high, but also facilitated the Individual Defendants' fraudulent efforts to conceal the Company's growing liquidity crisis. For example, on December 6, 2001, defendant Messier assured the investing public that "Vivendi Universal is in a very strong position, with solid performance in virtually every business," and just weeks later (after having announced that it would raise $2.5 billion by selling a $1.5 billion interest in British Sky Broadcasting Plc ("BSkyB") and a $1.06 billion interest in Vivendi Environnement) stated that certain asset sales would give Vivendi "room to manoeuvre" for additional acquisitions and enable it "to cover any eventual needs from different opportunities for strategic partnerships." On December 17, 2001, Vivendi then announced that it would be acquiring USA Networks for approximately $10 billion.

8.      Unbeknownst to investors, however, Vivendi's business at that time was anything but "strong" and decidedly lacked "room to manoeuvre." To the contrary, as *The Wall Street Journal* later reported, the Company then faced a potentially catastrophic liquidity crisis:

> On Dec. 13, [2001], Guillaume Hannezo sent Jean-Marie Messier, chairman of Vivendi Universal SA, a desperate handwritten plea.
>
> *"I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat,"* wrote Mr. Hannezo, the company's chief financial officer. *"All I ask is that all of this not end in shame."*
>
> *That very day, unknown to investors and the Vivendi board, the company had narrowly averted a downgrade by credit-rating agencies, which would have made it difficult to borrow money and plunged the company into a cash crisis.* Mr. Hannezo . . . implored his boss and longtime friend to take serious steps to reduce Vivendi's ballooning debt.

5

> When the company's board met the next day to consider whether to approve a roughly $10 billion acquisition of USA Networks Inc.'s TV and film businesses, *Mr. Messier made no mention of the close call with the rating agencies. Instead, when a director asked about Vivendi's financial profile, Mr. Messier said the company had no problem*, according to two directors who were there.
>
> The board endorsed the USA Networks deal . . . . But Vivendi was already in dire financial straits. . . .
>
> As new management struggles to salvage the French conglomerate, it has become clear that Vivendi came close to financial disaster far earlier than previously thought. *That picture is starkly at odds with the one repeatedly presented by Mr. Messier to investors and his board.*

"How Messier Kept Cash Crisis at Vivendi Hidden for Months; Media Giant Was at Risk Well Before Investors Knew," *The Wall Street Journal*, Oct. 31, 2001, at A1 (emphasis added).

9.     Without publicly disclosing the adverse material facts facing the Company, and while affirming and materially misrepresenting the truth concerning the Company's actual prospects, financial performance, improper accounting practices and liquidity situation, the Individual Defendants did not hesitate to take advantage of the market's ignorance of the truth by causing Vivendi to purchase numerous companies during the Relevant Period using artificially inflated Vivendi stock as currency.  By maintaining an artificially inflated price for Vivendi's stock, the Individual Defendants were able, in essence, to purchase tens of billions of dollars worth of The Seagram Company Ltd.'s ("Seagram"), Canal+'s and other entities' stock at a discount since Vivendi was paying for its interest in these companies with a currency (Vivendi's own stock) that was really worth a fraction of its publicly-traded price.

10.     Eventually the weight of Defendants' material misrepresentations and distorted financial results collapsed upon the scheme.  In June 2002, an immediate and severe cash

6

shortage threatened Vivendi's continued viability. Over the course of the next several weeks, the truth about Defendants' deception was revealed.

11.    On July 3, 2002, Vivendi's board ousted Messier. Hannezo left the Company just days later. Thereafter, the Company's new management was forced to disclose that the Company would immediately have to secure both bridge and long-term financing to avoid default on its largest credit obligations. During a hearing before the French Parliament in September 2002, Vivendi's new chairman admitted that had Messier remained Vivendi's CEO beyond July 3, 2002, the Company undoubtedly would have gone bankrupt "within 10 days."

