64.    "Goodwill" is an accounting term used to reflect the portion of the market value of a business entity that is not directly attributable to its assets and liabilities. When one company purchases another for more than its book value – *i.e.*, the amount of its assets minus its liabilities – it is required to record goodwill as an asset in its financial statements and to present it as a separate line item on its balance sheet.

65.    As noted above, prior to and during the Relevant Period, Vivendi engaged in an acquisition spree, which, in the aggregate, resulted in the acquisition of interests in other entities that Vivendi valued in excess of *$77 billion.* Vivendi utilized the "purchase method" of accounting for these acquisitions, in accordance with Accounting Principles Board ("APB") Opinion No. 16, *Business Combinations*, which sets the amount of goodwill to be recorded as follows:

> The acquiring corporation records at its cost the acquired assets less liabilities assumed. A difference between the cost of an acquired company and the sum of the fair values of tangible and identifiable intangible assets less liabilities is recorded as goodwill.

ABP Opinion No. 16, ¶11.

66.    Pursuant to APB Opinion No. 16, the cost of the acquired entity is determined by the fair value of the consideration acquired or issued, whichever is more determinable. Specifically, paragraphs 74-75 of APB Opinion No. 16 set forth the requirements for valuing stock used to effect an acquisition for purposes of determining the "cost of the acquired company" as follows:

> The fair value of securities traded in the market is normally more clearly evident than the fair value of an acquired company. Thus, the quoted market price of an equity security issued to effect a business combination may usually be used to approximate the value of an acquired company.

*    *    *

27

> If the quoted market price is not the fair value of the stock . . . the
> consideration received should be estimated even though measuring
> directly the fair values of the assets received is difficult.

67.    Purporting to apply these principles, Vivendi reported that it had recorded €12.54

billion of goodwill in connection with its Canal+ acquisition and €4.6 billion in connection with

its U.S. Filter acquisition, but violated U.S. GAAP by failing to timely write down impaired

goodwill in connection with these acquisitions when circumstances indicated that the carrying

amount of these two assets would not be fully recoverable.

(i)    **Canal+**

68.    In connection with the Merger, Vivendi valued the cost of Canal+ at €12.53

billion, and recorded goodwill at more than 100% of this cost, or €12.54 billion.

69.    In the fourth quarter of 2001, Vivendi recorded a €6 billion impairment charge in

the value of Canal+ goodwill under French GAAP. This was followed by an additional €3.8

billion charge under French GAAP for impairment in the value of Canal+ goodwill during the

quarter ended June 30, 2002. Accordingly, by June 2002, Vivendi had written off €9.8 billion, or

approximately 78%, of the total €12.53 billion cost to acquire Canal+, under French GAAP.

70.    However, although Vivendi had recognized the initial €6 billion impairment to

goodwill under French GAAP in the fourth quarter of 2001 attributable to the Canal+

acquisition, Vivendi did not take *any* impairment to goodwill under U.S. GAAP until the first

quarter of 2002. The Company purported to explain this disparate accounting treatment in its

2001 financial statements:

> *Goodwill Impairment Charge and Impairment of Other Long-*
> *Lived Assets*
>
> As required under both French and U.S. GAAP, Vivendi Universal
> reviews the carrying value of long-lived assets, including goodwill
> and other intangible assets, for impairment at least annually or
> whenever facts, events or changes in circumstances, both internally

28

and externally, indicate that the carrying amount may not be recoverable. Under French GAAP, measurement of any impairment is based on fair value. In 2001, following the recent market decline, particularly in the Internet, media and telecommunications industries, our annual review resulted in a non-cash, non-recurring goodwill impairment charge of €12.9 billion (€12.6 billion after €0.3 billion minority interest).    Under U.S. GAAP, measurement of any impairment is based on the provisions of Statement of Financial Accounting Standards (SFAS) No. 121, Accounting for the Impairment of Long-lived Assets and for Long-Lived Assets to Be Disposed of (SFAS 121). *SFAS 121 requires that an impairment loss be recognized whenever the sum of the undiscounted future cash flows estimated to be generated from the use and ultimate disposal of an asset are less than the net carrying value of the asset. On this basis no impairment was indicated and accordingly the goodwill impairment charge was reversed.*

(emphasis added.)

71.    Statement of Financial Accounting Standards ("SFAS 142"), *Goodwill and Other Intangible Assets*, requires intangible assets, such as goodwill, to be reviewed for impairment in accordance with SFAS 121, *Accounting For The Impairment Of Long-Lived Assets And For Long-Lived Assets To Be Disposed Of.* SFAS 121 provides that an impairment loss shall be recognized if the carrying amount of an intangible asset is not recoverable and if its carrying amount exceeds its fair value. Specifically, SFAS 121 provides:

1.    An entity shall review long-lived assets and certain identifiable intangibles and goodwill related to those assets to be held and used for impairment *whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.* The following are examples of events or changes in circumstances that indicate that the recoverability of the carrying amount of an asset should be assessed:

a.    A significant decrease in the market value of an asset

b.    A significant change in the extent or manner in which an asset is used or a significant physical change in an asset

c.    A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator

29

> d.    An accumulation of costs significantly in excess of the amount originally expected to acquire or construct an asset

> e.    A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that *demonstrates* continuing losses associated with an asset used for the purpose of producing revenue.

(emphasis added). SFAS 121 expressly requires a goodwill impairment to be recognized if the future cash flows expected to be generated by an asset are less than the carrying amount of an asset. Accordingly, by not taking any write-offs for impaired goodwill under U.S. GAAP in 2000 or 2001, Vivendi essentially represented to investors that the cash flows Vivendi expected to receive from Canal+ equaled or exceeded its carrying value. As set forth below, however, Defendants knew, or recklessly ignored, that Vivendi did not expect to receive cash flows from Canal+ equal to its carrying value long before it recognized goodwill impairments. Accordingly, Defendants violated SFAS 121 by failing to write down impaired goodwill for Canal+ before the first quarter of 2002.

72.    Specifically, well before the first quarter of 2002, Defendants knew that the value of Canal+'s "smart cards" had been severely compromised by known piracy beginning at least as early as March 1999. As the Securities Class Action alleged, Canal+ filed a civil action against NDS Group PLC ("NDS") in the United States District Court for the Northern District of California in March 2002 (the "March 2002 Complaint"), which alleged that since March 1999, NDS "permitted and facilitated the proliferation of counterfeit smart cards that enabled users to circumvent the security measures built into the Canal+ conditional access system," causing Canal+ to suffer losses over a billion dollars. According to the March 2002 Complaint,

> Through the investment of millions of dollars and thousands of man-hours into research and development, Canal+ was able to implement effective security measures in its smart cards used to control access to digital television signals. *These measures proved to be more than*

30

*adequate to protect Canal+ smart cards from piracy until March 1999, when Canal+ smart card software code was copied and published on a web site called "DR7.com." Thereafter, counterfeit Canal+ smart cards began to appear on the market. The proliferation of these counterfeit cards resulted in massive harm to Canal+ and to the system operators who depend on the security of Canal+ smart cards...*

*If smart cards pirates obtain Canal+' new software code, the damage to Canal+ will be irreparable. What is released to the public cannot be put back in the bottle. The market for counterfeit smart cards is massive and the harm from such activities is global.*

(emphasis added.)

73.   As Canal+ further alleged in the March 2002 Complaint:

Canal+ seeks redress in this action for the damage caused by its competitor, NDS. Through the calculated expenditure of millions of dollars for specialized equipment and other resources, NDS sabotaged C+ Technologies' [Canal+ Technologies'] previously unbroken security system for access to digital television signals. In apparent disregard for both the law and its own reputation, NDS caused the development of counterfeit "smart cards," permitting a theft of digital television on a massive scale. *Canal+ estimates that Defendants' illegal conduct has caused it harm in excess of $1,000,000,000.*

*            *            *

C+ Technologies has spent substantial time and money developing countermeasures to combat each type of pirate smart card that resulted from the publication caused by NDS. These countermeasures are created by a team of C+ Technologies engineers and then tested and broadcast by the digital television operators to stop unlawful television viewing by counterfeit card consumers. *The countermeasures, however, are quickly made obsolete by new versions of software for the counterfeit cards that pirate make available after analyzing the countermeasures. Counterfeiters are able to quickly and effectively respond to each new countermeasure because they have access to the UserROM code published on DR7.com.* C+ Technologies cannot stop this counterfeiting without implementing a fundamental change in the design of the smart card. At enormous expense, C+ Technologies is currently developing a new smart card design and will soon transition its existing network to the new design. This transition will be consuming and expensive

31

because each and every legitimate smart card will have to be exchanged.

*The mass production of counterfeit C+ Technologies smart cards has damaged not only Groupe Canal+'s direct revenue through its digital television operators, but has also hurt the sales efforts of C+ Technologies and Canal+ USA.    Conditional access system competitors, especially NDS, used the existence of counterfeit C+ Technologies cards as a competitive weapon in the sales process among content providers and system operators.*    For example, Canal+ has encountered competitors, including NDS, pointing out to customers and potential customers in the United States and elsewhere throughout the world, the breach of C+ Technologies' security schemes as evidence that Canal+ cannot guarantee the integrity of its systems. In highlighting this supposed security breach, Defendants have deceptively failed to disclose that the breach exists solely because of Defendants' own unlawful sabotage.

*As a result of the counterfeiting, Canal+ has lost sales opportunities and has lost customers to its competitors.*    NDS has also used the counterfeiting to attempt to disrupt Canal+' relationships with existing customers.

