its SEC filings. In addition, the Form F-4 contained untrue statements of material fact and

omitted to state material facts required therein or necessary to make the statements therein not

misleading because Defendants did not disclose that Vivendi was suffering from a burgeoning

liquidity crisis, as set forth in Section IV.C.

171.    On November 1, 2000, Defendants caused Vivendi to file a Form 6-K with the

SEC reporting Vivendi's financial results for first half of 2000, ended June 30, 2000 (the

"November 1, 2000 6-K"). The November 1, 2000 6-K stated in pertinent part:

> For the first six months of 2000, Vivendi generated net sales of 19.4
> billion euros compared with 18.1 billion euros for first-half 1999,
> representing growth of 7.4%. This amount takes into account the
> disposals of Vinci and Nexity with effect from January 1, 2000. It
> also includes a full six months' impact from the major acquisitions
> made in 999, notably U.S. Filter and Canal+.
>
> *        *        *
>
> The communications and Environnemental services businesses
> accounted for 18.6 billion euros, an increase of 46% which includes
> internal growth of over 15%. Net sales outside France rose 74% to
> 8.6 billion euros.

172.    On November 17, 2000, Defendants caused Vivendi to file a 6-K announcing

Vivendi's revenue for the first nine months of 2000 (the "November 17, 2000 6-K"). The filing

reported that Vivendi's revenues for the first nine months of 2000 were as follows:

> 29.1 billion euros, with Environnemental services and
> communications accounting for 28.2 billion euros, a 41.5% increase
> over the 19.9 billion euros as at September 30, 1999. Internal growth
> was close to 14% (19% in communications and 11% in
> Environnemental services).

173.    The November 1, 2000 6-K and the November 17, 2000 6-K contained untrue

statements of material fact and omitted to state material facts required therein or necessary to

make the statements therein not misleading because, *inter alia*, the Company was engaged in

improper accounting practices that had the effect of materially overstating Vivendi's reported

820154.1

earnings (as particularized in Section IV.B, *supra*), including: (a) failing to timely write down certain overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel subsidiary in which the Company had less than 50% ownership; (c) failing to consolidate revenue from ET; and (d) overstating the Company's revenue from certain multi-year contracts. In addition, the November 1, 2000 6-K and the November 17, 2000 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth above in Section IV.C, *supra*.

174.    On December 22, 2000, Vivendi issued a press release announcing that it had purchased a 35% stake in Maroc Telecom S.A. ("Maroc Telecom") for approximately €2.3 billion. The press release stated that the purchase would "have a positive effect on net income before goodwill from 2001, taken that the company is consolidated." This statement contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the consolidation of Maroc Telecom was improper, for the reasons set forth above in Section IV.B, *supra*.

175.    On January 12, 2001, Defendants caused the text of a December 5, 2000 speech to shareholders to be memorialized in a January 12, 2001 Form 6-K filed with the SEC (the "January 12, 2001 6-K"). In the speech, Messier touted Vivendi's quadrupled share price, sevenfold increase in market capitalization and tenfold increase in operating income. He also reported Vivendi's pro forma revenues of "almost 25 billion euros at the end of 2000, and pro forma EBITDA of 3.2 billion euros in the consolidated businesses alone." Calling the figures

73

"reliable and concrete," Messier projected an additional €220 million of EBITDA in 2002 and more than €400 million in 2003. He went on to state that "[w]e are therefore very comfortable with our business and financial performance forecasts, irrespective of the economic climate in the next two years." Messier's December 5, 2000 speech, and the January 12, 2001 6-K on which it was filed with the SEC, contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because the financial results reported therein, rather than being "reliable and concrete," were achieved as a result of the fraudulent accounting scheme described above in Section IV.B, *supra*. Further, the revenue and EBITDA results reported in the December 5, 2000 speech, and the January 12, 2001 6-K on which it was filed, were materially false and misleading because Defendants' improper consolidation of the results of Cegetel and Maroc Telecom into Vivendi's own results caused these reported financial results to be materially misstated, for the reasons set forth above in Section IV.B.3, *supra*.

176.    On February 2, 2001, Vivendi announced Vivendi Environnement's total revenue in 2000 was €26.4 billion. Vivendi cited "internal growth of 10.5% and major acquisitions in 1999" as the primary catalysts behind the 25.7% increase over its 1999 revenues. The press release stated that "[c]hanges in the scope of consolidation had a positive impact of €2 billion. External growth was mainly due to the full year effect of acquisitions made in 1999, principally U.S. Filter and Superior Services." These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Vivendi's reported revenue was overstated as a result of the accounting fraud discussed above in Section IV.B, *supra*.

177.    On February 14, 2001, Vivendi issued a press release in Paris and New York,

memorialized in a February 15, 2001 6-K filing with the SEC (the "February 15, 2001 6-K").

The February 15, 2001 6-K announced preliminary results for the fiscal year ended December

31, 2000 as follows:

> Vivendi Universal's preliminary total revenues for 2000 totaled 41.7
> billion Euros, with media and communications and environmental
> services accounting for 40.0 billion euros, a global 36.5% increase
> over 1999. [Messier said that:] "Vivendi Universal was created on
> December 8, 2000. The 2000 Vivendi [Universal] figures are
> showing the considerable burst of growth of our communications
> activities in 2000 both in global growth and even more important
> with a near 20% internal growth. Vivendi Universal enters its first
> full year of operations with strong growth prospects and a very strong
> balance sheet. This new company is off to a fast start and we are very
> confident that we will meet the very aggressive growth targets we
> have set for ourselves both at the revenues and EBITDA levels.

178.    The February 15, 2001 6-K contained untrue statements of material fact and

omitted to state material facts required therein or necessary to make the statements therein not

misleading because Defendants failed to disclose that Vivendi's reported revenues and purported

growth were overstated as a result of the accounting fraud discussed above in Section IV.B,

*supra.*

179.    In a March 8, 2001 Form 6-K (the "March 8, 2001 6-K"), Defendants caused

Vivendi to report on a Supervisory Board meeting held the same day and chaired by Messier

wherein Vivendi Environnement's financial statements were discussed. The release stated in

part that "[n]et debt was reduced from 16.6 billion euros to 13.2 billion euros, and shareholders'

equity – including minority interests – was increased from 1.5 billion euros to 8.2 billion euros."

Vivendi Universal further announced that net income was €615 million, including non-recurring

items after tax.

180.    In a March 9, 2001 Form 6-K signed by Messier (the "March 9, 2001 6-K"),

Vivendi reported "better than expected" fourth quarter and FY 2000 results. Vivendi announced

actual revenues of €41.8 billion for FY 2000, including Media and Communications revenues of

€13.6 billion and Environnement Services revenues of €26.5 billion. The 6-K further stated:

> Vivendi Universal announced today that on a pro forma basis for
> calendar 2000, the Company reported 7.2 billion euros in EBITDA
> . . . for the period ending December 31, 2000, up 48 percent from
> 1999. Results reflect strong performance across the Company's
> business units -- Media and Communications and Environnemental
> Services. Actual EBITDA for the 12 months ended December 31,
> 2000, was 6 billion euros versus 4.3 billion euros in 1999.