12.    The Individual Defendants may have succeeded in their plan to transform Vivendi into a multinational conglomerate, but the Company, and ultimately its shareholders, would come to pay an enormous price for Messier's and Hannezo's unchecked ambition and their concomitant material misrepresentations. Among other things, Defendants' actions resulted in (1) a crippling drop in the prices of Vivendi's ordinary shares traded on the Paris Bourse and ADSs traded on the NYSE when the fraud was finally revealed; (2) the Company's de-listing from the NYSE; (3) an onslaught of civil litigation; and (4) the imposition of a massive civil fine by the SEC, as more fully particularized below.

13.    The disclosure of Defendants' fraud caused a precipitous decline in the trading prices of the Company's securities. The Company's ADSs lost 85% of their value from their Relevant Period high of $75.50 and its ordinary shares declined 83.9% from their Relevant Period high of €86.50. These declines resulted in significant damage to the Company's shareholders, including Plaintiffs.

7

## II.   JURISDICTION AND VENUE

14.     The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the

Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2) and §77o; Sections

10(b), 18 and 20(a) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78r

and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule

10b-5, 17 C.F.R. § 240.10b-5. The claims alleged herein also arise under common law.

15.     The Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331 and 1337(a); Section 22 of the Securities Act, 15 U.S.C. §77v; Section 27 of the

Exchange Act, 15 U.S.C. § 78aa; and principles of supplemental jurisdiction in accordance with

28 U.S.C. § 1367.

16.     In connection with the acts and course of conduct alleged herein, the Defendants

directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mails and the facilities of the national securities markets.

17.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15

U.S.C. §77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c)

and (d). Many of the acts, transactions and conduct that occurred in furtherance of Defendants'

fraudulent scheme complained of herein occurred in substantial part and/or had an effect in this

District, including the creating and implementation of the manipulative devices and contrivances.

Further, Vivendi, and the Individual Defendants conducted substantial business and had

substantial contacts within this District during the Relevant Period.

18.     Vivendi is headquartered in Paris, France, but conducted substantial business and

maintained the Company's U.S. headquarters in this District during the Relevant Period and

through the present. In addition, defendant Messier became a resident of the District beginning

8

in 2001 when he moved himself and his family into a Manhattan penthouse apartment. As

alleged in the Securities Class Action, during a February 17, 2002 CNN interview, defendant

Messier explained that he moved to New York in furtherance of his responsibilities as Vivendi's

CEO and Chairman of the Board. Specifically, that

> Moving to New York, yes there [were] very simple reasons. The
> first one Vivendi Universal has 50,000 U.S. employees. They have
> a boss. Where is the boss? The boss is in the U.S. He's working
> there. I can meet with them. I can spend time with them. He is
> really the boss.
>
> The second goal was Vivendi International is a new group for
> many U.S. investors in the media field. We need and I needed to
> spend more time with the U.S. Universal community to explain the
> Vivendi Universal story, to go through all reasons of performances
> of prospects, and I think that it's just better to do it being in
> American, than being outside.

19.    The Defendants' domestic conduct was not "merely preparatory" or perfunctory

acts, but led directly to Plaintiffs' losses. Accordingly, this Court may properly apply subject

matter jurisdiction over the claims of foreign purchasers of Vivendi ordinary shares traded on

foreign exchanges, including the Paris Bourse, under the "conduct test" articulated by the Second

Circuit, which provides that a federal court has subject matter jurisdiction if (1) the defendant's

activities in the United States were more than "merely preparatory" to a securities fraud

conducted elsewhere, and (2) these activities or culpable failures to act within the United States

"directly caused" a plaintiff's losses. The facts alleged herein show that substantial activity in

furtherance of Defendants' fraud occurred within the United States and directly caused Plaintiffs'

losses.

20.    The Court has already exercised subject matter jurisdiction over the federal

securities claims in the Securities Class Action. *See In re Vivendi Universal, S.A. Sec. Litig.*, 381

F. Supp. 2d 158 (S.D.N.Y. 2003) (the "Court's Opinion"). In denying Defendants' motions to

9

dismiss pursuant to Rule 12(b)(1), the Court held that it possessed subject matter jurisdiction over claims brought by foreign purchasers who acquired Vivendi ordinary shares on foreign exchanges. *Id.* at 169-70. The Court Opinion noted that Defendants did not dispute that (1) Messier and Hannezo had relocated to the United States in September 2001; (2) that Vivendi filed Forms 20-F and 6-K with the SEC during the Relevant Period; (3) that Defendants disseminated other materials to investors in the United States; and (4) that Vivendi made numerous acquisitions in the United States. *Id.*