*Another loss occasioned by NDS to Groupe Canal+ is the loss of pay per view subscriptions.*    One common type of counterfeit access is a modification of a legitimate smart card. These cards, commonly referred to as "MOSC" cards (i.e., "Modified Official Smart Cards"), are legitimate cards, sometimes with valid basic subscriptions, that have been altered so they grant their owners rights that they have not purchased.    Some MOSC cards grant free access to upgraded packages or to every subscription channel; other have a number of pay per view television "credits" for which the owner has not paid. These cards did not exist before the publication on DR7.com and but for that publication they would have not have been produced. *The widespread use of MOSGs has caused Groupe Canal+ and pay television operators from the Canal+ group to lose revenues from premium programs as subscribers are able to have their smart cards altered to receive premium programs without paying for them.*

(emphasis added.)

74.    Similarly, according to the Securities Class Action, in a declaration filed on May 13, 2002 in connection with Canal+'s action against NDS, Jean-Marc Racine, the Director of Marketing for Canal+, and former CEO of Canal+, stated:

*[J]ust as Canal+ was getting a foothold in the U.S., the piracy of our conditional access system became known and Canal+' efforts to gain U.S. market share, based out of Milpitas and later Cupertino, were negatively impacted. A company's reputation, as well as market perception of the quality of its product is important in order to win new business, and the piracy of Media Guard had a negative impact on Canal+.*

I had several experiences with Canal+ customers that to me evidence the impact of the piracy of MediaGuard on Canal+' Northern California operations. For example, Canal+ Technologies, Inc. expended a great deal of resources tying to win a contract with Cablevision in New York. We lost this contract to NDS, and Cablevision told us that it was choosing NDS because NDS knew how to combat piracy better than Canal+. In another instance, I believe that NDS actively flaunted the hacking of Canal+' conditional access system when it was in competition with Canal+ to win a full end-to-end system contract from RCN, an over-builder based in Princeton, New Jersey, which has significant operations in major U.S. cities, including San Francisco. Canal+ Technologies, Inc.'s only real competition for the RCN business was NDS. Several times, RCN, which was in contact with NDS at the time, mentioned the piracy of MediaGuard that had occurred after our codes were published on DR7. *On May 29, 2001, RCN asked us to comment on several articles and other information contained on web sites regarding the hacking and counterfeiting of Canal+' smart cards. .
. .* This set of articles is extensive and had to take more than a few hours to prepare. It was sent by an RCN engineer who I believe was also in contact with NDS in this competition with Canal+. RCN asked us to justify why there was a piracy problem with our smart cards and told us that NDS had a much better solution and no piracy problem in Europe. *RCN postponed their decision on selecting a supplier for a new end-to-end system, but I believe that the piracy problem caused confusion and created doubts at RCN about the performance and quality of Canal+' products.*

*Since then, Canal+ Technologies, Inc. has successfully won only one contract in the United States*, WinFirst in Sacramento. As the piracy of MediaGuard became known, we have put management time and efforts into reassuring the customer. We had to set up a Security Committee and explain to the customer how to fight piracy, the legal actions taken in Europe, and the engineering steps that we would use and were using to combat piracy. These efforts would not have been needed if MediaGuard had remained secure. *The security problems associated with our conditional access system[s] have had a*

820154.1

> ***negative impact on the sales efforts in the United States of Canal+***
> ***Technologies, Inc. based in Cupertino.***

(emphasis added.)

75.    In addition, as the Securities Class Action alleged, on March 2, 2001, *New Media*

*Markets* reported:

> ***Some estimates put the level of piracy as high as 30 percent of the***
> ***pay-television subscriber base in Western Europe.***

\*        \*        \*

> The impact of piracy was made clear last month by Spanish pay-
> television group Sogecable, which runs both the Canal Satelite
> Digital digital-satellite platform and the Canal+ Espana premium
> service. The company, which has just over two million subscribers,
> said that pirate cards were being used by between 100,000 and
> 300,000 homes in Spain. ***This is hurting the premium channel and***
> ***pay-per-view services in particular.***

(emphasis added.)

76.    Despite the foregoing, when Vivendi reported its results for the quarter ended

March 31, 2002, the Company disclosed:

> Canal+ Premium Channel revenue fell 3% in the quarter because of
> lower advertising revenue and lower subscription revenue owing to
> lower average analogue subscribers.

In truth, and in fact, Canal+ premium channel revenue was materially adversely affected by the

undisclosed piracy of Canal+'s technology noted above. By failing to write down Canal+'s

goodwill under U.S. GAAP until the first quarter of 2002, Defendants misrepresented that this

known piracy had no effect on the Company's value and anticipated cash flow when this plainly

was false. Accordingly, Defendants violated SFAS 121 by continuing to represent publicly that

Canal+ was as valuable after this piracy (which Canal+ itself had estimated to cause harm in

excess of $1 billion), as it was before this theft.

34

77.     Moreover, although Defendants caused Vivendi to belatedly record goodwill impairments totaling €16.6 billion in the first quarter of 2002 under U.S. GAAP, after having taken no impairment charges under U.S. GAAP in FY 2001, and defendants downplayed the significance of these write-offs by attributing them to the adoption of a new accounting standard, SFAS No. 142, that changed the practice for goodwill accounting.[2] By delaying any recognition of goodwill impairment under U.S. GAAP, until after Vivendi had adopted SFAS No. 142, Defendants avoided having to admit that Vivendi's expected cash flows from its acquisitions had been materially impaired well before its adoption of the new accounting standard.

78.     Tellingly, following Messier's and Hannezo's ouster, the Company recorded an additional €3.8 billion impairment in the value Canal+'s goodwill at the end of the first half of 2002 under French GAAP, even though Canal+ had reported revenue growth of 8% during this period. The fact that Vivendi's new management took additional write-offs of Canal+'s goodwill during a period when its business was actually improving further evidences that the impairment should have been taken earlier.

**(ii)     U.S. Filter**

79.     Just as it did with Canal+, Vivendi similarly violated GAAP by failing to write down impaired goodwill for its U.S. Filter acquisition.   When Vivendi acquired U.S. Filter in September 1999, it paid approximately 46 times U.S. Filter's 1998 earnings. As a result, Vivendi recorded approximately €4.6 billion in goodwill for U.S. Filter.  However, Vivendi's reported goodwill on U.S. Filter was materially inflated during the Relevant Period because,

---

[2]     Prior to the June 2001 adoption of SFAS 142, companies were permitted to amortize goodwill over a period not to exceed forty years.  SFAS 142 prohibited the amortization of goodwill and required companies to carry goodwill on their balance sheets as an asset.

*inter alia*, (a) Vivendi was misstating U.S. Filter's reported revenue by improperly recognizing all of the revenue expected to be earned on multi-year contracts at the contracts' inception, as set forth more fully below at Section IV.B.4, *supra,* and (b) because companies comparable to U.S. Filter were sold during the Relevant Period at prices that were significantly less than what Vivendi had paid for U.S. Filter. (For example, although Vivendi paid 46.5 times U.S. Filter's purported operating profit when Vivendi acquired it in September 1999, in 2001 the German conglomerate RWE purchased a comparable U.S. water company, American Water, for only about 16 times earnings before interest and taxes). These events and circumstances confirmed that U.S. Filter's goodwill was impaired under U.S. GAAP prior to the fourth quarter of 2001. In the end, Vivendi recorded a staggering €2.6 billion impairment in the value of U.S. Filter's assets, but, in violation of U.S. GAAP, did not record this impairment until the end of the fourth quarter of 2001.

80.     After Vivendi's board ousted Messier and Hannezo, Vivendi's new management implicitly admitted that the goodwill impairments that prior management had recognized for entities other than Canal+ and U.S. Filter were also insufficient. For example, on August 14, 2002, Vivendi reported additional goodwill impairments (exclusive of those pertaining to Canal+) totaling €7.2 billion on a French GAAP basis for the three months ended June 30, 2002. By contrast, the Company's financial statements for the three months ended March 31, 2002 (prepared on a French GAAP basis) showed that no charge for goodwill impairment was recognized during the March 31, 2002 quarter.

### 3.     Defendants Improperly Consolidated Vivendi's Balance Sheet

81.     In addition to the failure to timely write down impaired goodwill that resulted in materially misstating Vivendi's financial results, Defendants also improperly consolidated

36

revenue from certain investments in which Vivendi possessed less than a 50% ownership

interest. This improper consolidation further inflated at least the Company's 1999, 2000 and

2001 revenues and operating income in violation of basic U.S. GAAP precepts.

82.    For example, Vivendi included in its consolidated financial statements for 1999,

2000 and 2001 the complete financial results of the French telecommunications company

Cegetel Group ("Cegetel"), and included in its 2001 consolidated financial statements the

complete financial results of the Moroccan telecommunications company Maroc Telecom S.A.

("Maroc Telecom"), despite the fact that Vivendi held only a minority interest in both

companies.

83.    GAAP permits the consolidation of related entities onto a company's balance

sheet when certain specific requirements are satisfied. Specifically, Accounting Research

Bulletin ("ARB") No. 51 provides:

> The purpose of consolidated statements is to present, primarily for the
> benefit of the shareholders and creditors of the parent company, the
> results of operations and the financial position of a parent company
> and its subsidiaries essentially as if the group were a single company
> with one or more branches or divisions. There is a presumption that
> consolidated statements are more meaningful than separate
> statements and that they are usually necessary for a fair presentation
> when one of the companies in the group directly or indirectly has a
> *controlling* financial interest in the other companies.