181.    Vivendi claimed that "the pro forma results were driven by growth in all business

segments with the exception of Internet" and further pointed out that "[n]et income climbed 44

percent, before goodwill, to 2.8 billion euros, from 1.4 billion euros." Messier further stated:

> The strong results that Vivendi Universal has generated for calendar
> 2000 provide a very solid foundation for the Company's growth
> prospects in 2001. The robust performance of Vivendi Universal's
> business segments clearly reflects the fast pace and clear momentum
> that we have established as Vivendi Universal enters 2001. The
> Company's unique combination of content and distribution assets
> paves the way for enormous growth opportunities. We have our
> management teams and plans in place as we moves [sic] to execute
> the growth strategies. The management team, in particular, has been
> focused on the day-to-day operational performance and increased
> productivity of each of the Company's business units. I am very
> confident that, for Media and Communications, we will reach our
> revenue growth target of 10 percent and our aggressive EBITDA
> growth target of 35 percent for the period 2000-2002 and achieve
> superior returns for Vivendi Universal shareholders. . . .Our
> businesses are strong, our management is focused and growth
> prospects are real and immediate.

182.    The March 9, 2001 6-K contained untrue statements of material fact and omitted

to state material facts required therein or necessary to make the statements therein not misleading

because Defendants failed to disclose that the reported results were not attributable to the stated causes but, rather, to the accounting fraud set forth above in Section IV.B, *supra*.

183.    In addition to the reasons discussed above, the January 12, 2001 6-K; the February 15, 2001 6-K; the March 8, 2001 6-K; and the March 9, 2001 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized above in Section IV.B, *supra*), including: (a) failing to timely write down certain overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc subsidiaries in which the Company had less than 50% ownership; (c) improperly recognizing revenue from its U.S. Filter and Canal+ acquisitions; and (d) failing properly to report pro forma metrics. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth above in Section IV.C, *supra*.

184.    In a March 30, 2001 Chairman's Statement and Shareholder Newsletter, filed with the SEC on a Form 6-K on the same date (the "March 30, 2001 6-K"), Messier stated that 2000 pro forma results showed an increase of 20% in revenues and an EBITDA increase of 48%, and that "[t]he EBITDA rise for the media and communications businesses alone is strong[], reaching 76%." Messier also pointed out that Vivendi was "ahead of our targets for 2000" and that he could "confirm the ambitious growth targets . . . for media and communications in October 2000: increases of 10% revenues and 35% for EBITDA." He further stated:

77

> Since the merger [with Seagram and Canal+], the integration of our teams has progressed well, enabling us to identify and develop synergies. Consumers will soon be seeing the first concrete results. In addition, we are in exceptionally fine financial health – our communications activities are nearly debt free.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi was neither "in exceptionally fine financial health" nor "nearly debt free." Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi was in a precarious financial condition due to the fraudulent accounting scheme and Defendants' active effort to conceal Vivendi's liquidity crisis, set forth above in Sections IV.B and IV.C, *supra*.

185.    On April 24, 2001, Vivendi issued a press release and filed a 6-K (collectively, the "April 24, 2001 6-K") announcing "very strong" first quarter 2001 results. The April 24, 2001 6-K announced that Media and Communications' revenues were up 10% to €5.9 billion and that Telecom's revenues were up 30% to €1.5 billion. The April 24, 2001 6-K further reported that Media and Communications' EBITDA increased 112% to €900 million and that Telecom's EBITDA more than tripled to €433 million. The April 24, 2001 6-K quoted Messier as follows:

> I am very pleased with Vivendi Universal's outstanding performance in our first quarter as a new company. All our results meet or exceed our key operating targets. We created significant momentum by delivering solid first quarter 2001 results in EBITDA, which more than doubled, and by generating double digit revenue growth.
>
> These results show the focus and dedication of all our management teams, in executing the unique promise of Vivendi Universal around its global strategy. This is a great beginning. With our momentum, our targets and the drive of our executive team, I am extremely confident that, for Media and Communications, we will reach our annual EBITDA and revenue growth targets of 35% and 10%,

78

respectively in 2001 and 2002 and achieve superior returns for Vivendi Universal shareholders.

We are also ahead of targets for the synergies which indicate that the path of integration between our teams is great. My only focus is and remains execution of this compelling media merger.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that the results reported were not attributable to the stated caused but, rather, to

the fraudulent accounting scheme as particularized above in Section IV.B, *supra*.

186.    On April 24, 2001, Messier addressed Vivendi's shareholders at the Company's

shareholders' meeting, the transcript of which was subsequently filed on the June 26, 2001 Form

6-K (collectively, the "June 26, 2001 6-K"):

The foundations of our communications related businesses are particularly healthy and strong. I would just like to emphasize a few points:

a healthy balance sheet with total equity reaching 66 billion Euros;

a pro forma net debt that is practically non-existent - around three billion Euros;

Vivendi Universal posted record-high net income, and has cash available for investing (participation in BskyB, etc.);

Vivendi has rapidly growing revenue, which reach the double digits annually, spread out through all the European and American markets (60% and 40%); extraordinarily large customer bases; several dozen million subscribers; business models often based on subscription - meaning loyalty, recurrence, predictable revenues, and very little dependence on the advertising market.

Financially, Vivendi Universal, concerning the communications sectors, is rock solid - very stable with high growth.

\*       \*       \*

In my role as the chairman and as an employee of the company, I owe you the company's results. Here they are. They are good. . . .

79

> Vivendi Universal, our company, your company, is solid. Today, we
> are a leader, strong, dynamic, and profitable.

187.    On May 18, 2001, Vivendi filed a Form 6-K with the SEC and issued a press

release providing total revenue information for first quarter 2001 (collectively, the "May 18,

2001 6-K"). The May 18, 2001 6-K stated in part:

> Vivendi Universal revenue for first quarter of 2001 totaled 12.6
> billion euros, a global 34.5% increase over the first quarter of the
> prior year.    Vivendi Universal's media and communications
> businesses accounted for 5.9 billion euros and environmental services
> businesses accounted for 6.7 billion euros.

188.    The March 30, 2001 6-K; the April 24, 2001 6-K; the June 26, 2001 6-K; and the

May 18, 2001 6-K contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because, *inter alia*,

the Company was engaged in improper accounting practices that had the effect of materially

overstating Vivendi's reported earnings (as particularized above in Section IV.B, *supra*),

including: (a) failing to timely write down overvalued assets from previous corporate

investments and acquisitions; (b) improperly consolidating into its financials revenue from its

Cegetel subsidiary in which the Company had less than 50% ownership; and (c) overstating the

Company's revenue from certain multi-year contracts.  In addition, these statements contained

untrue statements of material fact and omitted to state material facts required therein or necessary

to make the statements therein not misleading because Defendants failed to disclose that Vivendi

was suffering from a liquidity crisis (as particularized above in Section IV.C, *supra*) and that

Vivendi would need to restructure its debt obligations in order to remain solvent and avoid

bankruptcy.