21.    The Court further held that the Securities Class Action complaint sufficiently alleged grounds for the Court to exercise subject matter jurisdiction over the claims of foreign investors against Defendants including that, in furtherance of the alleged scheme, Vivendi had acquired well-known U.S. entertainment and publishing companies, such as Universal Studios, Houghton Mifflin and USA Networks, and to successfully accomplish this plan, took on a $21 billion debt while allegedly fraudulently assuring all investors "through false and misleading reports filed with the SEC and news releases that it had sufficient cash flow to manage its debt." *Id.*

22.    In addition to substantial U.S. conduct that occurred in furtherance of the fraud that is alleged herein, Vivendi has a vast U.S. presence that justifies the exercise of subject matter jurisdiction over the claims of Plaintiffs who, relying on the health and value of Vivendi's substantial U.S. businesses, acquired Vivendi ADSs traded on the NYSE and/or ordinary shares traded on the Paris Bourse, and were defrauded by the Defendants' material misrepresentations.

23.    Defendants perpetrated the alleged fraud upon Plaintiffs through material misrepresentations made in connection with the Company's $77 billion acquisition spree, during which time the Company made several high profile acquisitions, spending in excess of $54

10

billion for various U.S.-based entities. For example, the following companies, among others, were acquired in whole or in part by Vivendi.

| COMPANY ACQUIRED | U.S. LOCATION | PURCHASE PRICE |
| --- | --- | --- |
| Waste Management Inc. | Houston, TX | € 103.5 million |
| U.S. Filter Corp. | Palm Desert CA | $ 6.2 billion |
| Seagram Company Ltd. | University City, CA | $ 34 billion |
| Uproar.com | New York, NY | $ 128 million |
| MP3.com, Inc. | San Diego, CA | $ 400 million |
| Emusic.com | San Diego, CA | $ 24 million |
| Houghton Mifflin Co. | Boston, MA | $ 2.2 billion |
| EchoStar Communications Corp. | Littleton, CO | $1.5 billion |
| USA Networks | New York, NY | $10.3 billion |

24.    In addition to the U.S acquisitions, the Court's Opinion noted that Messier and Hannezo were alleged principal actors in this scheme and spent half their time within the United States from the middle through the end of the Relevant Period, for the specific purpose to increase investments by U.S. investors in Vivendi. *Id.*

25.    The Court also found that it was reasonable to infer from the decision by Messier and Hannezo to move to the United States during the Relevant Period, allegedly to better direct Vivendi's operations and to more effectively promote misleading perceptions on Wall Street, that the alleged fraud on the NYSE was a "substantial" or "significant contributing cause" of the foreign investors' decisions to purchase the Company's stock abroad. *Id.* at 170.

26.    In an Order denying reconsideration of the Court's Opinion in the Securities Class Action, the Court reconfirmed that it had subject matter jurisdiction over foreign investors' claims against Defendants because, *inter alia*, (i) allegedly false statements emanated from the U.S.; (ii) Messier and Hannezo, Vivendi's two highest officers, moved to and operated Vivendi from the U.S. allegedly to better implement the fraudulent scheme; and (iii) Messier and Hannezo carried out significant acts in the U.S. in furtherance of the alleged fraud and as alleged

11

controlling officers of Vivendi. *See In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH), 2004 WL 2375830 (S.D.N.Y. Oct. 22, 2004) (the "Reconsideration Opinion"). The Reconsideration Opinion specifically noted that "this Court concurs with Judge Baer's opinion finding jurisdiction over this dispute pursuant to the conduct test . . . ." *Id.* at *7.

27.    Further, pursuant to the judicially prescribed "effects test" for asserting extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over Plaintiffs' claims because Defendants' improper conduct had an impact upon the NYSE, the U.S. market on which Vivendi sold ADSs. Defendants' improper conduct, including that which was carried out in the U.S, artificially inflated the price of the Company's securities and affected the integrity of the prices paid for Vivendi securities in the United States and abroad. There was but a single worldwide market for Vivendi ordinary shares traded on foreign exchanges, including the Paris Bourse, and ADSs traded on the NYSE, which traded in tandem, and that market was defrauded by Defendants' conduct, causing extensive effects in this country and abroad.