(emphasis added.)

84.    U.S. GAAP, however, limits the circumstances under which such consolidation is

proper. In general, majority control is a prerequisite for consolidation. ARB No. 51, as amended

by SFAS No. 94, provides:

> *The usual condition for a controlling financial interest is ownership*
> *of a majority voting interest*, and, therefore, as a general rule
> *ownership by one company, directly or indirectly, of over fifty*

37

> ***percent of the outstanding voting shares*** of another company is a
> condition pointing toward consolidation.

(emphasis added.) While majority control is typically required for consolidation, the Emerging

Issues Task Force's ("EITF") Abstract No. 96-16 permits minority shareholders possessing

certain rights to overcome the presumption that consolidation requires a majority voting interest

in certain limited circumstances. Specifically:

> The Task Force believes that minority rights (whether granted by
> contract or by law) that would allow the minority shareholder to
> effectively participate in the following corporate actions should be
> considered substantive participating rights and would overcome the
> presumption that the investor with a majority voting interest should
> consolidate its investee:
>
> 1. Selecting, terminating, *and* setting the compensation of
> management responsible for implementing the investee's policies and
> procedures; [and]
>
> 2. Establishing operating *and* capital decisions of the investee,
> including budgets, in the ordinary course of business.

EITF No. 96-16. While the Task Force noted that the above examples were merely illustrative

and not necessarily all-inclusive, U.S. GAAP clearly limits the circumstances under which

consolidation of entities in which a company owns less than 50% interest is permitted.

85.    In fact, APB 18, *The Equity Method of Accounting for Investments in Common*

*Stock*, provides special rules for accounting for an entity of which a company owns between 20-

50% and over which the company has the ability to exercise significant influence. Specifically,

APB 18 provides:

> In order to achieve a reasonable degree of uniformity in application,
> the Board concludes that an investment (direct or indirect) of 20% or
> more of the voting stock of an investee should lead to a presumption
> that in the absence of evidence to the contrary an investor has the
> ability to exercise significant influence over an investee. ***Under the***
> ***equity method, an investor recognizes its share of the earnings or***
> ***losses of an investee in the periods for which they are reported by***
> ***the investee in its financial statements***. An investor's share of

38

> earnings or losses from its investment is ordinarily shown in its
> income statement as a single amount. The Board recognizes that
> determining the ability of an investor to exercise such influence is not
> always clear and applying judgment is necessary to assess the status
> of each investment.

APB 18 (emphasis added).

86.    Vivendi violated U.S. GAAP by consolidating into its financial statements the

results of Cegetel, in which it held only a 44% interest, into its own results for 1999, 2000 and

2001, and the results of Maroc Telecom, in which it held only a 35% interest, into its own results

for 2001. Vivendi should have accounted for these entities using the equity method of

accounting, rather than fully consolidating their complete financial results into Vivendi's own

financial statements.

87.    In addition, Vivendi violated SFAS 95, *Statement of Cash Flows*, by improperly

consolidating entities whose cash it could not access. Specifically, SFAS 95 ¶ 15 of provides:

> The information provided in a statement of cash flows . . . should
> help investors, creditors, and others to (a) assess the enterprise's
> ability to generate positive future net cash flows; (b) assess the
> enterprise's ability to meet its obligations, its ability to pay dividends,
> and its needs for external financing . . .

Vivendi's disclosures concerning its cash flows, rather than helping investors to assess its ability

to generate positive future cash flows and its ability to meet its obligations, painted a materially

false picture of the Company's finances by including cash on its balance sheet that it had no right

to access.

88.    In addition, under French GAAP, exclusive control and the power to direct the

financial and operational policies of an enterprise is required in order to consolidate results.

Furthermore, French GAAP states that enterprises are *excluded* from consolidation where severe

39

and long lasting restrictions substantially call into question the control or influence exercised over the enterprise.

89.    Vivendi did not possess controlling financial interest in, at least, Cegetal and Maroc Telecom and therefore should not have consolidated the financial statements such companies with its own. Indeed, the Shareholder Agreement between Vivendi and Cegetel, as described in Vivendi's 2000 Form 20-F, contained a key clause that blocked Vivendi from making operating and capital decisions in the ordinary course of Cegetel's business. The clause states:

> If all of BT, Mannesmann and Transtel dissent, *we [Vivendi] cannot cause Cegetel Group to*:
>
> - create or acquire shares in any entity which Cegetel Group or companies it controls hold less than 100% of the shares and voting rights; or
>
> - subject to some exceptions, *acquire, dispose of, lease or loan a material amount of assets* or significantly reduce or cease *any material business operation*.

(emphasis added.)

90.    Further, with regard to Maroc Telecom, Vivendi disclosed in its 2001 Form 20-F that:

> In the course of the partial privatization of Maroc Telecom, Vivendi Universal was chosen to be a strategic partner in the purchase of an interest in Morocco's national telecommunications operator for approximately €2.4 billion. The transaction was finalized in April 2001, at which time Maroc ETm began to be consolidated in the accounts of Vivendi Universal, as we obtained control through majority board representation and share voting rights. As a leader in Moroccan telecommunications, Maroc Telecom operates 1.2 million fixed lines, has 3.7 million GSM clients and generated revenues of approximately €1.4 billion in 2001.

40

91.    Vivendi also disclosed in its 2001 Form 20-F that no other shareholders or groups of shareholders exercise substantive participatory rights, which would allow them to vote to block decisions taken by Vivendi Universal.

92.    This disclosure and the consolidation of Maroc Telecom's 2001 results were false and misleading because Vivendi only owned 35% of Maroc Telecom, and because the remaining 65% was held by a single entity – the Moroccan government. The Moroccan government did not conduct its operations based on the views of Vivendi.

93.    These improper consolidations caused Vivendi to misstate materially its financial results. Specifically, the improper consolidation of Cegetel's results with the Company's caused Vivendi to overstate its reported revenues by €3.9 billion, €5.1 billion and €6.4 billion for the years ended 1999, 2000 and 2001, respectively, while Vivendi's reported revenues were overstated in 2001 by an additional €1.4 billion as a result of the improper consolidation of Maroc Telecom, bringing its total overstatement for the year to €7.8 billion. Further, the improper consolidation of Cegetel and Maroc Telecom caused Vivendi to overstate its operating income, earnings before interest, taxes, depreciation and amortization ("EBITDA"), cash flow provided by operating activities, and reported growth rates during these years.

94.    In so doing, Vivendi overstated its reported revenue, operating income and EBITA and inflated its reported growth rates throughout the Relevant Period, providing a false impression that Vivendi had much higher revenue and income than it actually did. In turn, these falsified financial results ensured that the Company's share prices and credit ratings remained artificially high. Further, by creating the false impression that the Company could readily access these entities' cash to use for its own purposes, the improper consolidation of Cegetel and Maroc Telecom helped Defendants to conceal Vivendi's burgeoning liquidity crisis.

41

95.    When asked about the liquidity of the Company, Vivendi's CEO Jean-René

Fourtou ("Fourtou"), who became Vivendi's interim-CEO after Messier was forced to resign on

June 3, 2002, admitted in a June 26, 2002 conference call that "we do not have access to Cegetel

and Maroc Telecom." In an August 14, 2002 conference call with investors, Fourtou further

conceded that "Vivendi cannot access the cash flow generated by the companies [of which] it

owns less than 50%."

### 4.    Defendants Improperly Recognized Revenue

96.    In addition to failing to write down impaired goodwill and improperly

consolidating Cegetel and Maroc Telecom, Vivendi improperly recognized hundreds of millions

of revenue from (at least) its U.S. Filter subsidiary in violation of U.S. GAAP.

97.    It is a basic accounting maxim that revenue should not be recognized until it is (a)

realized or realizable and (b) earned. *See* CON No. 5, *Recognition and Measurement in

Financial Statements of Business Enterprises*. The conditions for revenue recognition ordinarily

are met when persuasive evidence of an arrangement exists, delivery has occurred or services

have been rendered, the seller's price is fixed and determinable, collectibility of the sales price is

reasonably assured and when the entity has substantially performed the obligations which entitle

it to the benefits represented by the revenue. *Id.* Generally, revenue should not be recognized

until the earnings process is complete. *See* SEC Staff Accounting Bulletin ("SAB") No. 101;

CON Nos. 2 and 5; SFAS No. 48; ARB No. 43; APB Opinion No. 10; and SOP 97-2.

98.    Further, SAB No. 101 provides that:

> Supply or service transactions may involve the charge of a
> nonrefundable initial fee with subsequent periodic payments for
> future products or services. The initial fees may, in substance, be
> wholly or partly an advance payment for future products or services.
> In the examples above, the on-going rights or services being provided
> or products being delivered are essential to the customers receiving

42

the expected benefit of the up-front payment. Therefore, the up-front fee and the continuing performance obligation related to the services to be provided or products to be delivered are assessed as an integrated package. In such circumstances, *the staff believes that up-front fees, even if nonrefundable, are earned as the products and/or services are delivered and/or performed over the term of the arrangement or the expected period of performance and generally should be deferred and recognized systematically over the periods that the fees are earned.*

(emphasis added; footnotes omitted.)