189.    On July 2, 2001, Vivendi filed its Form 20-F with the SEC, signed by Hannezo,

for the fiscal year ended December 31, 2000 (the "2000 Form 20-F"). The 2000 Form 20-F

contained Vivendi's consolidated financial statements for the years ended December 31, 2000,

1999 and 1998 and as at December 31, 2000 and 1999. The 2000 Form 20-F stated as follows:

> For the years ended December 31, 2000, 1999 and 1998, we had a net
> income under U.S. GAAP of €1,907.8 million, €246.1 million and
> €565.2 million, respectively, compared to €2,229.0 million, €1,431.4
> million and €1,120.8 million under French GAAP. Under U.S.
> GAAP, shareholders' equity was €64,729.4 million and €16,954.5
> million for 2000 and 1999, respectively, compared to €56,671.1
> million and €10,892.2 million under French GAAP.

190. The 2000 Form 20-F further reported on marketing rights, stating:

> As of January 1, 2000, the following new accounting principles were
> adopted:
>
>       *      *      *
>
> Sports broadcasting rights acquired by Canal+ are now capitalized as
> intangible assets and are amortized over the period of the agreement.
> The cumulative effect of this change had no impact on net income in
> 2000 and 1999. Total assets increased by €2.0 billion (most of which
> related to intangible assets) and total liabilities and shareholders'
> equity increased by the same amount.

191. When discussing Accounting Policies, the 2000 Form 20-F stated that revenues

and costs for the music segment were recognized upon shipment to third parties and that revenue

relating to public service contracts was recognized when the services were rendered.

192. For the reasons set forth above in Section IV.B, *supra*, Vivendi's historical

financial statements and balance sheets contained in its 2000 Form 20-F contained untrue

statements of material fact and omitted to state material facts required therein or necessary to

make the statements therein not misleading because, *inter alia*, Defendants failed to disclose that

the Company improperly consolidated into its financials revenue from its Cegetel subsidiary (in

which the Company had less than 50% ownership), improperly manipulated EBITDA, failed to

timely write down impaired goodwill from previous corporate investments and acquisitions,

including Canal+ and U.S. Filter, overstated the Company's revenue from its Environnement

81

division on certain multi-year contracts in violation of GAAP, failed to adhere to the accounting

policies described in its SEC filings, and inflated the value of certain Canal+ assets. Further,

these statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that Vivendi was suffering from a burgeoning liquidity crisis, as set forth above

in Section IV.C, *supra*.

193.   On July 23, 2001, Vivendi Universal issued a press release and filed a Form 6-K

(collectively, the "July 23, 2001 6-K") announcing its "very strong" second quarter and first half

2001 Media and Communications results. Vivendi reported Media and Communications'

revenues were up 16% (excluding Universal Studios Group) to €6.6 billion, and EBITDA grew

57% to €1.3 billion. Concerning Vivendi's first half 2001 results for Media and

Communications businesses, the press release stated in part:

> In the course of the first half of 2001, Vivendi Universal achieved
> three quarters of its full-year target of incremental EBITDA (nearly
> 800 million euros excluding Maroc Telecom, relative to the
> company's target of slightly more than 1 billion euros).
>
> In the first half of 2001, revenues increased to 12.4 billion euros (up
> 15% [excluding USG]), and EBITDA *grew* to 2.2 billion euros (up
> 77% over 2000 comparable period).
>
> During a strong second quarter, revenues increased 16% to 6.6 billion
> euros, and EBITDA grew 57% to 1.3 billion euros.
>
> Excluding Maroc Telecom, revenue growth was 8%, and EBITDA
> growth was 35% for the second quarter. For the first half of 2001,
> revenues were up 11% and EBITDA was up 62%. [footnotes
> omitted]

194.   The July 23, 2001 6-K also reported on the Telecom segment, stating

> Telecom EBITDA was €703m for the quarter ended June 30, 2001
> and €1.1b for the first half ended June 30, 2001.

*       *       *

82

Telecom registered an excellent second quarter and a half year. The second quarter of 2001, revenues increased by 51%, and EBITDA grew by 70% versus second quarter 2000.

195.    Messier commented on the results, stating in part as follows:

The results produced by Vivendi Universal in the second quarter are well ahead of market consensus. . . . They confirm the robustness of our businesses . . . and the fast progress of the reorganization and implementation of our recent merger.

With three quarters of the 'aggressive' incremental EBITDA target for the full year 2001 [(1.12 billion euros of incremental EBITDA, or 35%, over the pro forma 2000 guidance provided last October and slightly above 1 billion euros of incremental EBITDA over the final 2000 results)] already achieved in the first half of the year, I can only re-emphasize our confidence. We will at least meet our stated targets.

Obviously, our current stock price does not fully reflect this situation in terms of EBITDA multiples or Enterprise Value to EBITDA to growth. With the highest growth rates of the industry and the lowest multiples, our stock is definitely an attractive investment today.

The first half has been a period of total operational focus in each of our businesses, while completing significant achievements in the implementation of the merger, reorganization and execution of our strategy.

196.    Following the July 23, 2001 press release, Vivendi hosted a conference call to discuss the second quarter 2001 results and the Company's business and prospects. A July 26, 2001 analyst report by Commerzebank reported that "Messier is confident the company will reach its own targets." As the plaintiffs in the Securities Class Action allege, during the conference call, Messier and others in Vivendi management stated:

Vivendi was able to achieve strong results even in a down market and was in fact gaining market share.

The Company was still on track to achieve strong growth in revenues and earnings in 2001, including EBITDA growth of 35%.

The statements made by Vivendi management during the conference call contained untrue

statements of material fact and omitted to state material facts required therein or necessary to

make the statements therein not misleading because they failed to disclose that Vivendi was able

to achieve the purportedly "strong results" reported only as a result of the accounting fraud as set

forth above in Section IV.B, *supra*, and Defendants' active concealment of the Company's

burgeoning liquidity crisis, as discussed above in Section IV.C, *supra*.

197.    On August 10, 2001, Vivendi Universal issued a press release and filed a 6-K

(collectively, the "August 10, 2001 6-K") announcing its total revenue for the first half of 2001,

including the second quarter. Second quarter 2001 revenue totaled €13.9 billion, "comprised of

6.6. billion euros for media communications businesses and 7.3 billion euros for environmental

services businesses." The first half of 2001 total revenue for Vivendi Universal was €26.4

billion, "comprised of 12.4 billion euros for media and communications businesses and 13.9

billion euros for environmental services businesses."

198.    In early September 2001, Vivendi's ADSs declined from the mid-$50s to the mid-

$40s per share, and its ordinary shares declined from the mid-€50s to the mid-€40s. In response,

Defendants categorically denied any problems. Vivendi, after the market closed on September 5,

2001, reiterated its targets for 2001 and 2002. Messier stated in an interview with Reuters that

evening that "no profit warning of any kind needs to be feared coming from Vivendi Universal."