28.    In the U.S., Vivendi sold securities whose prices were artificially inflated by means of false and misleading statements in financial reports, a Form F-4 Registration Statement filed with the SEC on October 30, 2000, and various press releases. Vivendi actively marketed and sold these securities in the U.S. despite its false reporting of its financial condition as alleged herein. Many, if not most, of the Company's press releases shared a New York dateline. Further, throughout the Relevant Period, Vivendi regularly filed Forms 20-F and Forms 6-K with the SEC that contained materially false and misleading information as detailed herein.

29.    Vivendi also organized and participated in meetings in New York with the financial community, including with Wall Street analysts, to review and report on Vivendi's

820154.1

purported financial results. As alleged herein, Defendants issued materially false and misleading statements during those meetings.

30. According to Vivendi's Form 20-F for the fiscal year ended December 31, 2001, filed with the SEC on May 28, 2002 (the "2001 Form 20-F"), over 54% of Vivendi's long lived assets, then valued at €53.5 billion, were located in the U.S. The 2001 Form 20-F also reported that Vivendi's U.S. revenue exceeded €7 billion. As alleged in the Norges Bank Action, on January 19, 2002, at a Los Angeles luncheon, Defendant Messier stated that Vivendi was "forty percent within the United States and sixty percent out of the states," and in a February 17, 2002 interview on CNN, stated that the Company had "50,000 U.S. employees."

31. As news came to light near the end of the Relevant Period of Vivendi's near-bankruptcy, the SEC commenced an investigation within this District. In addition, the SEC brought enforcement proceedings against Vivendi, Messier and Hannezo in this District for violations of U.S. securities laws, alleging substantial fraudulent conduct in the U.S., including the issuance of false and misleading statements to investors in the U.S. The SEC asserted that certain of the acts and practices described in the SEC Action that constituted violations of the Securities Act and the Exchange Act occurred within this District. In further support of the SEC Action, the SEC also alleged that the Court had subject matter jurisdiction because Vivendi conducted business and maintained offices in this District during the Relevant Period, and, during at least part of the Relevant Period, Messier and Hannezo resided in this District. As part of the resolution of the SEC Action, Defendants executed a consent decree entered in this Court.

32. Further, in April 2004, the SEC issued a cease-and-desist order against John Luczycki, Vivendi's former Chief Accounting Officer and controller, who resided in New York,

finding that during the period December 2000 to July 2002, he had violated United States anti-fraud statutes.

### III.    PARTIES

**A.    Plaintiffs**

33.    Allianz Global Investors Kapitalanlagegesellschaft MbH;, Allianz Global Investors Luxembourg S.A. Allianz Global Investors Ireland Limited (collectively referred to herein as "AGI") was founded in 1956 as DIT (Deutscher Investment Trust) and became AGI in 2007. AGI is part of the Allianz Global Investors network and the asset management division of Allianz AG.

34.    Alecta Pensionsförsäkring, Ömsesidigt ("Alecta") manages the Alecta Pension Fund for private clients and institutions. Based in Stockholm, Sweden and founded in 1917, Alecta is one of the largest providers of occupational pension services in Sweden catering to salaried private-sector employees.

35.    Sjunde Ap-Fonden ("AP7"), or the Seventh Swedish National Pension Fund, is based in Stockholm, Sweden and was founded in 1998. AP7 is part of the Swedish National Pension Fund (AP Fund) system and manages a portion of the pension assets of the citizens of Sweden.

36.    Varma Mutual Pension Insurance Company ("Varma") manages the pension assets for the Finnish private sector. The firm was founded in 1998, following the merger between Sampo Pension and Pension Varma.

37.    Danske Invest Administration A/S ("Danske") is a Copenhagen, Denmark based mutual fund manager. Danske is the fund manager and administrator of the Danske family of

14

mutual fund and with assets under management of approximately US $26 billion it is one of the largest mutual fund managers in Denmark.