99.    Vivendi's Form 20-F for the fiscal year ended December 31, 2001 expressly represented that the Company was following these rules with regard to revenue recognition, stating:

> *Revenues on public service contracts are recognized as services are provided.* Amounts billed and collected prior to services being *performed* are included in deferred revenues.

(emphasis added.)

100.    In contravention of these clear rules and Vivendi's stated revenue recognition policies, Vivendi, throughout the Relevant Period, improperly recognized anticipated revenue from multiyear public service contracts upon signing the contracts. As the Securities Class Action alleged, a former officer of U.S. Filter contended that Vivendi Environmental, through its U.S. Filter subsidiary, materially overstated its operating results by employing a practice internally referred to as "booking backlog." Pursuant to such practice, Vivendi improperly recognized and reported the *entire dollar amount of long-term fixed price contacts as revenue upon the signing of the contract.* According to the complaint filed in the Securities Class Action, the former U.S. Filter officer stated that because of the illicit practice, U.S. Filter overstated revenue on major contracts *by as much as ten times*. In fact, Vivendi Environmental accounted for approximately 51% of Vivendi's reported revenues and operating income during

43

the year ended December 31, 2001, with its U.S. Filter subsidiary reporting €1.32 billion in total revenue in 2000.

101.    Vivendi's financial statements were materially overstated during the Relevant Period as a result of Defendants' improper recognition of revenue on U.S. Filter in violation of GAAP.    Indeed, according to the Securities Class Action, Vivendi's management directly or knowingly condoned and encouraged the process in which employees would improperly record revenue, thereby inflating reported revenue.    Further, the term "booking to backlog" was a phrase that was widely used among U.S. Filter personnel, and the phrase was even included in monthly reports given to the Executive Board of Vivendi Environmental, according to the Securities Class Action.

### 5.    Defendants Improperly Inflated Canal+'s Assets

102.    In addition to the failure to timely write down Canal+'s impaired goodwill as discussed above, Defendants materially and improperly inflated the reported value of Canal+'s assets on Vivendi's balance sheet in other respects.    Specifically, Vivendi reported as assets on its balance sheet €250 million in "marketing rights" that Canal+ purportedly acquired through contracts with five French football league clubs.    However, as set forth below, the purported "marketing rights" provided no economic benefit to Canal+ and, accordingly, could not properly be recorded as assets.

103.    According to the Securities Class Action, after Vivendi acquired Canal+, Hannezo reviewed a memorandum dated January 29, 2001 that disclosed that the purported "marketing rights" Vivendi was recording as assets on its financial statement actually belonged to the football league, not to the five individual teams with which Canal+ had contracted.    Accordingly, these "marketing rights" provided no economic benefit whatsoever to Canal+.    Even though this

44

memorandum flatly warned that recording these contracts as assets would put Vivendi in a "difficult" position with respect to U.S. GAAP reporting requirements, Defendants caused the Company to recognize these "marketing rights" as assets on its financial statements in violation of U.S. GAAP.

104.    CON No. 6, *Elements of a Financial Statement*, defines "assets" as "***probable future economic benefits*** obtained or controlled by a particular entity as a result of past transactions or events." (emphasis added). As set forth above, however, the "marketing rights" belonged to the football league, not the individual teams with which Canal+ had contracted. Accordingly, the "marketing rights" did not provide "probable future economic benefits" to Canal+ and were not "assets" within the meaning of CON No. 6. Vivendi recorded these rights as assets in its year-end financial statements for 2000, in violation of GAAP, which were filed with the SEC on July 2, 2001.

### 6.    Defendants Improperly Manipulated Vivendi's Reported EBITDA

105.    According to the SEC Action, in order to meet ambitious earnings targets, Vivendi, at the direction of its senior executives, improperly adjusted certain reserve accounts of its subsidiaries and made other accounting entries without supporting documentation and not in conformity with U.S. GAAP. As the SEC Action alleged, during the Relevant Period, Vivendi and the Individual Defendants referred to these improper efforts to meet or exceed earnings targets as "stretching."

106.    At the time of the Merger Transactions, Vivendi and Messier predicted that the Company would generate annual EBITDA growth of 35% during 2001 and 2002. According to the SEC Action, in order to assure that Vivendi would reach that target, during 2001 Vivendi improperly adjusted various reserve accounts and prematurely recognized income in a manner

45

that was not in conformity with U.S. GAAP, including, in certain instances, with SFAS No. 5, *Accounting for Contingencies*.

###### (i)    Improper EBITDA Adjustments during the Second Quarter of 2001

107.    As the SEC Action alleged, in late June 2001, Vivendi, Messier, Hannezo and other Vivendi executives became concerned that Vivendi's EBITDA growth for the quarter ended June 30, 2001 might not meet or exceed market expectations. As a result, Vivendi, at the direction of its senior executives, made various improper adjustments that artificially inflated Vivendi's EBITDA by almost €59 million, or 5% of the total EBITDA of €1.12 billion that Vivendi reported (excluding the results of the recently-acquired Maroc Telecom) for that quarter.

108.    According to the SEC, Defendants increased Vivendi's EBITDA primarily by causing Cegetel, in the weeks leading up to Vivendi's earnings release for the second quarter of 2001, to depart from its historical methodology for determining the level of its reserve for bad debts (accounts receivable) during the second quarter of 2001. That departure resulted in Cegetel taking a lower provision for bad debts during that quarter than its historical methodology required. *This improper departure caused Cegetel's bad debts reserve for the second quarter of 2001 to be €45 million less than it should have been. As a result, Vivendi's overall EBITDA for that period was increased by the same amount.*

109.    Under U.S. GAAP, SFAS No. 5 precludes the use of reserves, including excess reserves, for general or unknown business risks, and the systemic or time release of reserves into income. Further, paragraph 23 of SFAS No. 5 states that an estimate of losses on accounts receivable "normally depend[s] on, among other things, the experience of the enterprise . . . and appraisal of the receivables in light of the current economic environment."

46

110.    According to the SEC Action, Cegetel reduced its provision for bad debts during the second quarter of 2001 without the level of documentation and analysis that was required. Further, the decision to take a lower provision for bad debts in the second quarter of 2001 occurred at a time when Cegetel was actually having *more difficulty* collecting on its bad debts, according to the SEC Action.

111.    In addition to taking a lesser bad debt provision in the second quarter of 2001, Cegetel also, at the direction of Vivendi's senior executives, improperly deferred to the third quarter of 2001 approximately €14 million in provisions for potential future payments and potential liabilities that Cegetel properly should have booked in the second quarter of 2001, according to the SEC Action. Altogether, those adjustments at Cegetel totaled €59 million and enabled Vivendi to show overall EBITDA growth of 35% for the second quarter of 2001.

112.    Those accounting adjustments at Cegetel were made without proper supporting documentation and as a result, Vivendi's reconciled U.S. GAAP financial statements (which incorporated Cegetel's results) were therefore not in conformity with the requirements of SFAS No. 5.

### (ii)    Improper Adjustments of UMG's EBITDA

113.    According to the SEC Action, various improper adjustments to Vivendi's EBITDA also occurred in the third quarter of 2001, and primarily affected the results of its music division, UMG. These improper adjustments increased UMG's reported results for the quarter ended September 30, 2001 by at least €10.125 million, or approximately 4% of UMG's total EBITDA of €250 million for that quarter.

114.    The SEC Action alleged that Vivendi improperly increased UMG's results in order to reach a pre-determined EBITDA figure at UMG for the quarter ended September 30,

47

2001 of €250 million. At that level, UMG would have been able to show EBITDA growth of approximately 6% versus the same period in 2000, and to outperform its rivals in the music business.

115.    According to the SEC, Defendants caused at least two improper adjustments to be made to UMG's reported results in order to reach their €250 million EBITDA target. First, UMG prematurely recognized just over €3 million in deferred revenue that it received in connection with a contract between UMG and other parties, however, this payment would need to be refunded if Vivendi and the other parties to the contract failed to meet certain conditions by mid-December 2001. The recognition of this €3 million payment as income in the third quarter of 2001 was not in conformity with U.S. GAAP because those conditions were not met during the third quarter, and the payment remained refundable.

116.    Second, in late October 2001, Vivendi temporarily reduced the amount of corporate overhead charges it allocated to UMG by €7 million. This reduction in the corporate overhead charges equaled the exact amount of additional earnings that Vivendi's senior executives determined that UMG would need in order to reach €250 million in EBITDA for the quarter ended September 30, 2001, according to the SEC Action.

117.    This overhead allocation was not in conformity with U.S. GAAP, specifically CON No. 6, *Elements of Financial Statements*, which states that allocations should be assigned and distributed "according to a plan or a formula." Further, SFAS No. 131, *Disclosures about Segments of an Enterprise and Related Information*, provides that amounts allocated to reported segment profit or loss "shall be allocated on a reasonable basis." During the third quarter of 2001, Defendants based the overhead allocation charged to UMG not on a plan or formula, but

primarily on a desire to reach a predetermined, specific EBITDA target, according to the SEC

Action. This conduct was not in conformity with either CON No. 6 or SFAS No. 131.

118.    The SEC Action also alleged that both the corporate overhead adjustment and the

premature recognition of the contract revenue occurred _after_ UMG had submitted its accounts to

Vivendi for the quarter. Moreover, these accounting adjustments to UMG's EBITDA were made

without proper documentation and were not in conformity with U.S. GAAP. Vivendi

incorporated these inflated results into the Company's financial statements, causing Vivendi's

financial reports, press releases, and other market communications to be materially false and

misleading, as alleged below in Section V.