Messier's statement contained untrue statements of material fact and omitted to state material

facts required therein or necessary to make the statements therein not misleading because he

failed to disclose that Vivendi's security in its targets and in the fact that it would not have to

issue any profit warning was attributable to the accounting fraud as set forth above at Section

84

IV.B, and to its active concealment of the Company' liquidity crisis, as discussed above in Section IV.C, *supra*.

199.    On September 25, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "September 25, 2001 6-K") announcing "Strong First Half 2001" results and a "Solid Outlook for 2002." The press release reported that revenues increased 11% to €26.4 billion, that EBITDA grew 42% to nearly €4 billion, that operating income grew 65% to €1.9 billion, and that net income, before goodwill amortization, reached €1.1 billion or €0.97 per share. With respect to Media and Communications, the release reported that first half 2001 revenues reached €12.4 billion, up 15%, EBITDA reached €2.2 billion, up 77%, and that operating income nearly tripled to €946 million, up 184%. Concerning Vivendi's Environnement business, the release reported that revenues were up 11% to €13.9 billion, that EBITDA was up 12% to €1.76 billion, and that operating income was up 13% to €0.97 billion. In the filing, Messier commented:

> Despite the current environment, we will reach all our previously stated revenue/EBITDA objectives for the 2001 year. I continue to express my confidence in achieving our more than 10% revenue growth targets for 2001 and our more than 35% EBITDA growth (versus the company's October 2000 guidance) at a constant asset base. This, combined with some extensions in the company's asset base (i.e., Maroc Telecom and Houghton Mifflin), should result in full-year Media and Communications EBITDA slightly north of 5 billion euros. In the current Environnement, giving a 2002 target would not be meaningful, and we have yet to complete our 2002 budget and plan process. Before the recent tragedy [of September 11], market consensus for 2002 EBITDA was not far from 6 billion euros. Despite the events, looking at the trends of our businesses and our defensive qualities, we are currently very confortable [sic] with this expectation. (Footnote omitted.)

85

200.    On October 17, 2001, Vivendi Universal filed a Form 6-K (the "October 17, 2001

6-K") announcing its consolidated half-year financial statements as filed with regulatory

authorities in France.  The October 17, 2001 6-K reported:

> In the first half of 2001, Vivendi Universal's revenues increased to
> €26.4 billion from €19.4 billion in the comparable period of 2000.
> On a pro forma basis the revenue increase was 11.5%
>
> The parent company recorded revenues of €64.1 million and net
> income of €149.7 million in first half 2001.

Media and Communications reported a revenue increase to "€12.4 billion, up 12.4% over the pro

forma first half of 2000.  Excluding Maroc Telecom and Universal Studios Group ('USG')

Filmed Entertainment, revenue growth was 11%."  Environnement Services reported revenues of

"€13.9 billion compared to €12.5 billion in the first half 2000, an 11.3% increase."

201.    The July 23, 2001 6-K, the August 10, 2001 6-K, the September 25, 2001 6-K and

the October 17, 2001 6-K contained untrue statements of material fact and omitted to state

material facts required therein or necessary to make the statements therein not misleading

because, *inter alia*, the Company was engaged in improper accounting practices that had the

effect of materially overstating Vivendi's reported earnings (as particularized above in Section

IV.B, *supra*), including: (a) failing timely to write down overvalued assets from previous

corporate investments and acquisitions; (b) improperly consolidating into its financials revenue

from its Cegetel and Maroc subsidiaries in which the Company had less than 50% ownership; (c)

overstating the Company's revenue from certain multi-year contracts, (d) improper EBITDA

manipulation; and (e) the inflation of certain Canal+ assets.  In addition, these statements

contained untrue statements of material fact and omitted to state material facts required therein or

necessary to make the statements therein not misleading because Defendants failed to disclose

that Vivendi was suffering from a liquidity crisis (as particularized above in Section IV.B, *supra*)

86

820154.1

and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was not adhering to the "Significant Accounting Policies" listed in its 2000 Form 20-F but, rather, was preparing its financial statements using accounting policies that violated GAAP.

202.    On October 30, 2001, Vivendi issued a press release and filed a Form 6-K (collectively, the "October 30, 2001 6-K") announcing its third quarter 2001 Media and Communications results. The October 30, 2001 6-K announced that Media and Communications' revenues were up 24 % to €7.3 billion, and that EBITDA was up 90% to €1.5 billion. This 6-K further reported that Telecom's revenues increased by 17%, and EBITDA grew by 31% versus pro forma results for the third quarter of 2000. Music EBITDA was €250 million for the quarter ended September 30, 2001 and €702 million for the nine months ended September 30, 2001. UMG reported a 6% increase in EBITDA to €250 million. The 6-K also stated in pertinent part:

> On a pro forma basis, third quarter revenue growth was 8%, and EBITDA growth was 30%. Year-to-date revenues increased 9%, and EBITDA increased 46%.
>
> Company reaffirms confidence in achieving its growth targets: 10% revenue growth and 35% organic EBITDA growth in 2001.

203.    Messier was quoted in the October 30, 2001 6-K as follows:

> Our third quarter results for the media and communications businesses, with 24% revenue and 90% EBITDA growth, including organic growth of 8% and 36% respectively, are obviously strong despite the tough environment. . . . They reflect both our higher potential for growth and greater resiliency to recessionary environments compared to many of our peers.

87

\*　　\*　　\*

> Additionally, Vivendi Universal's media and communications businesses are presently less vulnerable to recessionary environments than many of our peers because of our strong defensive qualities.

\*　　\*　　\*

> Having the highest resiliency and lowest sensitivity to a recessionary environment explains our ability to outperform most of our peers.

\*　　\*　　\*

> An early look at the fourth quarter indicates that we are on track to meet our targets. I continue to express my confidence in achieving 10% revenue growth and 35% EBITDA growth in 2001 at a constant asset base. This, combined with some expansions in the company's asset base (i.e., Maroc Telecom and Houghton Mifflin), should result in full-year Media and Communications EBITDA slightly above 5 billion euros. (Footnotes omitted.)

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that the results reported were not attributable to the stated causes but, rather, to the accounting fraud particularized in Section IV.B, *supra*, and to Defendants' concealment of the liquidity crisis discussed above in Section IV.C, *supra*.

204.    Following the release of the October 30, 2001 6-K, Vivendi hosted a conference call to discuss the third quarter 2001 results and the Company's business and prospects. As reported in the complaint in the Securities Class Action, during the call, Messier and others in Vivendi management stated:

> Vivendi was able to achieve strong results even in a down market and was in fact gaining market share;

> The Company was still on track to achieve strong growth in revenues and earnings in 2001.

88

The statements made by Vivendi management during the conference call contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because they failed to disclose that the Company was only able to achieve the results reported through the accounting fraud discussed above in Section IV.B, *supra*, and through their concealment of the liquidity crisis the Company was facing, as set forth above in Section IV.C, *supra*.