38.    AFA Livförsäkringsaktiebolag; AFA Trygghetsförsäkringsaktiebolag; AFA Sjukförsäkringsaktiebolag; and AFA Sjukförsäkringsaktiebolag On Behalf Of Kollektivavtalsstiftelsen Trygghetsfonden TSL (Collectively reffered to herein as "AFA Insurance") is based in Stockholm, Sweden and administers the various insurance policies and services negotiated by the three private-sector federations in the labor market, Svenskt Näringsliv, LO and PTK, as part of their collective agreements. AFA Insurance is also responsible for managing the equity assets related to these policies.

39.    AMF Pension Fondförvaltning AB and Arbetsmarknadsförsäkringar, Pensionsförsäkringsaktiebolag (collectively "AMF Pension") manages the AMF family of mutual funds, as well as separate pension, private client, and fixed income portfolios. AMF was established in 1973 as the asset management branch of the Stockholm-based AMF insurance group.

40.    Pensionskassernes Administration A/S ("PKA"), is Denmark's largest administration company for occupational pension funds which represents those individuals in the public social and health sectors.

**B.    Vivendi**

41.    Vivendi is a "société anonyme" organized under the laws of France with its corporate headquarters at 42 Avenue de Friedland 75380, Paris, Cedex 08, France. Vivendi has offices in this District at 800 Third Avenue, New York, NY 10022. Between October 30, 2000 and April 26, 2006, Vivendi was known as Vivendi Universal, S.A.

15

42.    During the Relevant Period, Vivendi described itself as a global conglomerate engaged in business that was focused primarily on two core areas: "Media and Communications" and "Environmental Services." Vivendi's Media and Communications business was divided into five segments: (a) Music; (b) Publishing; (c) TV and Film; (d) Telecom; and (e) Internet. Vivendi was formed through the December 2000 merger of Vivendi, Seagram and Canal+, with Vivendi continuing as the surviving parent entity (this three-way merger is hereinafter referred to as the "Merger Transactions"). Vivendi is named herein as a defendant in its own right and as the successor entity and successor-in-interest to Vivendi Universal, S.A., Seagram and Canal+. At all times relevant to this Complaint, Vivendi sold shares in the form of ADSs on the NYSE and ordinary shares on the Paris Bourse.

43.    Vivendi Environnement, a subsidiary of Vivendi, operates the Company's worldwide environmental services business, including its water utility operations.

## C.    Individual Defendants

44.    Defendant Jean-Marie Messier ("Messier") was Vivendi's CEO and Chairman of the Board during the Relevant Period until he was forced to resign from the Company on July 3, 2002. He had been CEO of Vivendi's predecessor company since 1994. Messier was also Chairman of the Supervisory Board of Vivendi Environnement and Canal+. Messier was a control person of Vivendi within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act. As alleged in the Securities Class Action, Messier received compensation of $4.8 million in 2001 despite the Company's record loss, as well as various other perquisites, including use of a $17 million New York penthouse apartment the Company had acquired for him.

16

45.    Defendant Guillaume Hannezo ("Hannezo") was Vivendi's CFO during the Relevant Period, until he resigned from the Company on July 9, 2002. As the Securities Class Action alleged, the *Associated Press* reported that Hannezo was a "close collaborator" of Messier. Hannezo was a control person within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

46.    It is appropriate to treat the Individual Defendants as a group for group pleading purposes and to presume that the materially false and misleading and incomplete information conveyed in the Company's public filings, press releases and other publications, as alleged herein, are the collective actions of the Individual Defendants. As officers and/or directors and controlling persons of a publicly held company whose ADSs were registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

47.    The Individual Defendants, by virtue of their positions of control and authority as officers or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period. The Individual Defendants were provided with copies of the documents alleged herein to

17

be misleading, prior to or shortly after their issuance, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, they are responsible for the accuracy of the public reports and releases detailed herein.