### 7.    Defendants Failed to Disclose
### Vivendi's 2% Interest in Elektrim Telekomunikacja

119.    In 1999, Vivendi made a €1.198 billion investment in a joint venture with

Elektrim Telekomunikacja ("ET") that gave the Company a 49% interest in a company that

controlled Polish mobile telephone operator PTC and Polish cable operator Bresnan. On June

28, 2001, Vivendi announced a memorandum of understanding pursuant to which it would

increase this stake from 49% to 51% via an additional €100 million investment.

120.    According to the SEC Action, after this announcement, Vivendi learned that

Poland's antitrust authorities would have to approve the acquisition, a process that could have

taken several months. Vivendi also learned that the market in general, and the credit rating

agencies in particular, might react negatively to Vivendi's acquisition of additional ET shares.

The SEC Action alleged that, as a result, rather than directly purchasing the 2% interest in ET,

Vivendi deposited $100 million into an investment fund administered by Société Générale Bank

& Trust Luxembourg. That fund subsequently purchased a 2% stake in ET in September 2001.

121.    Vivendi did not disclose all material details about this transaction until 2003.

Instead, Vivendi's 2001 Form 20-F stated only the following concerning Vivendi's interest in

ET:

> Participation in Elektrim – In September 2001, Elektrim
> Telekomunikacja (ET), in which Vivendi Universal has a 49%
> interest, acquired all of Elektrim S.A.'s landline telecommunications
> and Internet assets.

122.    Vivendi failed to consolidate ET's results into its own in violation of ARB 51,

*Consolidated Financial Statements*, SFAS 94, *Consolidation of All Majority-Owned*

*Subsidiaries*, and APB No. 18, *The Equity Method of Accounting for Investments in Common*

*Stock.* Notably, APB No. 18, required Vivendi to apply the equity method of accounting to its

ET investment. Under APB No. 18, Vivendi was required to recognize its share of ET's

earnings or losses in its financial statements.

123.    Unfortunately for Vivendi, ET, which it was not only permitted but required to

consolidate under GAAP, was losing money instead of making it. In fact, according to the

Norges Bank Action, Vivendi disclosed in its Forms 20-F that ET's net loss €31 million and €28

million in 2000 and 2001, respectively. To avoid having to record ET's losses on its own

balance sheet, Vivendi flouted GAAP by opting simply to not consolidate ET. Vivendi

overstated its income by failing to consolidate ET's results into its own following its acquisition

of majority control of that entity.

**C.    Defendants Concealed Vivendi's Growing Liquidity Crisis**

124.    Vivendi's costly acquisitions left the Company cash strapped, creating a liquidity

crisis that threatened its very survival. In addition to the improper accounting discussed above,

Defendants took active steps to conceal this growing liquidity crisis, hoping to thereby prop up

the Company's stock and assure its continued access to financing.

50

125.    However, during the Relevant Period, Defendants also repeatedly made material misstatements and omissions concerning the Company's liquidity.  Unbeknownst to Plaintiffs, investors or the financial markets, and contrary to Defendants' repeated assurances that the Company was in strong financial condition, Vivendi's implementation of its growth-by-acquisition strategy caused it to overpay for businesses and saddled the Company with a huge debt burden that the operations of the acquired businesses could not satisfy.

126.    As a result, Vivendi was under great strain to meet its obligations in the ordinary course as they came due.  The causes of Vivendi's liquidity problems included the following:

### 1.    Defendants Failed to Disclose Vivendi's Inability to Generate Expected Cash Flows from the Company's Costly Acquisitions

127.    A number of Vivendi's most significant acquisitions, including, as set forth above, Canal+ and U.S. Filter, were not generating the expected revenue that would have been required to justify Vivendi's publicly-reported "goodwill."  Defendants engaged in the improper accounting described above in an effort to conceal from Plaintiffs and the investing public that the cash flows from these massive and costly acquisitions were falling far short of expectations.

### 2.    Defendants Failed to Disclose the Insufficiency of Vivendi's Working Capital

128.    Further, Defendants failed to disclose the insufficiency of Vivendi's working capital.  Item 5B of the Instructions to Form 20-F required Vivendi's to include "a statement by the company that, in its opinion, the working capital is sufficient for the company's present requirements, or, if not, how it proposes to provide the additional working capital needed."  In addition, Paragraph 49 of CON 1, *Objectives of Financial Reporting By Business Enterprises*, provides:

> Financial reporting should provide information about how an enterprise obtains and spends cash, about its borrowing and repayment of borrowing, about its capital transactions, including

51

> cash dividends and other distributions of enterprise resources to
> owners, and about other factors that may affect an enterprise's
> liquidity or solvency.

CON 1 at ¶ 49. Defendants failed to comply with the Instructions for completing their Forms 20-F and violated CON 1 by, as set forth above, failing to disclose that (1) cash from Cegetel and Maroc Telecom was not available to the Company, even though the results of these entities were consolidated in Vivendi's financial results, and (2) the Cegetel current account—as described below—severely impacted the Company's liquidity.

### 3.   Defendants Failed to Disclose Certain Off Balance Sheet Liabilities

129.   During the Relevant Period, Defendants misled investors about an off-balance sheet liability that further threatened Vivendi's liquidity and ultimately cost Vivendi hundreds of millions of dollars and impaired Vivendi's liquidity crisis. According to the Securities Class Action, in late 2000 and 2001, Defendants wagered on the future success of the Company by selling put options to raise cash to fund executive compensation. These put options obligated Vivendi to purchase in the future at least 22.8 million of its own shares, or approximately 2% of all outstanding Vivendi stock, at an average price of €69. Even as Vivendi's share price dropped during 2001 and the first half of 2002, making it increasingly likely that the Company would take a large loss on the options, Defendants continued to conceal the true nature and extent of these liabilities, and to misrepresent Vivendi's true liquidity condition. Moreover, even when Defendants finally made limited disclosures of its put obligations in the spring of 2002, the disclosures were woefully inadequate. For example:

(i)   As the Securities Class Action alleged, after being criticized by the French press for concealing the risk connected to the options, Vivendi claimed that defendant Hannezo went over the put options with analysts at an accounting workshop March 6, 2002 in

Paris. However, as the May 1, 2002 edition of *The Wall Street Journal* reported, "***analysts who were present or listened in said Vivendi glossed over the issue***," [emphasis added] and Vivendi admitted that discussion of the puts was "easy to miss" at the accounting workshop. Moreover, the slide presentation from this workshop, belatedly filed with the SEC as an exhibit to Vivendi's May 2, 2002 Form 6-K did not mention Vivendi's put obligations.

　　　　　　　　(ii)　　　On April 15, 2002, Vivendi disseminated its annual report on Form 6-K for FY 2001 which contained a translation of its 2001 year end financial statements. This translation also made only vague reference to Vivendi's put obligations:

> In connection with the sale of puts on its shares, Vivendi Universal had a commitment, at December 31, 2001, to buy 19.7 million shares at exercise prices ranging from €60.40 to €80.00 in 2002 and 3.1 million shares at an exercise price of €50.50 in January 2003.

Vivendi's annual report therefore did little to clarify the details of Vivendi's risks and obligations in connection with the put options. For example, other than specifying that Vivendi could be forced to purchase 3.1 million shares in January 2003, the report failed to inform investors of the scope, if any, of the Company's obligations with respect to the puts after December 31, 2001. The report also failed to comment on whether the options were likely to be exercised given the decline in Vivendi's stock price, or their potential adverse impact on Vivendi's liquidity.

　　　　　　　　(iii)　　　On April 18, 2002 (as later reported on May 1, 2002 by *The Wall Street Journal*) Laura Martin ("Martin"), who headed Vivendi's investor-relations departments, sent an e-mail to selected analysts that purported to clarify Vivendi's obligations with respect to the put options:

> In a sign that Vivendi itself was conscious it hadn't made clear enough the consequences of the put options, Laura Martin, who heads the company's investor-relations department, sent an e-mail to four analysts on April 18 spelling the put options out clearly.

> In the e-mail, Ms. Martin said Vivendi had 18 million put options outstanding that the company sold to undisclosed parties for 12 euros each and that carry an exercise price of 69 euros. She estimated the impact on the company's balance sheet at 50 million euros to 1.2 billion euros. The e-mail went on to say that, though previously raised at the [March 6, 2002] accounting workshop, the put options "were easy to miss."

Still, Martin's "selective disclosure" failed to state the timetable for Vivendi's future obligations, preventing analysts and investors from making a reasonable assessment with regard to Vivendi's cash flow for the immediate future. In addition, Martin's range of potential liability was rendered meaningless by its impossibly large scope and failure to reference when the obligation would come due.

       (iv)    It was therefore not until May 28, 2002, in its 2001 Form 20-F, that Vivendi began to inform investors about its true potential adverse effects ensuing from the put options:

> Except for one put sold in 1998, Vivendi Universal in 2001 sold puts to banks on 19.7 million ordinary shares at exercise prices ranging from €60.40 to €80.00 in 2002 and 3.1 million ordinary shares at an exercise price of €50.50 in January 2003. As of April 30, 2002, approximately 16 million of these puts remain outstanding . . . .

> Vivendi Universal's contingent liability relating to these puts is approximately €1.1 billion to settle the 16 million puts outstanding for cash at an average of €69 per put and approximately €540 million to settle the 16 million puts outstanding for cash by paying the banks the difference between the average of €69 per put and the market price per ordinary share of Vivendi Universal as of April 30, 2002.