205.    Based on Defendants' statements, including those made during the conference call, securities analysts that followed Vivendi securities reacted positively to the Company's reported financial results. For example, on October 31, 2001, ING Barings ("ING") issued a "Strong Buy" recommendation, stating:

> Vivendi . . . is one of the few media groups not to have issued a profit warning since the beginning of the year. Management has stressed its confidence once again and remains comfortable with the consensus forecasts.

206.    On November 14, 2001, Vivendi Universal filed a Form 6-K (the "November 14, 2001 6-K") incorporating Messier's shareholder newsletter. Messier trumpeted Vivendi Universal's first-half 2001 earnings as "good" and stated that "we are in a position to confirm our annual targets with confidence despite the economic climate." He further stated:

> For the company as a whole, revenues are up 11%, generating a 42% increase in EBITDA to almost 4 billion euros. The Media and Communications businesses posted a 77% increase in EBITDA and a 184% increase in EBIT, while Environnemental Services businesses have continued to grow steadily in terms of both revenues (11%) and EBITDA (12%). Vivendi Universal's primary strength is its operational strength.

207.    On December 6, 2001, Vivendi issued a press release and filed a Form 6-K announcing the decision of Edgar Bronfman, Jr. ("Bronfman") to resign from his position as Executive Vice Chairman of Vivendi. Bronfman remained as "Vice-Chairman of the Board and

89

an advisor to the company." Commenting on Bronfman's resignation, Messier assured the investing public that Vivendi "is in a very strong position, with solid performance in virtually every business." Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was not in a "very strong position" but, rather, was in a precarious financial position as a result of the accounting fraud discussed above in Section IV.B, *supra*, and was suffering from a liquidity crisis, as more particularized above in Section IV.C, *supra*. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi's purportedly "solid performance" was attributable to the accounting fraud discussed above in Section IV.B, *supra*, and to Defendants' active concealment of the liquidity crisis the Company was facing, as more particularized above in Section IV.C, *supra*.

208.    On December 11, 2001, Defendants caused Vivendi to file a Form 6-K (the "December 11, 2001 6-K") announcing the revenue figures filed with French authorities. In the Form 6-K, Vivendi announced:

> [T]he company's Media and Communications businesses reported pro forma revenue growth of 9% for the year ended December 31, 2001, reaching 28.9 billion euros. Revenue growth was 10% using the 2000 perimeter excluding Universal Film, exactly in line with management estimates given 12 months ago.

Messier further stated that he was "pleased that we achieved our ambitious target of 10% organic revenue growth in 2001, for the businesses resulting from Vivendi's merger with Seagram and Canal+."

90

209.    The October 30, 2001 6-K, the November 14, 2001 6-K and the December 11,

2001 6-K contained untrue statements of material fact and omitted to state material facts required

therein or necessary to make the statements therein not misleading because, *inter alia*, the

Company was engaged in improper accounting practices that had the effect of materially

overstating Vivendi's reported earnings (as particularized in Section IV.B, *supra*), including: (a)

failing to timely write down overvalued assets from previous corporate investments and

acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc

subsidiaries in which the Company had less than 50% ownership; (c) overstating the Company's

revenue from certain multi-year contracts, (d) improper EBITDA manipulation; and (e) the

inflation of certain Canal+ assets. In addition, these statements contained untrue statements of

material fact and omitted to state material facts required therein or necessary to make the

statements therein not misleading because Defendants failed to disclose that Vivendi was

suffering from a liquidity crisis (as particularized in Section IV.C, *supra*) and that Vivendi would

necessarily need to restructure its debt obligations in order to remain solvent and avoid

bankruptcy. Further, these statements contained untrue statements of material fact and omitted

to state material facts required therein or necessary to make the statements therein not misleading

because Defendants failed to disclose that Vivendi was not adhering to the "Significant

Accounting Policies" listed in its 2000 Form 20-F but, rather, was preparing its financial

statements using accounting policies that violated GAAP.

210.    In a December 13, 2001 press release, the Company announced that it had

"authorized Goldman Sachs and Deutsche Bank to carry out a [$1.5 billion] placement of BSkyB

share certificates that must be converted in October 2002." The press release went on to state:

> Following last week's sale of 9.3% of Vivendi Environnement and
> with this transaction, Vivendi Universal will then be in a position to

91

> cover any needs that may arise from various opportunities for
> strategic partnerships in the U.S. television and distribution segments.
> Such opportunities may or may not be taken up.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that Vivendi was suffering from a liquidity crisis, as discussed above in Section

IV.C, *supra*.

211.    The next day, on December 14, 2001, the *Financial Times* (London) reported on

the announced sale of Vivendi's $1.5 billion interest in BSkyB and the sale of a $1.06 billion

interest in Vivendi Environnement. The article quoted Vivendi as stating that these asset sales

would give Vivendi "room to manoeuvre" for additional acquisitions, and enable it "to cover any

eventual needs from different opportunities for strategic partnerships." These statements

contained untrue statements of material fact and omitted to state material facts required therein or

necessary to make the statements therein not misleading because Defendants failed to disclose

that Vivendi was suffering from a liquidity crisis, as discussed above in Section IV.C, *supra*.

212.    On December 17, 2001, Vivendi issued a press release in Paris and New York and

filed a Form 6-K announcing the acquisition of USA Networks for $10.3 billion in combined

stock and cash. The acquisition was financed by an exchange of securities and "limited" cash

outlay by Vivendi. Commenting on the acquisition, Messier stated in pertinent part:

> Our strategy is clearly coming together. Combining within the same
> operational entity, VUE, USG and the entertainment assets of USA
> creates a new U.S. major, which will benefit from the full integration
> of TV and movies activities with production and distribution.
>
> *        *        *
>
> In addition, this strategic move will significantly benefit Vivendi
> Universal shareholders, because of its significant value-accretion at
> every level – EBITDA, net income and free cash flow. By using

92

> mainly non-core, consolidated assets to acquire this control, we are
> strongly positioned to enhance performance and value to Vivendi
> Universal shareholders.
>
> \*        \*        \*
>
> At the end of just one year following our merger with Seagram and
> Canal+, we have put the pieces together in fulfilling our strategy. In
> one short year, we have focused on integration and addressing our
> relative distribution weakness in the U.S. - and here we are today.
> We expect that 2002 will be a year of growth, without further change
> in perimeter.

Messier's statements contained untrue statements of material fact and omitted to state material

facts required therein or necessary to make the statements therein not misleading because he

failed to disclose that the Company was not "strongly positioned to enhance performance and

value to Vivendi Universal shareholders" but, rather, was in a precarious financial condition due

to the Defendants' concealment of Vivendi's liquidity crisis from the investing public.