48. The Individual Defendants directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels. The Individual Defendants were privy to confidential proprietary information concerning the Company and its business operations, products, growth, financial statements, and financial condition, as alleged herein, and were involved in the drafting, preparation and/or dissemination of the various public, shareholder and investor reports and other communications that were materially false and misleading as alleged herein. Messier and Hannezo both were aware of, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

49. Because of their Board memberships and/or executive and managerial positions with the Company, the Individual Defendants had access to the adverse non-public information about the business, operations, finances, markets, financial statements, and present and future business prospects of Vivendi particularized herein via access to internal corporate documents, conversations or communications with corporate officers or employees, attendance at management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

18

## IV.    FACTUAL BACKGROUND

### A.    Vivendi's Unrestrained Growth through Acquisitions

50.    Vivendi's origins date back to 1853 when it began as a French-based water company named Compagnie Générale des Eaux ("CGE"). CGE had focused primarily on the water market until 1976 when Guy Dejouany became CEO and, following a series of acquisitions, expanded into other business areas, including waste management, energy, transport services and construction and property.

51.    Messier became chairman of CGE in June 1996, and changed its name to Vivendi in April 1999. Beginning at least as early as 1998, and continuing throughout the Relevant Period, Messier embarked on a multi-billion dollar acquisition spree that transformed Vivendi into a multinational conglomerate. For example, as alleged in the Securities Class Action, in the two years prior to the Relevant Period, Vivendi acquired the following companies:[1]

| COMPANY ACQUIRED | CLOSING DATE | % ACQUIRED |
|---|---|---|
| Quotidien Sante | 4/9/98 | 100% |
| Linjebuss AB | 4/15/98 | 66.7% (33% owned) |
| Havas SA / Old | 6/2/98 | 70% (30% owned) |
| Cia de Saneamento do Parana | 6/8/98 | 41.38% |
| Ediciones Doyma SA | 6/25/98 | 50% |
| l'Etudient | 11/10/98 | 100% |
| ScVK | 11/18/98 | 100% |

---

[1] Pre-existing ownership interest, if any, is shown in parenthesis.

19

| | | |
|---|---|---|
| OVP-Vidal | 11/23/98 | 100% |
| Vivendi Universal | 12/15/98 | 10.5% |
| ALPINA GmbH | 1/5/99 | 100% |
| Cendant Software | 1/12/99 | 100% |
| Pathe | 1/26/99 | 19.6% (5% owned) |
| FCC | 3/5/99 | 28% |
| Aique | 4/20/99 | 100% |
| US Filter Corp. | 4/30/99 | 100% |
| SL Tunnelbanan AB | 5/4/99 | 60% |
| MediMedia | 5/12/99 | 100% |
| 18 Litre Water Division | 5/20/99 | 100% |
| Sani Gestion Inc. | 6/11/99 | 100% |
| MUSIDISC | 6/30/99 | 99.02% |
| Canal+ | 7/22/99 | 15% (34% owned) |
| British Sky Broadcasting PIc | 7/22/99 | 4% (20.5% owned) |
| Aqua Alliance Inc. | 8/24/99 | 17% (83% owned) |
| Pathe | 9/30/99 | 80.2% (19.8% owned) |
| Superior Services Inc. | 11/11/99 | 100% |
| 23 GPU In. Power plants | 11/24/99 | 100% |
| Elektrim Telekomunikacja | 12/9/99 | 49% |
| Daesan Power Plant | 12/17/99 | 100% |
| The StayWell Company | 2/29/00 | 100% |

20

| Three V Health Inc. | 2/29/00 | 100% |
|---|---|---|
| Haniel Rohr; Kanal Service & Haniel Industrie Reinignung | 3/28/00 | 100% |
| Prize Central Network | 3/29/00 | 100% |
| HD Offshore | 5/30/00 | 100% |
| Quod Bonum BV | 8/17/00 | 80% |
| Prelude et Fugue | 9/20/00 | 100% |
| Poland.Com SA | 9/21/00 | 55.01% |

52.    Messier's rapid growth strategy required Vivendi to finance the acquisitions,

causing the Company to accumulate a massive amount of debt. For example, in March 1999,

Vivendi financed its $6.2 billion acquisition of U.S. Filter by raising approximately €5.7 billion

through a convertible bond offering. Similarly, in December 1999, Vivendi increased its equity

investment in Elektrim Telekomunikacja ("ET"), a polish conglomerate, to $1.2 billion (or 49%

of ET's equity), by investing an additional $250 million in cash and converting an earlier $615

million loan into ET shares.