A later June 7, 2002 article in the *Economist* reported that Hannezo had confirmed that Vivendi was using cash each month to buy out the costly put options.

       (v)    In its 2002 half year financial statements released August 14, 2002, Vivendi disclosed the impact its put obligations had during the first six months of 2002 alone:

As at June 30, 2002 and December 31, 2001, Vivendi Universal had outstanding obligations on 13.9 million and 22.8 million shares respectively. The average exercise prices were €69 and €70 respectively, giving a potential commitment of €953 million and €1,597 million respectively. These put options are only exercisable on the specific date of the option and expire at various dates during 2002 and the first quarter of 2003.

\*        \*        \*

The cost to Vivendi Universal during the first half of 2002 by option holders exercising their rights amounted to €239 million.

### 4.    Defendants Failed to Disclose Acceleration Clauses in Vivendi's Loans

130.    Further, Vivendi failed to disclose that maturity dates on major loans would accelerate in the event of a downgrade in Vivendi's credit rating.  Specifically, according to the Norges Bank Action, an acceleration clause in one of Vivendi's loan agreements provided that it could be required immediately to settle €3.5 billion worth of "return swap" derivative transactions if its credit rating were to slip.

131.    Vivendi violated the SEC's Instructions for filing Forms 20-F by failing to disclose these acceleration clauses. Item 5B of the Instructions to Form 20-F required the Company to disclose "information on the level of borrowings at the end of the period under review, the seasonality of the borrowing requirements and *the maturity profile of borrowings and committed borrowing facilities, with a description of any restrictions on their use*." Item 5.B(1)(c) (emphasis added).  Vivendi failed to disclose a very significant restriction on its use of the funds it had borrowed—namely, that it could be required to return immediately all amounts outstanding if its credit ratings slipped.

55

5.    **Defendants Failed to Disclose Material**
      **Commitments Concerning Cegetel and Maroc Telecom**

132.    According to the SEC Action, in key meetings with analysts from Moody's

Investors Services ("Moody's") and Standard & Poor's in December 2001, and in its Forms 20-F

for 2000 and 2001, Defendants failed to disclose future commitments regarding Cegetel and

Maroc Telecom that would have revealed grave doubts about the Company's ability to meet its

cash needs.

(i)    **Cegetel's Current Account**

133.    In the summer of 2001, Defendants caused Vivendi to enter into an undisclosed

current account with Cegetel, its most profitable and cash-flow positive subsidiary. Under this

current account—which operated in much the same manner as a loan—Cegetel delivered excess

cash to Vivendi on a short-term basis beginning in August 2001. Vivendi paid Cegetel a market

rate of interest and agreed to return the funds at the expiration of the current account agreement

on December 31, 2001.

134.    As the SEC Action alleged, Vivendi maintained cash pooling arrangements with

most of its subsidiaries, it treated the funds it received from Cegetel differently than it treated

these other pooling arrangements. In addition to the specific December 31, 2001 expiration date,

the Cegetel current accounts contained an "on demand" clause that entitled Cegetel to demand

immediate reimbursement of the funds it deposited with Vivendi at any time.

135.    According to the SEC Action, Cegetel gave Vivendi approximately €520 million

pursuant to the current account in August 2001. This account balance ballooned between

September 2001 and June 2002, at times exceeding €1 billion. Vivendi used the money Cegetel

gave it under the current account to pay for ordinary operating expenses.

56

136.    Cegetel's right to demand immediate reimbursement of the funds it provided to

Vivendi under the current account had a direct impact on the Company's liquidity.  Vivendi,

however, declined to disclose the existence of this account in its 2001 Form 20-F.  Item 5B(1)(b)

of the instructions for filing Form 20-F, *Liquidity and Capital Resources*, required Vivendi to

include in its financial statements the nature and extent of any legal or economic restrictions on

the ability of subsidiaries to transfer funds to the Company and to disclose the impact such

restrictions have had or are expected to have on its ability to meet its cash obligations.  Vivendi

failed to make the required disclosure in violation of Item 5B(1)(b).

137.    Similarly, Vivendi's failure to disclose the current account violated Item 303 of

SEC Regulation S-K.  Item 303 requires issuers to identify any known "demands, commitments,

events or uncertainties that will result in or that are reasonably likely to result in the registrant's

liquidity increasing or decreasing in a material way."  Vivendi violated Item 303 by failing to

disclose the Cegetel current account.

138.    In addition to violating SEC regulations, Vivendi violated U.S. GAAP by failing

to disclose the Cegetel current account.  Paragraph 2 of SFAS 57, *Related Party Disclosures*,

provides:

> Financial statements shall include disclosures of material related
> party transactions, other than compensation arrangements, expense
> allowances, and other similar items in the ordinary course of business
> ... The disclosures shall include:
>
> a.    The nature of the relationship(s) involved;
>
> b.    A description of the transactions, including transactions to
> which no amounts or nominal amounts were ascribed, for each of the
> periods for which income statements are presented, and such other
> information deemed necessary to an understanding of the effects of
> the transactions on the financial statements;

c.      The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and

d.      Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

Transactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist. Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated.

(emphasis added). Vivendi violated SFAS 57 by failing to disclose the Cegetel current account.

### (ii)    The Maroc Telecom Side Agreement

139.    In February 2001, Vivendi entered into a side agreement with Maroc Telecom to purchase an additional €1.1 billion stake in that entity. Defendants failed to disclose this side agreement.

140.    As discussed in Section IV.B above, Vivendi acquired a 35% stake in Maroc Telelcom in December 2000. As the SEC Action alleged, in February 2001, Vivendi entered into a side agreement with the Moroccan government that required the Company to purchase an additional 16% of Maroc Telecom's shares in February 2002 for approximately €1.1 billion. In return, the Moroccan government granted Vivendi certain management rights over the Telecom's operations that Vivendi used to justify its consolidation on the Company's financial statements. This side agreement was not disclosed in Vivendi's public filings in 2001 and early 2002. By failing to disclose this €1.1 billion liability, Defendants were able to conceal Vivendi's burgeoning cash crunch and were able to keep the Company's stock prices and credit ratings at artificially high levels during the Class Period.

58

**6.    Defendants Failed to Disclose Vivendi's 2001 Stock Buybacks**

141.    Further exacerbating Vivendi's cash flow situation was defendant Messier's

undisclosed and massive stock buy-back program, which – unbeknownst to Plaintiffs and

investors – caused the Company to spend approximately $6.3 billion of the Company's cash on

acquiring Vivendi shares.  As later reported in *The Wall Street Journal* on October 31, 2002:

> Mr. Messier, a former top investment banker with Lazard LLC, was
> famously fond of deal making.  But now it turns out he pursued many
> more deals than has been publicly known.  ***More important, he spent
> billions of dollars buying back Vivendi stock on the market last year
> without consulting his CFO or the board, according to people
> familiar with the situation.  Trying to prop up the stock price, he
> instead only sent Vivendi's debt soaring.***
>
> *      *      *
>
> The board signed off on Mr. Messier's acquisitions.  But it did so
> without knowing the full extent of his spending spree, current and the
> board about his single biggest expenditure: the purchase of 104
> million Vivendi shares, or nearly 10% of the company's equity, on the
> stock market during 2001.  His purpose was to prop up the share
> price.  The cost: $6.3 billion.
>
> Shareholders had earlier approved a resolution allowing Vivendi to
> buy back up to 10% of its shares.  But current and former directors
> say they expected to hear beforehand about such massive purchases.
>
> *      *      *
>
> Mr. Hannezo opposed the stock purchases as a waste of cash . . . .
> This resulted in Mr. Messier trying to circumvent his CFO on the
> buybacks.  The ex-chairman placed his stock orders by phone the two
> mid-level employees in the finance department, Hubert Dupont
> Lhotelain and Francois Blondet, according to a person familiar with
> the matter . . . .
>
> In early December 2001, the CFO finally intervened by forbidding
> his subordinates to take Mr. Messier's phone calls, the person
> familiar with the situation says Mr. Hannezo set up a formal process
> to slow Mr. Messier down, requiring that the chairman request
> buybacks in writing, along with some justification.
>
> *      *      *

59

> By December, the buybacks had taken their toll: Vivendi was running
> out of cash, according to Mr. Hannezo's memo to the COB.

(emphasis added.)

### 7.    <u>Magnitude of the Undisclosed Liquidity Crisis</u>

142.    As subsequently reported on October 31, 2002 by *The Wall Street Journal* in an

article entitled "How Messier Kept Cash Crisis at Vivendi Hidden For Months: Media Giant Was

At Risk Well Before Investors Knew," Vivendi's acquisition spree, together with the other

factors referenced in the preceding paragraphs, had put Vivendi on the brink of financial

collapse:

> On Dec. 13, [2001], Guillaume Hannezo sent Jean-Marie Messier,
> chairman of Vivendi Universal SA, a desperate handwritten plea.
>
> *"I've got the unpleasant feeling of being in a car whose driver is
> accelerating in the turns and that I'm in the death seat,"* wrote Mr.
> Hannezo, the company's chief financial officer. *"All I ask is that all
> of this not end in shame."*
>
> That very day, unknown to investors and the Vivendi board, the
> company had narrowly averted a downgrade by credit-rating
> agencies, which would have made it difficult to borrow money and
> plunged the company into a cash crisis. Mr. Hannezo (pronounced
> AN-ZO) implored his boss and longtime friend to take serious steps
> to reduce Vivendi's ballooning debt.
>
> When the company's board met the next day to consider whether to
> approve a roughly $10 billion acquisition of USA Networks Inc.'s
> TV and film businesses, *Mr. Messier made no mention of the close
> call with the rating agencies. Instead, when a director asked about
> Vivendi's financial profile, Mr. Messier said the company had no
> problem, according to two directors who were there.*
>
> The board endorsed the USA Networks deal, buying Mr. Messier's
> pitch that it would help complete Vivendi's transformation from a
> onetime water utility into an entertainment giant. He boasted that the
> company would be able to distribute the movies and music made by
> its Universal Studios and Universal Music units by means of cellular
> devices, as well as by satellite, cable and pay television.