213.    According to the Norges Bank Action, on December 17, 2001, Messier held a

press conference with Barry Diller, Chairman and CEO of USA Network, at the St. Regis Hotel

in New York City to discuss the acquisition of USA Networks, the creation of Vivendi Universal

Entertainment ("VUE"), and Vivendi's prospects for 2002:

> At the end of the day, this transaction is not putting pressure on
> Vivendi Universal. On the reverse, what it allows us to do is to
> increase our [EBITDA] target for 2002 by more than ten percent. It's
> to increase our net income in 2002 by roughly 200 million dollars.
> It's to increase the net free cash flow of the group in 2002 by, let's
> say three hundred and fifty million dollars. At every level of the
> [P&L] and of the cash flow that you may look at, this transaction is
> very positive to VUE shareholders year one.
>
> \*        \*        \*
>
> As far as the global [debt] ratio of the group is concerned, our target
> is to have in '02 a debt to [EBITDA] ratio well below three times and
> especially we are focusing to reach that target ahead of the end of the
> first half of 2002, which means that Vivendi Universal will end up its
> program of selling its non core asset in the first half of '02; it will

93

> give us very comfortable triple B credit rating targets that we are very comfortable with. . . . So, no cleaning of balance sheet because the balance sheet is clean. . . . [W]e are committed to issue full U.S. [GAAP] earnings starting Q1 of '02. We already, in fact, worked on the basis of U.S. [GAAP] accounting methods in '01 in order to build our track record at the time of this year, at the time of the release of our first full quarterly U.S. [GAAP] in '02. So we are already applying all U.S. [GAAP] methodologies, including those relating to amortization.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Messier failed to disclose that Vivendi was not applying "U.S. [GAAP] methodologies" but, rather, was engaging in accounting fraud as discussed above in Section IV.B, *supra*.

214.    As the plaintiffs in the Securities Class Action alleged, on February 6, 2002, AFX News Limited reported that in an attempt to dispel concern about the Company's debt levels and accounting practices, a letter was distributed to the Company's employees stating that no profit warnings were forthcoming:

> Vivendi Universal CEO Jean-Marie Messier said the media company will not make any change in its guidance for 2001 earnings due for release on March 5, although the fourth quarter was a difficult period.
>
> Messier made the comment in a letter to Vivendi's staff, addressing the recent volatility and losses in the company's share price...
>
> "Some global markets, including the music market, declined during this period. But despite the difficulties, we are the only media company not to have issued a profit warning on its operating results and there's no change to that situation," said Messier.
>
> "There are no hidden risks and no speculative instruments," he said.

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, contrary to his assertions, there were "hidden risks" associated with Vivendi – the accounting fraud and liquidity crisis discussed above in Sections IV.B and IV.C, *supra*.

94

215.   On February 11, 2002, Vivendi issued a press release (the "February 11, 2002 Press Release") announcing its year-end 2001 Media and Communications results. Vivendi announced Media and Communications "pro forma revenue growth of 9% for the year ended December 31, 2001, reaching 28.9 billion euros." The release further reported that Vivendi's Telecom segment achieved 24% revenue growth in 2001, and that "[r]evenue growth was 10% using the 2000 perimeter excluding Universal Film, exactly in line with management estimates given 12 months ago."

216.   Commenting on the results, Messier stated:

> I am pleased that we achieved our ambitious target of 10% organic revenue growth in 2001, for the businesses resulting from Vivendi's merger with Seagram and Canal+. Organic growth is, more than ever in today's markets, the most important strength of Vivendi Universal. Achieving the highest level of growth in our industry is a big differentiation of Vivendi Universal, and the operating management deserves recognition for fulfilling their growth objectives and outperforming their peers in a difficult year. Our 2001 results give us confidence that we can achieve our growth targets again in 2002.

217.   The February 11, 2002 Press Release contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized above in Section IV.B, *supra*), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries, in which the Company had less than 50% ownership; (c) overstating the Company's revenue from certain multi-year contracts; and (d) failing to follow its own accounting policies. In addition, the February 11, 2002 Press Release contained untrue statements of material fact and omitted to state material facts required

therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized above in Section IV.C, *supra*), and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

218.    On March 4, 2002, Messier was quoted in the *Financial Times* as stating that Vivendi had only two significant off-balance sheet structures, one relating to shares it is selling in BSkyB and another relating to four buildings: "There are no hidden risks and no speculative instruments." Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, contrary to his assertions, there were "hidden risks" associated with Vivendi – the accounting fraud and liquidity crisis set forth above in Sections IV.B and IV.C, *supra*.

219.    On March 5, 2002, Vivendi issued a press release and filed a Form 6-K (collectively, the "March 5, 2002 6-K") proclaiming its year-end 2001 results. Vivendi announced that revenues of €57.3 billion reflected a 10% increase and that operating income of €3.79 billion reflected a 47% increase, on a pro forma basis.

220.    The March 5, 2002 6-K included financial information by business segment. The release further reported Media and Communications revenues of €28.1 billion, representing 10% pro forma revenue growth; EBITDA of €5 billion, representing 34% pro forma EBITDA growth; and operating income of €1.8 billion, representing 89% pro forma growth. In addition, Telecom's pro forma revenue was up 24% to €8 billion and its EBITDA increased 49% to €2.5 billion. Further, the March 5, 2002 Form 6-K listed Telecom EBITDA of €2.3 billion as 46% of Media and Communications EBITDA of €5 billion. Telecom's operating income was €1.3 billion, which was 72% of Media and Communications' operating income of €1.8 billion. The

96

Telecom pro forma EBITDA was reported as growing by 49%, with Maroc Telecom reporting a

pro forma EBITDA gain of 33%. EBITDA was discussed as follows:

> EBITDA consists of operating income before depreciation, amortization (including film amortization at CANAL+ Group and book plate amortization at VUP), restructuring charges and other one-time items (principally reorganization costs at CANAL+ Group), and does not reflect adjustment for any minority interests in fully consolidated subsidiaries. EBITDA is presented and discussed because Vivendi Universal management considers it an important indicator of the operational strength and performance of its Media and Communications businesses, including the ability to provide cash flows to service debt and fund capital expenditures.

> *    *    *

> U.S. GAAP requires consolidation by whatever company manages the assets, controls the board of directors and possesses majority voting control. VU is required under U.S. (and French) GAAP to consolidate Cegetel and Maroc Telecom since they meet these criteria.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because the

consolidation of Cegetel and Maroc Telecom was not "required" under U.S. GAAP but, rather,

violated GAAP as set forth above in Section IV.B, *supra.*

221.    In discussing off balance sheet transactions, Vivendi stated that there were "no

off-balance sheet loans that have not been disclosed or any such items that would create

accounting benefits" and that Vivendi regards "cash as king." Vivendi attached a document to

its March 5, 2002 Form 6-K that would "provide full disclosure of our off balance sheet

financing as well as other matters" for the Media and Communications division. Here, Vivendi

stated that "[p]hilosphically, VU prefers to keep its obligations on the balance sheet." Only two

off-balance sheet financing vehicles were reported: "two qualifying special purpose entities

associated with the sale of 400 million BSkyB shares." These statements contained untrue

97

statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Vivendi failed to disclose the existence of two significant obligations, the Cegetel current account and the Maroc Telecom side agreement, set forth above in Section IV.C, *supra*.