53.    By June 2000, Vivendi had significantly expanded and diversified its holding

when it announced the massive €29.5 billion three-way Merger Transactions among Vivendi,

Seagram (which owned Universal Studios and Polygram Records) and Canal+. The Merger

Transactions closed on December 8, 2000, and as the Company announced in its 2000 Annual

Report:

> As a result of the Merger Transactions, we are one of the world's
> leading media and communications companies, with assets that
> include the world's largest recorded music company, one of the
> largest motion picture studios and film libraries in the world and
> leading businesses in the global telecommunications, television,
> theme park, publishing and Internet industries. We believe that we
> will become a fully integrated global media and communications

21

company capable of providing a diverse array of entertainment and information over wired and wireless access devices using cable, Internet, satellite and broadcast networks.

54.    According to press reports, the Merger Transactions "transformed the Company into the second-largest global media empire after AOL Time Warner." *See*, "Vivendi Provides Critics Some Revenue Numbers To Chew On," *The New York Times*, Feb. 12, 2002.

55.    Following the Merger Transactions, many Wall Street analysts expected Vivendi to ensure that the newly merged and recently acquired businesses were achieving desired synergies before consummating any new acquisitions, as the Securities Class Action alleged. Defendants, however, pursued a much different strategy.  In a span of just sixteen months after the massive three-way Merger, Vivendi acquired significant equity positions (or added to its existing equity positions) in the following companies, several of which Vivendi acquired outright:

| COMPANY | CLOSING DATE | INDUSTRY | % ACQUIRED |
|---------|-------------|----------|-----------|
| Maroc Telecom | 12/21/00 | Telecom Services | 35% |
| MUSIDISC | 1/31/01 | Multimedia | 0.98%  (99.02% owned) |
| Medicine Publishing | 2/1/01 | Publishing | 100% |
| HCCOM | 2/19/01 | Publishing | 100% |
| Uproar Inc. | 3/23/01 | Internet Company | 100% |
| GetMusic LLC | 4/25/01 | Internet Content | 50% (50% owned) |
| Editions Juris Service | 4/25/01 | Multimedia | 100% |
| Emusic.Com Inc. | 6/14/01 | E-commerce | 100% |
| RMM Records & Video | 6/25/01 | Music | 100% |
| Scoot Europe NV | 7/27/01 | Broadcast Server | 50% (50% owned) |

820154.1

| Houghton Mifflin Co. | 8/3/01 | Publishing | 100% |
|---|---|---|---|
| MP3.Com | 8/28/01 | Internet Content | 100% |
| Elektrim Telekomunikacja | 9/4/01 | Telecom Services | 2% (49% owned) |
| Mediabright | 9/12/01 | Applications Software | 100% |
| Studio Canal | 10/12/01 | Motion Pictures Services | 14.8% (85.2% owned) |
| Multithernatiques | 12/17/01 | Cable TV | 27% |
| EchoStarCommunications | 1/22/02 | Satellite Telecom | 10% |
| Koch Group Recorded Music | 2/15/02 | Music | 100% |
| USA Network Entertainment | 5/7/02 | Cable TV | 93% |

56.     Like the pre-Merger Transactions acquisitions, the vast majority of these post-Merger Transactions acquisitions were paid for by using Vivendi stock as currency, or by borrowing against future earnings.  Thus, to sustain its growth by acquisition strategy, it was crucial for Vivendi and the Individual Defendants to continue to report favorable financial results to keep Vivendi's stock price artificially high and to maintain Vivendi's favorable credit ratings that were essential to support the Company's existing debt and its access to additional debt financing.

**B.     Vivendi's Use of Improper Accounting to Artificially Inflate its Stock Price**

57.     Throughout the Relevant Period, Vivendi made use of various types of improper accounting machinations that had the purpose and effect of materially misstating Vivendi's financial results, as more particularized below.

**1.     Accounting Rules Applicable to Foreign Issuers**

58.     During the Relevant Period, Vivendi filed financial statements with the SEC that were represented to have been prepared in conformity with GAAP in France ("French GAAP").