> But Vivendi was already in dire financial straits. The USA Networks deal, along with a $1.5 billion investment in satellite-TV operator EchoStar Communications Corp., in fact signaled the beginning of the end for Mr. Messier. The boy wonder of the French business establishment was ousted seven months later in July, after directors discovered the company was skirting close to a bankruptcy filing.
>
> As new management struggles to salvage the French conglomerate, it has become clear that Vivendi came close to financial disaster far earlier than previously thought. ***That picture is starkly at odds with the one repeatedly presented by Mr. Messier to investors and his board.***

(emphasis added.)

143.    Similarly, citing an article first appearing in *Le Monde*, Bloomberg reported on

May 14, 2002 that Vivendi was close to insolvency at the end of 2001:

> Vivendi Universal SA, the world's second-largest media company, was close to insolvency at the end of 2001 after delays in planned asset sales, French daily Le Monde said, without citing anyone.
>
> Delays in the sale of the Seagram liquor unit and a French magazine business caused a "serious cash crisis" at the Paris-based company, which faced payments of about 10 billion euros ($9 billion) at the end of last year, the paper said. Today, Vivendi's businesses "barely produce the cash needed to pay the bills," according to the report . . .
>
> Vivendi's cash woes help explain why the company sold 55 million of its own shares in January, 9 percent of Vivendi Environnement SA, as well as its stake in AOL Europe and British Sky Broadcasting Plc, Le Monde said. Since the beginning of the year, Vivendi shares have lost half their value.

144.    Although Defendants denied any pending liquidity crisis in response to the *Le*

*Monde* report and reassured investors during the spring and early summer of 2002 that Vivendi

could meet its obligations for the next 12 months, in reality the Company continued to teeter on

the edge of bankruptcy.

145.    Similarly, on September 27, 2002, the AFX News reported:

820154.1

Vivendi Universal chairman Jean-Rene Fourton said the company would have been forced to declare bankruptcy within 10 days if Jean Marie Messier had not resigned, according to a report in Le Figaro.

146.    On December 13, 2002, the *Associated Press* reported, based on an article first appearing in *Le Monde*, that defendant Hannezo admitted that 2001 was marked by a series of errors, including underestimating the debt problem:

> Electronic mail seized in an investigation of alleged financial irregularities at Vivendi Universal and other documents show escalating tension amid a growing debt crisis that led to the fall of flamboyant Chairman, Jean-Marie Messier.
>
> Board member Edgar Bronfman Jr. of Canada's Seagrams empire, which was purchased by Vivendi in 2000, warned Messier in an e-mail that he could be courting danger with his "very costly personal shows," according to Friday's edition of the newspaper Le Monde.
>
> And former Financial Director Guillaume Hannezo, in a note to France's stock exchange watchdog, said Messier had turned Vivendi into a "permanent deal machine," while an "urban guerrilla atmosphere" gripped a divided board, the newspaper said.
>
> \*       \*       \*
>
> Hannezo, the former finance director, said in his 20-page report to the COB that 2001 was marked by the "accumulation of a series of errors," including underestimating that the debt problem, according to Le Monde.
>
> \*       \*       \*
>
> Hannezo, a key figure in the COB investigation, speculated that Vivendi could have been spared its debt mountain in 2001 "had it resolved to sell before buying . . . . Unfortunately, it oriented itself toward the inverse choice, satisfying itself with potential riches," he wrote.  Vivendi's shares have tumbled around 75 percent this year.

## D.    The Truth Begins to Emerge

147.    On May 3, 2002, Moody's downgraded Vivendi's long-term debt rating to Baa3, just one level above the "junk" status assigned to speculative investments.  Moody's attributed

the ratings drop to concerns that Vivendi might not be able to reduce its debt load as quickly and

comprehensively as the Company had planned.

148.    In response to the ratings downgrade, Vivendi issued a press release which

contended that Moody's purportedly failed to consider the poor market conditions or the full

extent of Vivendi's debt reduction program.  In a Form 6-K that Vivendi issued that same day,

Defendants tried to assure the market that Moody's downgrade would have no adverse affect on

Vivendi, stating:

> This decision has no impact on Vivendi Universal's cash situation.  It
> does not trigger any renegotiation clauses or advance repayments of
> bank credit lines.  In addition, Vivendi Universal's use of commercial
> paper in the current amount of 1.6 billion euros is well covered by
> back-up lines of more than 3 billion euros, the availability of which
> will not be affected by the rating change.
>
> Vivendi Universal affirms that it has every confidence in its ability to
> meet its operating targets for 2002, as proved by its first-quarter
> results.  The company is totally determined to carry through its debt
> reduction program in order to make a rapid return to a comfortable
> position with a Baa2 rating.

Despite the Company's effort to reassure the market, Vivendi's ADSs dropped $1.74, from

$30.76 to $29.07, in response to Moody's rating downgrade.  The Company's ordinary shares

suffered similar declines, dropping from €33.77 to €31.52.

149.    By May 29, 2002, with Vivendi's ADSs trading in the $29 to $30 range and its

ordinary shares trading in the €31 to €33 range in response to concerns about its debt levels,

Defendants sought to reassure the financial markets by issuing a press release (also filed on a

Form 6-K) reflecting a May 29, 2002 board meeting.  The press release stated that Vivendi's

board had "carried out a detailed examination of Vivendi Universal's operating and financial

targets for 2002."  According to the press release, the board stated that their strategy was "based

on the active continuation of the debt reduction program and the internal growth of the
company's businesses." Messier was quoted as follows:

> Our Board of Directors and management are proceeding together,
> deliberately and decisively, to execute a plan that, in meeting our
> financial targets and operating objectives, will deliver increased value
> and solid growth to our Company. I look forward to the
> recommendations of our newly created governance committee,
> which, I believe, will have an added contribution by continuing to
> improve the structures and procedures that insure an absolute and
> impartial focus on the Board's fiduciary duty to stakeholders.

150.    While the Company sought to assure investors that it was not facing a liquidity

crisis, rumors that Vivendi was in danger of default on its credit facilities persisted. On July 2,

2002, Vivendi's debt was downgraded for a second time. This announcement caused Vivendi's

ADSs to plummet nearly 21%, falling from $22.45 to $17.76, while its ordinary shares fell more

than 25%, from €23.90 to €17.80. The Company's shares dropped so rapidly that the Paris

Bourse repeatedly suspended trading in the embattled conglomerate's ordinary shares.

151.    Vivendi swiftly ousted Messier the following day, and admitted that the Company

was facing a "short-term liquidity issue." Vivendi disclosed that it would be required to repay

creditors €1.8 billion by the end of July 2002 and that €3.8 billion in credit lines were up for

renegotiation. Further, credit analysts estimated that Vivendi could face a cash shortfall of €2.7

billion by the end of 2002 – an amount they feared could expand to €5.5 billion by the middle of

2003 if the Company failed quickly to secure new multibillion-euro lines of credit. These

announcements caused the Company's ADSs and ordinary shares to fall even further, dropping

nearly another 12% on July 3, 2002 from $17.76 to $15.66 and nearly another 22% from €17.80

to €13.90, respectively. All told, the Company's ADSs and ordinary shares fell a stunning 30%

and 41.8%, respectively, in the two days following the second credit rating downgrade.

64

152.    According to the Norges Bank Action, on July 5, 2002, *The Globe and Mail Metro*, a Canadian newspaper, reported that Vivendi "finally admitted what its ousted chairman and chief executive officer, Jean-Marie Messier, had strenuously denied in recent weeks: The media-and-utility conglomerate is in danger of a cash crunch." *The Globe and Mail Metro* further stated:

> Based on a detailed liquidity statement Vivendi put out late Wednesday, credit analysts estimate that Vivendi could face a cash shortfall of 2.7 billion euros ($2.64 billion U.S.) by the end of the year, expanding to as much as 5.5 billion euros by the middle of 2003, unless it can quickly secure a new multibillion-euro credit line from its lenders.

*    *    *

> In its statement, Vivendi said it must repay 1.8 billion euros this month and said the payment would be financed from 2.4 billion euros in existing cash and credit lines. It also has a 3.8-billion-euro credit line that will roll over this month unless the banks determine there has been a "material adverse change" with the company.

> This grim outlook contrasts with Mr. Messier's recent assurance that the "treasury situation" at Vivendi--owner of Universal Studios, Universal Music Group, USA Networks and minority stakes in a host of other assets-was "comfortable even in the most pessimistic market hypotheses."

153.    On July 10, 2002, *The Wall Street Journal* reported that the COB had raided Viviendi's Paris headquarters as part of a formal investigation into the Company's financial disclosures going back to 2001. The French investigation had been opened to look into alleged "publication of false balance sheets for the tax years closing December 31, 2001 and December 31, 2002" and the publication of false and misleading information concerning the Company's financial outlook for those years.