222.    Vivendi also reported a charge for impairment to goodwill under French GAAP of €12.6 billion, including €6 billion for Canal+. Debt in French GAAP was listed as €14.6 billion for the Media and Communications activities; under U.S. GAAP, debt was €19.1 billion. The release also stated in part:

> After having been the only large media company not to modify any of its guidance for the year 2001, Vivendi Universal reiterates its confidence in the strength of its businesses and their performance and their ability to grow. For 2002, no other new guidance will be expressed, apart from the company's full confidence to reach for its Media and Communications businesses.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants, despite their alleged "confidence" in the strength of Vivendi's business, were concealing both the accounting fraud discussed above in Section IV.B, *supra*, and the liquidity crisis discussed above in Section IV.C, *supra*.

223.    The March 5, 2002 6-K also touted the Company's "Operating Free Cash Flow" as being "ahead of guidance" and announced Media and Communications operating free cash flow of €2.026 billion, "up 2 billion euros over 2000." Commenting on the results, Messier stated in part as follows:

> I am very pleased with the excellent operating results that have been achieved. These results confirm the strength of Vivendi Universal's businesses across the board despite a very difficult global economic environment.

98

> Most of our businesses improved market share, EBITDA and free cash flow during this period of global economic slowing. Even more important, those operational performances are showing improvement at every level of our P&L. The good EBITDA to EBIT transformation ratio: 68% of incremental EBITDA translating in incremental EBIT, is a strong and positive sign. The improvement of operational free cash-flow (FCF) at a higher rate than EBITDA indicates the clear focus given in 2001 to cash management. We will continue this effort.
>
> *     *     *
>
> We stay fully committed to conveying full transparency in our financial results. Vivendi Universal is not only transparent but is the only media and communications company not to change its numbers and targets, it underscores its commitment to accurate, conservative and consistent reporting in every area of its operations.

These statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the results reported were not attributable to the reasons stated but, rather, to the accounting fraud discussed above in Section IV.B, *supra*, and their active concealment of the liquidity crisis discussed above in Section IV.C, *supra*. Further, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants were not "fully committed to conveying full transparency" in Vivendi's financial results but, rather, were employing fraudulent accounting to burnish the Company's actual performance, as set forth above in Section IV.B, *supra*.

224.    The March 5, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized above in Section

99

IV.B, *supra*), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries, in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the March 5, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized above in Section IV.C, *supra*) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

225.    On March 5, 2002, during an investor conference call, Messier discussed the Company's fiscal year 2001 results and fiscal year 2002 expectations and attempted to minimize the importance of the $12.6 billion write down in goodwill as follows:

> I just want to say a very quick points before going to your questions. And I - the first point here based on the fact that we experienced excellent operating results in the '01 and obviously that's very fortunate because this excellent operating results in '01 are also in the captive of the future and then we'll drive our future. I think that we build our operational reserve but what I want to point out is that if we continue or renewed on the EBITDA growth target results and add to our main in the quarter '01. We did all of this. Our operating pre cash flow target, we average Euro 2 million instead of the guidance of Euro 1.2 - 1.5 million [sic]. Obviously the fact that the more you go to cash the more we over this -- the guidance that we gave to the market is a strong sign of the quality of the casual management in working above the requirements and CAPEX management in '01. That goes to the same direction is that we did overcome largely all targets in terms of cash service. We save Euro 200 million EBITDA, we reach 300 EBITDA 100 more, and close to Euro 600 million total cash savings. The operations and these business achievements, I think that we owed them to our competitive advantages that were evident in '01. That: (1) the excellent quality of management; (2) the fact that we gain market share in about every single of our business. Those gains of market shares coming from [scale and scope]; (3) the assets mix, maximize our ability to go to digitalization for delivery on

100

> the mobile devices; and (4) to our global footprint minimizes of
> earnings volatility. That's the business achievement.

Messier also attempted to downplay the impairment charges as a choice of switching from French

GAAP to U.S. GAAP in order "to be even more transparent." Messier stressed the non-cash

nature of the impairment charge.

226.    As reported in the Securities Class Action Complaint, Lehman Brothers issued a

report on March 6, 2002 based, in part, on the statements made by Vivendi's management in the

March 5, 2002 conference call:

> In its post results conference call, management confirmed that the
> value adjustments to the U.S. assets . . . reflected largely a change in
> accounting treatment and did not signal a negative outlook for the
> U.S. water business.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that the goodwill write-down was not attributable to a change in accounting

but, rather, to the fact that the Company had been overstating goodwill all along, as set above in

Section IV.B, *supra*.

227.    Bear Stearns issued a report on March 6, 2002, based on the March 5, 2002

conference call, stating in pertinent part as follows:

> For '02, Management reiterated their guidance of 10% organic sales
> growth for all the Media Communications businesses. Vivendi also
> expects EBITDA of close to €6 billion (pre-USA Networks and pre-
> Stream). . . .

> A list of ten accounting 'issues' relating to off-balance sheet
> financing was published in conjunction with the results and the group
> is today holding an accounting workshop to clarify the impact of
> moving to U.S. GAAP when it reports Q1'02 results this year.

*    *    *

101

> The company disclosed that the €19 billion of net debt has an average maturity of 4-years and an average cost of 4.1%. Management pointed out that the strength of the group's finances is underlined by a recently negotiated 5-year credit facility at 45 basis points over LIBOR.

The statements made by Vivendi management contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that they expected to reach the reported goals by employing fraudulent accounting, as discussed above in Section IV.B, *supra*, and by continuing to conceal to Company's liquidity crisis, as discussed above in Section IV.C, *supra*.

228.    On April 4, 2002, Messier filed another shareholder newsletter on Form 6-K (the April 4, 2002 6-K"). In it, he confirmed that "Vivendi Universal has met its targets in 2001." He went on to state:

> Our media and communications businesses posted EBITDA . . . of 5 billion euros (a 34% pro forma growth), and operating income of 1.8 billion euros (an 89% pro forma growth) and operating free cash flow of 2 billion euros, which is above projections. These results were achieved with a 10% pro forma revenue growth to 28.9 billion euros. If we include our subsidiary Vivendi Environnement, total pro forma revenues amount to 58.2 billion euros.
>
> Our business in media and communications have improved their performance, with strong EBITDA growth for Cegetel, TV and Film . . ., and Vivendi Universal Publishing. . . .
>
> Achieving these results during the general economic downturn of recent months was no easy task. But it is in tough situations like this that we can demonstrate our capacity. The proof is there, thanks to the quality of our teams and our products.

Messier's statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was able to meet its target and posts the results reported only by

102

employing fraudulent accounting, as discussed above in Section IV.B, *supra*, and by continuing

to conceal to Company's liquidity crisis, as discussed above in Section IV.C, *supra*.