23

The SEC allows foreign issuers, such as Vivendi, to prepare their primary financial statements in accordance with a comprehensive body of GAAP other than U.S. GAAP, provided that an understanding of such financial statements is facilitated via reconciliation to U.S. GAAP. Specifically, Item 17 of the Instructions to Form 20-F requires that foreign issuers' "financial statements shall disclose an information content substantially similar to financial statements that comply with U.S. generally accepted accounting principles."

59.    Vivendi filed its 1999, 2000, 2001 consolidated annual financial statements with the SEC on Form 20-F and represented that the Company's financial statements had been prepared in conformity with French GAAP and purportedly reconciled to U.S. GAAP. In addition, Vivendi's 2001 Form 20-F represented that beginning in 2002 the Company's financial information would be reported on a U.S. GAAP basis and reconciled to French GAAP. Despite these representations, Vivendi deviated from U.S. GAAP in several material respects when it reported the results of its operations during the Relevant Period.

60.    GAAP are the fundamental principles, consisting of rules, procedures and conventions that are recognized by the accounting profession as essential and define accepted accounting practice at a particular time. As set forth in the Financial Accounting Standards Board's ("FASB") Statement of Concepts ("CON") No. 1, one of the fundamental objectives of financial reporting is that financial statements provide accurate and reliable information concerning an entity's financial performance during the period being presented. Specifically, CON No. 1, ¶42 states:

> Financial reporting should provide information about an
> enterprise's financial performance during a period. Investors and
> creditors often use information about the past to help in assessing
> the prospects of an enterprise. Thus, although investment and
> credit decisions reflect investors' and creditors' expectations about

24

> future enterprise performance, those expectations are commonly
> based at least partly on evaluations of past enterprise performance.

61.    Further, Regulation S-X provides that financial statements filed with the SEC that

do not conform to GAAP are presumed to be misleading and inaccurate.  Defendants'

representations that Vivendi's financial statements had been reconciled to U.S. GAAP were

materially false and misleading because the financial statements materially distorted the

Company's true financial performance, as described herein.

62.    The Company's financial statements for at least fiscal years 1999, 2000 and 2001

did not fairly and accurately represent Vivendi's financial position and operations and were

materially false and misleading because, as more particularized below in Section IV.B, Messier

and Hannezo manipulated the Company's reported financial results through a plethora of

accounting practices that violated at least the following basic GAAP precepts:

1.    That financial reporting should provide information about the economic

resources of an enterprise, the claims to those resources, and the effects of

transactions, events, and circumstances that change resources and claims

to those resources (CON No. 1, ¶ 40);

2.    That financial reporting should provide information about how

management of an enterprise has discharged its stewardship

responsibilities to owners for the use of enterprise resources entrusted to it.

To the extent that management offers securities of the enterprise to the

public, it voluntarily accepts wider responsibilities for accountability to

prospective investors and to the public in general (CON No. 1, ¶ 50);

3.      That financial reporting should be reliable in that it represents what it

purports to represent -- that information should be reliable as well as

relevant is a central principle of accounting (CON No. 2, ¶¶ 58-59);

4.      That information is complete and nothing is left out that may be necessary

to insure that it validly represents underlying events and conditions (CON

No. 2, ¶¶ 79, 80);

5.      That conservatism be used as a prudent reaction to uncertainty to try to

ensure that uncertainties and risk inherent in business situations are

adequately considered (CON No. 2, ¶¶ 95, 97);

6.      That revenues and gains generally should not be recognized until realized

or realizable, and that revenues are considered to have been earned when

the entity has substantially accomplished what it must do to be entitled to

the benefits represented by the revenues (CON No. 5, ¶ 83); and

7.      That the costs of services be matched with, *i.e.*, recognized

contemporaneously with, the recognition of revenues that resulted from

the same transactions (CON No. 6, ¶ 145).

## 2.      **Defendants Failed to Timely Write Down Impaired Goodwill**

63.     During the Relevant Period, Vivendi's financial statements were materially false

and misleading and were prepared in violation of U.S. GAAP and SEC rules and regulations

because, *inter alia*, the Company failed to timely record an impairment in the value of its

reported goodwill. In so doing, Vivendi misled investors about cash flows it expected to receive

from certain of its recent acquisitions.

26