154.    On July 16, 2002, Vivendi announced that Hannezo was relieved of his CFO

duties at Vivendi and would stay with Vivendi for six months as an advisor to the new chairman.

A July 17, 2002 research report by BNP Paribas Equities stated:

> This is no surprise. Guillaume Hannezo was very close to Jean-Marie
> Messier. *The group's financing packages and strategy were as
> much his as Messier's.*

(emphasis added.)

155.    Unfortunately for Vivendi's investors, the stunning collapses of early July 2002

only foreshadowed drops still to come.

156.    On August 14, 2002, the Company's new management held a conference call and

issued three press releases (filed with the SEC on Forms 6-K) informing the public of just how

dire Vivendi's financial situation had become.

157.    The first press release memorialized the August 14 conference call. In it, Fourtou

stated that:

> In the short term, due to the structure of our debt, we are facing a
> liquidity problem . . . in spite of the value of our assets. That's why
> the first thing I did upon my arrival was to negotiate . . . a new bank
> facility of 1 billion euros. This new money has not yet been used. As
> announced in July, we are presently negotiating a new facility of 3
> billion euros which will include the first 1 billion euros. We have
> reached a framework for agreement with the same seven banks and
> we expect this new facility to be signed by the end of August. This
> will allow Vivendi to buy the time necessary to implement the best
> conditions for the necessary sale of the businesses. . . .

158.    The second August 14 press release reported on a August 13, 2002 Board meeting

and announced that the Board had, among other things, approved a plan to dispose of at least €10

billion worth of assets, including €5 billion in the next nine months; voted to sell Houghton

Mifflin Co.; and authorized the cancellation of 20,865,167 treasury shares linked to certain stock

option plans.

820154 1

159.    The final August 14 press release and Form 6-K announced Vivendi's results for the first half of 2002, and reported that "[n]et income was a loss of 12.3 billion euros, representing negative 11.32 euros per basic share, for the first half of 2002." Further, the press release highlighted the €11 billion goodwill impairment charge and the "financial provisions of 3.4 billion euros" that were recorded at June 30, 2002. Net income was negative €66 million, "or negative 0.06 euros per basic share in the first half of 2002 compared with positive 0.27 euros earnings per basic share in the 2001 period." Debt under French GAAP was approximately €35 billion. The Board also laid out its commitment to "raising at least 10 billion euros through asset sales during the next two years, 5 billion euros of which will be completed during the next 9 months."

160.    In response to the news, debt-rating agency Standard & Poor's slashed Vivendi's long-term corporate credit that same day and warned of a further downgrade if Vivendi could not secure new funding within a month. Fourtou was quoted by the Associated Press on August 14, 2002 as stating: "We are facing a liquidity problem, [and I will] try to avoid any fire sale, but we have negotiations that could be concluded very soon if the price was lowered." The news report also stated:

> Vivendi Universal, the teetering French media conglomerate, reported a massive loss of $12 billion for the first half of the year and said it will sell $10 billion in assets as it seeks to pare debt, including the U.S. publisher Houghton Mifflin. Adding insult to injury, a ratings agency downgraded the company's debt to junk.
>
> The sale of Houghton Mifflin, which the company only bought last year for $1.7 billion, appeared to mark a first step toward breaking up the entertainment and media empire built up by Vivendi's former chairman, Jean-Marie Messier, in a whirlwind of costly acquisitions. In all, Vivendi said it hopes to dispose of at least $9.8 billion worth of assets - half of them within nine months, the rest within two years.

161.    In response to these developments, on August 14, 2002, Vivendi ordinary shares closed at €11.89, down more than €4 (or approximately 25%) from its close the previous day. Vivendi's ADSs suffered a similar decline, closing down $3.67 at $11.66.

162.    In the wake of the public admission that the Company was facing a cash crunch, Vivendi's new management set about the process of raising revenue by jettisoning some of the conglomerate's major assets.  Media reports indicated that the Company had enough cash to last only until October 2002, putting Vivendi in a dire position.  In response, Vivendi announced an ambitious plan to shed €16 billion in assets between July 2002 and the end of 2004.  As the Norges Bank Action alleged, Vivendi's "garage sale" included the following dispositions:

| Date | Disposition | Price |
|------|-------------|-------|
| July 2002 | B2B/Health | €150 million |
| July 2002 | Lagardére | €44 million |
| July 2002 | Vinci | €291 million |
| December 2002 | Vizzavi | €143 million |
| December 2002 | Houghton Mifflin | €1.567 billion |
| December 2002 | VUP publishing activities in Europe | €1.138 billion |
| December 2002 | Veolia Environment | €1.865 billion |
| December 2002 | EchoStar | €1.037 billion |
| December 2002 | Sithe Energies, Inc. | €319 million |
| February 2003 | Consumer Press division | €200 million |
| February 2003 | Canal+ Technologies | €191 million |
| April 2003 | Telepiù | €831 million |
| May 2003 | Fixed-line telecommunication in Hungary | €315 million |

68

| May 2003 | Comareg | €135 million |
| May 2003 | Interest in Vodafone Egypt | €43 million |
| June 2003 | InterActive Corp. warrants | €600 million |
| June 2003 | Interest in Sithe International | €40 million |
| June 2003 | VUE real estate | €276 million |
| October 2003 | Canal+ Nordic | €48 million |
| February 2004 | Atica & Scipione | €31 million |
| March 2004 | Sportfive | €274 million |
| May 2004 | Vivendi Universal Entertainment | €2.312 billion |
| May 2004 | Kencell | €190 million |
| June 2004 | Monaco Telecom | € 169 million |
| June 2004 | Egée and Cédre Towers | €84 million |
| August 2004 | Interests in VIVA Media | €47 million |
| September 2004 | Canal+ Group headquarters | €108 million |
| October 2004 | UCI Cinemas | €170 million |
| December 2004 | 15% of Veolia Entertainment | €1.497 billion |

In sum, Vivendi unloaded over €15 billion in assets between July 2002 and December 2004.

163.    On October 30, 2002, Vivendi announced that Paris's public prosecutor's office had opened an investigation into the veracity of the Company's financial disclosures. A few days later, the Company announced that a separate investigation had been opened by the U.S. Attorney's Office for the Southern District of New York. The U.S. Attorney announced that it planned to coordinate its efforts with the SEC, which had already begun to conduct an informal inquiry into Vivendi.

820154.1

164.    On November 20, 2002, the SEC announced that it had upgraded its inquiry into Vivendi from an informal inquiry to a formal investigation. The SEC made clear that it intended to review Vivendi's accounting and the veracity of its public disclosures. In connection with these enforcement efforts, the SEC in September 2003 obtained a court order forcing Vivendi to place in escrow $23 million it had earmarked to pay a severance package Messier negotiated just before his ouster. Messier was similarly barred from executing a judgment he had obtained via an arbitration in New York State Court concerning this severance package.

165.    On September 15, 2003, the COB – following a fourteen month investigation – announced its conclusion that Vivendi had made false financial disclosures. Among its failures, the COB found that Vivendi had not disclosed to investors the growing cash problems it faced during the end of Messier's tenure.

166.    The United States-based investigations into the crisis engendered by Messier's $77 billion acquisition spree came to a stunning conclusion on December 24, 2003. That day, the SEC filed and simultaneously settled securities fraud charges against Vivendi, Messier and Hannezo, imposing fines totaling $51 million. The SEC charged Vivendi, Messier and Hannezo with multiple violations of the federal securities laws committed between December 2000 and July 2002. Specially, the SEC contended that these parties had engaged in a course of fraudulent conduct that disguised the Company's cash flow and liquidity problems, improperly adjusted accounting reserves to meet predetermined EBITDA targets, and failed to disclose material commitments at Cegetel and Maroc Telecom.

167.    In addition to the massive fines imposed against them, Messier and Hannezo both entered into consent decrees permanently enjoining them from further violations of the federal

820154 1

securities laws and barring them from service as officers or directors of any public companies for respective ten and five year periods.

168.    On January 18, 2006, the Company announced plans to discontinue its ADS program, citing concerns over the costs of complying with U.S. disclosure requirements.

## V.    FALSE AND MISLEADING STATEMENTS

169.    On October 30, 2000, Vivendi filed a Form F-4 (the "Form F-4") with the SEC, which Defendants Messier and Hannezo signed, in connection with the Merger Transactions. The Form F-4 presented Vivendi's historical financial statements for fiscal year ended December 31, 1999 and the first half of the fiscal year 2000, ended June 30, 2000. Vivendi reported revenue of $16.4 billion and net income of $509.1 million for the first half of the fiscal year ended December 31, 2000, and revenue of $17.4 billion and net income of $254.6 million for the comparable period in 1999. Vivendi also reported shareholders' equity of $11.9 billion and total assets of $73.6 billion as of June 30, 2000.

170.    However, for the reasons set forth in greater detail above in Section IV.B, *supra*, Vivendi's historical financial statements and balance sheets contained in its Form F-4 were materially false and misleading and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported revenue and net income, including (a) improperly consolidating into its financial statements revenue from its Cegetel subsidiary (in which the Company had less than 50% ownership); (b) failing to write down impaired goodwill from previous corporate investments and acquisitions, including U.S. Filter; (c) overstated the Company's revenue from its Environmemental division on certain multi-year contracts; and (d) failing to adhere to the accounting policies described in

71