229.    When addressing the reported accounting losses of €13.6 billion, Messier pointed

out that "this loss results from a write-down of the value of certain assets taken purely for

accounting purposes. There is no actual cash disbursement." He went on to blame the losses on

"our anticipated application of U.S. GAAP," stating:

> The change involves several technical modifications, the most significant being the re-evaluation of acquired assets at current market values. Taking into account the stock market decline, the following companies have been reduced on our balance sheet. The value of Canal+ is reduced by 6 billion euros, that of Universal Music by 3.1 billion euros, and the value of USG (studios) and Vivendi Telecom International by 1.3 billion euros each. I would like to repeat this move does not represent any operating loss – it is an accounting loss that has no cash impact whatsoever.

> By making this adjustment now in our financial statements . . . we are keeping one step ahead of market expectations. We are also giving ourselves the opportunity to present first quarter 2002 figures that are understandable to all investors.

> This will also enable us, in the future, to improve our net income by significantly reducing charges relating to amortization.

> These factors allow us to propose to the shareholders' meeting that the dividend for 2001 be maintained at 1 euro per share.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that the goodwill write-down was not attributable to a change in accounting

but, rather, to the fact that the Company had been overstating goodwill all along, as set forth

above in Section IV.B, *supra*.

230.    On April 15, 2002, Defendants caused Vivendi to file a Form 6-K (the "April 15,

2002 6-K") containing a translation of financial information provided to the French financial

regulators. In discussing the goodwill impairment of Vivendi's assets, the Form 6-K stated:

> Vivendi Universal reviews the carrying of long-lived assets,
> including goodwill and other intangible assets, for impairment at least
> annually or whenever facts, events or changes in circumstances, both
> internally and externally, indicate that the carrying amount may not
> be recoverable. Measurement of any impairment is based on fair
> value. In 2001, following the recent market decline, . . . our annual
> review resulted in a non-cash, non-recurring goodwill impairment
> charge of €12.9 billion (€12.6 billion after €0.3 billion minority
> interest related to Vivendi Environnement). The charge was
> comprised of €6 billion for CANAL+ Group, €3.1 billion for
> Universal Music Group, €1.3 billion for Universal Studios Group,
> €1.3 billion for international Telecoms businesses, €0.6 billion for
> Vivendi Environnement (net of €0.3 billion minority interest) and
> €0.3 billion for Internet businesses. Of the total charge, €12.1 billion
> related to consolidated subsidiaries and €0.8 billion related to
> investments accounted for using the equity method.

231.    The financial statements contained in the April 15, 2002 6-K indicated that

"[t]otal revenues were €57.4 billion." The revenues generated by Vivendi's "core businesses"

were €57.2 billion, which was an increase of 43%. Twenty-seven percent of the revenues was

due to the "inclusion of a full twelve-month results of the acquired Seagram's operations in 2001

. . . 4% resulted from the 2001 acquisitions of Maroc Telecom, Houghton Mifflin and MP3.com,

and the remaining 12% was generated by a combination of organic growth and the impact of less

significant acquisitions and disposals." The April 15, 2002 6-K further stated:

> Revenues generated by our Media and Communications businesses
> increased 107% to €28.1 billion, accounting for 49% of our total
> revenues compared to 33% in 2000. . . . On a pro forma basis, which
> includes twelve months of comparable operations both for Seagram
> and the above 2001 acquisitions, revenues increased 9% to €28.9
> billion (10% excluding Universal Studios Group filmed
> entertainment). Double-digit revenue growth of 24% and 36%
> respectively, were generated by our Telecom and Internet businesses.
> Our TV & Film and Publishing businesses generated revenue growth

104

of 8% and 5%, respectively. In our Music business, revenues declined 1%, however, this was a strong performance in a down market.

Revenues generated by our Environnemental Services businesses, at €29.1 billion, increased 11%, 8% of which was generated by organic growth and 3% of which was due to the implementation of the Dalkia-EDF agreement and other acquisitions. . . .

*      *      *

. . . In the U.S., revenues increased 81% to €12.7 billion.

232.    In discussing Vivendi's operating income, the April 15, 2002 6-K noted that operating income had "more than" doubled to €3.8 billion, an increase of 145% in Vivendi's "core businesses." The Media and Communications businesses generated €2.2 billion in operating income "before holding and corporate expenses." The 2001 €2.2 billion operating income was an extraordinary increase from €174 million in 2000. Environnemental Services' operating income increased 24% to €2 billion.

233.    On April 24, 2002, Vivendi filed a Form 6-K (the "April 24, 2002 6-K") announcing its "strong" first quarter 2002 Media and Communications results. Vivendi reported a "strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations." The release, issued in New York and filed on a Form 6-K, further reported that "[n]et debt fell from approximately 19 billion euros to approximately 17 billion euros." The release also reported Media and Communications' "revenue organic growth of 13% to 6.8 billion euros; strong EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros." Messier commented on these results as follows:

> The hard numbers in the first quarter show that Vivendi Universal has a winning strategy, and demonstrate our commitment to excellent management and delivering operating results quarter after quarter. In the first quarter, each operating segment delivered its revenue targets, and most segments over-delivered EBITDA and operating free cash flow compared with their budgets.

105

*     *     *

>In a difficult environment, Vivendi Universal's businesses gained
>market share. Cash management improved dramatically. Finally, the
>revenue and cost synergies achieved in the quarter were significant.
>Further gains will be driven by improving businesses that currently
>have negative operating free cash flow: Canal+ and Internet
>operations.

234.    On April 30, 2002, Vivendi filed a Form 6-K (the "April 30, 2002 6-K")

announcing purportedly "strong" results for the first quarter of 2002, including a 12% increase in

pro forma consolidated revenue to €13.2 billion.  The release, issued in New York and filed on a

Form 6-K, also reported that consolidated operating income grew 11% pro forma to €781

million, excluding goodwill amortization.  In the release, Messier commented on the results as

follows:

>The consolidated financial results for the quarter demonstrate that
>Vivendi Universal is delivering on the strategy, goals and targets that
>we have articulated to our shareholders.  In the first quarter of 2002,
>both Media & Communications and Vivendi Environnement
>delivered their targets.

>The Media & Communications financial results released last week,
>coupled with our consolidated results issued today, are testimony to
>our ability and conviction to deliver strong results in operations, cash
>flow, EBITDA and net income.  As I said last week, because of our
>strong performance in the quarter, we are lowering our estimate of
>Media & Communications year-end Debt/EBITDA ratio to less than
>3x by December 31, 2002.

>In a very difficult economic environment, characterized by many
>market uncertainties, Vivendi Universal's global businesses gained
>market share.  In addition, strong improvement was achieved in cash
>management, debt reduction, synergies, management development
>and revenue growth.

235.    The April 30, 2002 6-K further touted the Company's allegedly strong cash flow

position:

>On a pro forma basis, excluding Vivendi Universal's publishing
>businesses to be disposed of (including the B-to-B and Health

106