businesses whose sale is expected to be completed in the second quarter), Media and Communications reported:

A strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations;

Strong operating results in the first quarter: revenue organic growth of 13% to 6.8 billion euros; EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros. All were significantly ahead of budget.

236. The April 4, 2002 6-K, the April 15, 2002 6-K, the April 24, 2002 6-K and the April 30, 2002 6-K contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because, *inter alia*, the Company was engaged in improper accounting practices that had the effect of materially overstating Vivendi's reported earnings (as particularized above in Section IV.B, *supra*), including: (a) failing to timely write down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries, in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, these statements contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that the Company was suffering from a liquidity crisis (as particularized above in Section IV.C, *supra*) and that Vivendi would need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

237. On May 3, 2002, Moody's lowered the Company's long-term debt rating to Baa3. According to Moody's, the ratings downgrade reflected Moody's concern that Vivendi "might not be able to reduce debt as quickly and comprehensively as planned."

107

238.   That same day, Vivendi issued a press release, filed on a Form 6-K, criticizing

Moody's decision and attempting to downplay its significance:

> The company believes that this decision does not fully take into
> consideration the currently poor market conditions and the fact that
> the agency does not take into account immediately the whole of the
> debt reduction program planned by Vivendi Universal.
>
> This decision has no impact on Vivendi Universal's cash situation. It
> does not trigger any renegotiation clauses or advance repayments of
> bank credit lines. In addition, Vivendi Universal's use of commercial
> paper in the current amount of 1.6 billion euros is well covered by
> back-up lines of more than 3 billion euros, the availability of which
> will not be affected by the rating change.
>
> Vivendi Universal affirms that it has every confidence in its ability to
> meet its operating targets for 2002, as proved by its first-quarter
> results. The company is totally determined to carry through its debt
> reduction program in order to make a rapid return to a comfortable
> position with a Baa2 rating.

These statements contained untrue statements of material fact and omitted to state material facts

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that Vivendi's "confidence" in its ability to meet its targets for 2002 was based

on the accounting fraud discussed above in Section IV.B, *supra*, and on their continued

concealment of the Company's burgeoning liquidity crisis discussed above in Section IV.C,

*supra*.

239.   On May 28, 2002, Vivendi filed its Form 20-F for the fiscal year ended December

31, 2001 (the "2001 Form 20-F"). The 2001 Form 20-F reported total revenues of €57.4 billion

in 2001, which was an increase of 43% over 2000.   Vivendi's Media & Communications

business's revenues increased 107% to €28.1 billion over 2000, accounting for 49% of its total

revenues. The Environmental Services businesses generated €29.1 billion, an increase of 11%

over 2000. In discussing 2001 financial results versus the 2000 results, Vivendi reported that

"EBITDA more than doubled to €2.3 billion and operating income almost tripled to €1.3 billion." Excluding Maroc Telecom's results, "revenue growth was 26%, EBITDA increased 56% and operating income increased 103%." In discussing 2000 financial results versus 1999 results, Defendants reported that "EBITDA grew 164% to €1.3 billion and operating income of €486 million was earned compared to an operating loss of €60 million."

240.    According to the 2001 Form 20-F, Vivendi's total operating income "more than doubled to €3.8 billion." The Media & Communications businesses "generated operating income before holding and corporate expenses of €2.2 billion in 2001." Environmental Services' operating income increased 24% to €2 billion.

241.    Vivendi listed its liquidity and capital resources at December 31, 2001 as follows:

> €41.8 billion of debt, €4.7 billion of cash and cash equivalents and €36.7 billion of shareholders equity compared to €38.8 billion of debt, €3.3 billion of cash and equivalents and €65.7 billion of shareholders equity at December 31, 2000.

242.    The Consolidated Balance Sheet listed cash at €4.7 billion and €3.2 billion as of December 31, 2001 and December 31, 2000, respectively. Net cash provided by operating activities was presented in the Consolidated Statement of Cash Flows as being €4.5 billion and €2.5 billion as of December 31, 2001 and December 31, 2000, respectively.

243.    In discussing goodwill, Defendants stated:

> Recurring goodwill amortization increased to almost €1.7 billion, primarily due to the inclusion of a full twelve-months of goodwill amortization related to the merger with Seagram and Canal+. Additionally, as previously discussed, our 2001 annual review for impairment of the carrying value of long lived-assets resulted in a non-recurring, non-cash charge of €12.9 billion to goodwill amortization. The impact of the charge on future results will be to reduce goodwill amortization by approximately €380 million per year.

244.    Defendants also reported cash flow in the 2001 Form 20-F as follows:

820154 1

Net Cash Flow from Operating Activities -- Net cash flow provided by operating activities totaled €4.5 billion in 2001, an increase of €2 billion from 2000. The increase was attributed to operating earnings generating incremental cash flow of €1.1 billion and improvements in working capital of €1.5 billion, partially offset by approximately €600 million of cash payments made for the settlement of restructuring and merger-related liabilities. Of the improvements in working capital, €0.8 billion was generated by Vivendi Environnement primarily due to the implementation of a receivables securitization program. In 2000, operating activities provided net cash of €2.5 billion compared to €0.8 billion in 1999. The significant improvement was primarily due to increased earnings generated by our Telecom, Publishing and Environmental Services businesses.

Net Cash Flow from Investing Activities -- Net cash flow provided by investing activities was €4.3 billion in 2001 compared to net cash flow used for investing activities of €1.5 billion in 2000. Contributing to cash from investing activities was €9.4 billion from the sale of our spirits and wine business and €4 billion from the disposal of our investment in BSkyB, partially offset by capital expenditures for tangible and intangible assets net of sales proceeds of €4.9 billion and the acquisitions of Houghton Mifflin for €2.0 billion and Maroc Telecom for €2.4 billion. In 2000, net cash used for investing activities was €1.5 billion compared to €12.9 billion in 1999. The significant decrease primarily reflects fewer strategic acquisitions paid for in cash in 2000 compared to 1999. . . . Proceeds from the disposal of investments and fixed assets were €6.9 billion in 2000 compared to €4.5 billion in 1999, mainly attributable to the divestiture of non-core real estate, construction assets and GPU power generation plants.

Net Cash Flow from Financing Activities -- In 2001, net cash flow used for financing activities was €7.5 billion, the principal components of which included a €59 billion repayment of long-term borrowings and other liabilities, a €1.7 billion decrease in short-term borrowings, the purchase of treasury stock for €4.3 billion and cash dividends paid of €1.4 billion, partially offset by €5.2 billion proceeds from the issuance of long-term borrowings and other liabilities and €0.6 billion net proceeds from the issuance of common stock. In 2000, net cash flow used for financing activities was €0.6 billion compared to net cash provided by financing activities of €13.7 billion in 1999. The year-on-year variance was primarily due to the Merger Transactions. In July 2000, the sale of 37% of Vivendi Environnement through an IPO contributed to an increase in financing transactions of €03.8 billion.

110

245.    In discussing the Maroc and Cegetel consolidation in Footnote 11 to the

Consolidated Financial Statements, Defendants reported:

> [Cegetel and Maroc are] consolidated because, through a
> shareholders' agreement, Vivendi Universal has a majority of the
> shareholder voting rights and no other shareholder or groups of
> shareholders exercise substantive participating rights, which would
> allow them to veto or block decisions taken by Vivendi Universal.

246.    In reporting on its investment into Elektrim SA, Defendants disclosed only that

Vivendi had entered into an Investment Agreement with Elektrim SA, acquiring 49% of

Elektrim.  It further stated:

> In March 2002, Vivendi Universal announced that it had signed a
> non-binding Memorandum of Understanding with a group financial
> investors led by Citigroup Investments to sell its 49% interest in
> Elektrim Telekomunikacja. As part of the agreement, Vivendi
> Universal will retain a minority interest in the Citigroup-led
> consortium and will be granted a put option and the investors a call
> option on this interest. The exercise of the two options will ensure
> that Vivendi Universal is able to completely withdraw from its
> investment in Elektrim Telekomunikacja in due course

247.    In discussing Vivendi's accounting policies, Defendants again stated that Vivendi

recognized revenues from the sale of recorded music, "net of a provision for estimated returns

and allowances, . . . upon shipment to third parties" and recognized revenues in Environnemental

Services when services were provided, stating:

> Amounts billed and collected prior to services being performed are
> included in deferred revenues. Fees incurred to obtain a contract and
> paid upfront are capitalized and amortized on a straight-line basis
> over the duration of the contract. Revenues from long-term contracts
> involving a substantial construction component are recorded on the
> percentage-of-completion basis.

248.    For the reasons set forth in greater detail above in Section IV.B, *supra*, Vivendi's

historical financial statements and balance sheets contained in Vivendi's 2001 Form 20-F

contained untrue statements of material fact and omitted to state material facts required therein or

111

necessary to make the statements therein not misleading because, *inter alia*, the Company (a) failed to report pro forma financial results properly, improperly consolidated into its financials revenue from its Cegetel subsidiary (in which the Company had less than 50% ownership); (b) failed timely to write down impaired goodwill from previous corporate investments and acquisitions, including Canal+; (c) overstated the Company's revenue from its Environnemental division on certain multi-year contracts in violation of GAAP; and (d) failed to adhere to the accounting policies described in its SEC filings. In addition, the 2001 Form 20-F contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading because Defendants failed to disclose that Vivendi was suffering from a liquidity crisis, as set forth above in Section IV.C, *supra*.

249.    Defendants further attempted to address concerns about debt levels by issuing a press release on May 30, 2002, subsequently filed on a Form 6-K (collectively, the "May 30, 2002 6-K"). The May 30, 2002 6-K disclosed that Vivendi had negotiated some debt relief by obtaining an "agreement from the banks to delete the clauses that linked the availability of credit lines to a rating level." This action decoupled Vivendi's bank credit lines from rating agencies' decisions. Investors were further reassured that "the Company has no reason to anticipate or fear any further deterioration in its credit rating." The May 30, 2002 6-K further stated:

> Vivendi Universal has also confirmed that, after payment of the dividend and the acquisition of USA Networks, its available credit lines that have not been used to date amount to almost 3.5 billion euros. Also, its use of commercial paper is limited to about 1 billion euros, and the reimbursement of expected debts during the coming months is limited.

> This cash situation, which, the Company believes, is comfortable – even assuming an extremely pessimistic market – will enable the Company to continue its debt reduction program with confidence and with a view to creating the best possible value for its shareholders.

112

250.    The May 30, 2002 6-K contained untrue statements of material fact and omitted to

state material facts required therein or necessary to make the statements therein not misleading

because Defendants failed to disclose that Vivendi was facing a liquidity crisis, as discussed

above in Section IV.C, *supra*. Unbeknownst to investors, Vivendi's cash situation was dire and

a further deterioration in its credit rating was all but certain. Defendants were offering false

reassurances that had their intended effect – on May 31, 2002, Vivendi ADSs closed up $1.23, at

$31.05.

251.    On June 11, 2002, Defendants caused Vivendi to file a Form 6-K (the "June 11,

2002 6-K") containing Vivendi's first quarter 2002 unaudited consolidated financial results

reporting numbers in line with its April 30, 2002 6-K, as set forth above.

252.    The statements contained in the June 11, 2002 6-K contained untrue statements of

material fact and omitted to state material facts required therein or necessary to make the

statements therein not misleading for the same reasons the statements in the April 30, 2002 6-K

contained untrue statements of material fact and omitted to state material facts required therein or

necessary to make the statements therein not misleading, as set forth above in Section IV.B,

*supra*.

253.    Defendants continued their efforts to counteract the stream of bad news. On June

25, 2002, Vivendi issued a press release (and filed a Form 6-K) (collectively, the "June 25, 2002

6-K") titled "Vivendi Universal to Lower Debt by €4 billion in 2002," reiterating the positive

steps it had taken to reduce debt and announcing that the Company's cash position was not

precarious.

254.    The statement in the June 25, 2002 6-K that the Company's cash position was not

precarious contained untrue statements of material fact and omitted to state material facts

113

required therein or necessary to make the statements therein not misleading because Defendants

failed to disclose that the Company was facing a liquidity crisis, as set forth above in Section

IV.C, *supra*.

255.    On June 26, 2002, Vivendi issued yet another press release and Form 6-K

(collectively, the "June 26, 2002 6-K") outlining additional details about Vivendi's

"deleveraging and liquidity." The June 26, 2002 6-K first outlined that "[a]ccording to the U.S.

definition of net debt (gross debt less cash), Vivendi Universal's net debt (excluding Vivendi

Environnement) fell from around €19 billion at December 31, 2001 to approximately €17 billion

at March 31, 2002, (and from €14.6 billion to €12.9 billion under French GAAP)." The June 26,

2002 6-K stated that "[t]he main factors that will impact debt under U.S. practices in the second

quarter were or will be [cash inflows and cash outflows]."

256.    Further, the June 26, 2002 6-K stated that Vivendi's new debt target was €15

billion by December 31, 2002, stating that "[t]his target represents a ratio of debt to estimated

2002 EBITDA of below 2.5 times, including Cegetel and Maroc Telecom, as is required by both

U.S. and French accounting standards. Using 'proportional' levels of estimated 2002 EBITDA

and debt adjusted for the minority interests of Telecoms, the debt target ratio is around 3 times

EBITDA." According to the press release, the lowered debt target, "which is lower than that so

far announced, has been made possible by the rapid progress made in the debt-reduction plan

during the first half of the year."

257.    The June 26, 2002 6-K also lauded Vivendi's high levels of available credit,

stating that "[a]t this point in time, Vivendi Universal has available around €3.3 billion in unused

credit lines. This is available to back up its commercial paper outstanding of nearly €1 billion."

This 6-K extolled Vivendi's strong free cash flow, stating:

114

> Owing to its strong free cash flow, combined with the execution of
> the disposals program and potential bond issues, Vivendi Universal is
> confident of its capacity to meet its anticipated obligations over the
> next 12 months.

258.    According to the June 26, 2002 6-K, to aid its cash situation, Vivendi had also

"renegotiated a number of bank clauses, in particular those that placed it in the situation of

certain loans being called if its credit ratings fell below [a certain level]."

259.    The June 26, 2002 6-K contained untrue statements of material fact and omitted to

state material facts required therein or necessary to make the statements therein not misleading

because Defendants failed to disclose that the Company was facing a liquidity crisis, as set forth

above in Section IV.C, *supra*.

260.    On June 26, 2002, Messier discussed the Company's debt and liquidity during an

investor conference call as follows:

> I have read, I held in the markets all certainties, question, rumors in
> the current environment relating to views, view for yourselves, views
> for your accounting and I seen that in those circumstance. The best
> that we can do is to show you that's [sic] there is no hidden liability
> that's you have all the information to come back.

Messier's statement that there was no "hidden liability" contained untrue statements of material

fact and omitted to state material facts required therein or necessary to make the statements

therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent

accounting scheme, as discussed above in Section IV.B, *supra*, and that it was facing a liquidity

crisis, as set forth above in Section IV.C, *supra*.

261.    As stated in the Securities Class Action Complaint, on June 26, 2002 the Dow

Jones International News reported:

> Chairman Jean-Marie Messier said late Wednesday that he plans to
> stay in charge of the embattled media company despite criticism of
> his strategy and a crumbling share price.

115

> Messier sought to counter those doubts, opening the call with a
> comment that the company has no hidden, off-balance sheet liabilities
> and adding, "we feel very confident looking to our debt and cash
> analysis with all our commitments of the group for the coming 12
> months."

Messier's statement that there was no "hidden liability" contained untrue statements of material

fact and omitted to state material facts required therein or necessary to make the statements

therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent

accounting scheme, as discussed above in Section IV.B, *supra*, and that it was facing a liquidity

crisis, as discussed above in Section IV.C, *supra*.

262.    On July 2, 2002, Vivendi's debt was downgraded again amid reports that the

Company was in danger of default. On July 2, 2002, Bloomberg reported that Messier "told

employees in an e-mail that while he may have gone 'too fast, too far,' there are 'no hidden

risks' in the company's accounting." Messier's statement that there were no hidden risks in the

company's accounting contained untrue statements of material fact and omitted to state material

facts required therein or necessary to make the statements therein not misleading because he

failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed

above in Section IV.B, *supra*, and that it was facing a liquidity crisis, as discussed above in

Section IV.C, *supra*.

263.    According to the Norges Bank Action, the next day, July 3, 2002, *The Columbian*

reported that Messier continued to defend Vivendi's financial statements: "There are no

underestimated liabilities. There are no overvalued assets," Messier said. "Our results are true,

genuine and complete."

264.    Messier's contention that the Company's results were "true, genuine and

complete" contained untrue statements of material fact and omitted to state material facts

116

required therein or necessary to make the statements therein not misleading because he failed to disclose that Vivendi was engaging in a fraudulent accounting scheme, as discussed above in Section IV.B, *supra*, and that it was facing a liquidity crisis, as discussed above in Section IV.C, *supra*.

## VI.    DEFENDANTS' SCIENTER

265.    Throughout the Relevant Period, Defendants intentionally, or at the very least recklessly, made materially false and misleading statements and concealed material information regarding Vivendi's financial condition, as alleged herein. Many of the misstatements and omissions were the result of intentional deception and intentional violations of GAAP by these Defendants, for the purposes of boosting Vivendi's ordinary share and ADS prices.

266.    As set forth elsewhere herein in detail, Messier and Hannezo, by virtue of their receipt of information reflecting the true facts regarding Vivendi, their control over, and/or receipt and/or modification of Vivendi's materially misleading statements, financial statements and/or their associations with the Company that made them privy to confidential proprietary information concerning Vivendi, were active and culpable participants in the fraudulent scheme alleged herein. The Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the market and to Plaintiffs.

267.    Vivendi is charged with the knowledge possessed by its senior officers, including Messier and Hannezo.

268.    Messier's and Hannezo's intentional misconduct included, *inter alia*, authoring and enforcing improper accounting practices and demanding that Vivendi's employees misapply GAAP in order to mask the true liquidity and cash flow situation that Vivendi was suffering.

269.    During the Relevant Period, Messier and Hannezo signed Vivendi's Forms 20-F, Annual Reports and/or Forms 6-K with knowledge that they falsely represented Vivendi's financial results, or with reckless disregard for their truth or falsity.

270.    By mid-December 2001, Defendants knew that Vivendi had just narrowly avoided a downgrade in its investment status by the credit rating agencies that, had it happened, would have nearly eliminated Vivendi's cash and would have deleteriously impacted the Company's ability to borrow more funds from its credit facilities for further acquisitions. In fact, it was that near downgrade that gave Hannezo the "unpleasant feeling of being in a car whose driver is accelerating in the turns" with him in the "death seat," and led him to implore Messier that "all of this not end in shame." Nevertheless, Messier chose to not mention the narrowly-averted credit rating downgrade when urging Vivendi's Board of Directors to approve the $10 billion acquisition of USA Network's television and film business just two days later, and both he and Hannezo continued to sign off on Vivendi's false disclosures about, *inter alia*, its cash and liquidity situation.

271.    Further, as alleged above in Section IV.B, *supra*, Hannezo knew from a memo dated January 29, 2001, prepared shortly after Vivendi acquired Canal+, that the football marketing rights that originally had been believed to be an asset of Canal+ actually belonged to the football league. Hannezo knew or should have known, but recklessly disregarded, the fact that Vivendi took no impairment charge in fiscal 2001, resulting in Vivendi overstating the value of its subsidiary.

272.    Additional evidence of Defendants' scienter is the fact that, even though Vivendi claimed in its March 5, 2002 earnings release that, based on the company's "excellent" operating results, it would pay a €1 per share dividend, Vivendi had had to borrow against credit facilities

118

to pay the dividend, which cost more than €1.3 billion after French corporate taxes on dividends. Similarly, despite stating in Vivendi's June 26, 2002 press release that the Company had "around €3.3 billion in unused credit lines to back up its commercial paper outstanding of nearly €1 billion" and that the cash situation had greatly improved since the beginning of the year, just one day before Vivendi issued that press release, at least €900 million of the €3.3 billion in Vivendi credit lines had expired, and Vivendi's cash situation had in fact worsened as a result of a demand made weeks earlier by Cegetel's minority shareholders for the repayment of a current account pursuant to which Cegetel made its excess cash available to Vivendi.

273.    The magnitude of the impact of Defendants' fraud also strongly evidences Defendants' intentional or reckless conduct. As set forth above, the revelation of Vivendi's truly dismal liquidity situation – including a €19 billion debt burden – caused it to teeter on the edge of bankruptcy, dried up its credit lines, caused its credit ratings to crumble, triggered its credit facility covenants' ratings thresholds, and led its lenders to refuse to extend to Vivendi sorely needed fresh credit. Vivendi itself admitted that it faced having to reduce its debt by billions of euros in order to achieve an acceptable capital structure. This cash and liquidity crisis did not happen overnight but, rather, was the direct result of Defendants' deliberate, steady collision course driven by their insatiable appetite for more acquisitions and the attendant prestige, power and money that would inure to them as the world's leading media and entertainment group. The extent of the crippling debt load, that Vivendi only first started to publicly admit it was bearing in July 2002, directly belied the financial picture that Defendants presented to the securities markets during the Relevant Period.

274.    Defendants' scienter is further evidenced by the fact that, commencing immediately on the heels of the disclosure that the Company's viability going forward was

119

threatened absent a fire sale of its assets, new management rapidly downsized the Company, sold off major assets and restructured it, as alleged above in Section IV.D. Those actions demonstrate the extent of the bloat, waste and excess caused by Defendants' hunger for a global empire that they built by means of a fraudulent scheme that misled investors about Vivendi's financial condition, cash and cash flow positions, and liquidity situation. *See* Sections IV.B and IV.C, *supra.*

275.    In the arbitration proceedings brought by Messier to enforce the terms of his termination agreement with Vivendi, Vivendi itself stated that Messier caused Vivendi's near collapse. In addition, as reported by the Associated Press on December 12, 2002, Hannezo admitted that "2001 was marked by a series of errors, including underestimating the debt problem." Further, Vivendi's new CEO also admitted at a French parliamentary hearing in September 2002 that had Messier remained CEO of Vivendi beyond July 3, 2002, Vivendi invariably would have gone bankrupt "within 10 days."

276.    The criminal, civil and regulatory authorities in the United States and in France (including the SEC, the United States Attorney's Office, public prosecutors in Paris and the COB) that investigated and/or commenced proceedings against Defendants all focused on the same question: whether Vivendi, Messier, Hannezo and other Vivendi executives misled investors with overly rosy assessments of the Company's financial health. As a result of its investigation, the SEC found that Vivendi, Messier and Hannezo violated the federal securities laws, including Section 10(b) of the Exchange Act. The COB concluded that Vivendi had committed irregularities in its financial disclosures and fined Vivendi and Messier €1 million each for making misleading financial disclosures between 2000 and 2002.

120

277.    Messier and Hannezo had the motive and opportunity to commit fraud because they had the means and the likely prospect of achieving concrete benefits from their fraudulent conduct. Messier wanted Vivendi to be a worldwide empire and Vivendi was on an unrelenting quest to maintain and expand its enterprise. In total, Vivendi spent over $75 billion in pursuit of Messier's ambition to create the world's number-one entertainment company through rapid acquisitions of companies in the United States and abroad, using Vivendi's securities as consideration. Defendants achieved that objective by artificially maintaining the value of Vivendi's ordinary shares and ADSs and by propping up their price through the dissemination of the materially false and misleading statements described in detail above. In addition, Vivendi's ability to maintain positive credit ratings and thereby to obtain additional financing for further acquisitions depended on Defendants' fraudulent scheme. Vivendi's global reach could not have been achieved *without* Defendants' fraudulent inflation of Vivendi's share price.

278.    Messier had an even greater motive for inflating the appearance of Vivendi's financial performance from which he derived concrete benefit by virtue of his fraudulent conduct: his bonus was pegged to Vivendi achieving specific earnings targets. Messier's compensation included a base salary, plus lucrative bonuses based on earnings results, stock options and other perks such as a personal assistant, security guards and the use of a $17 million Park Avenue penthouse at below market rate. As reported in Vivendi's Form 20-F for fiscal year ended December 31, 2001, Messier received 835,000 stock options and earned $4.8 million in compensation. Of that amount, more than $3 million – two-and-a-half times his salary – comprised his bonus, which he received because Vivendi's EBITDA had increased that year by more than 30%. Had Vivendi's earnings increased by more than 35%, Messier would have received three times his base salary as a bonus. Hannezo likewise received extremely lucrative

121

compensation and remuneration that was dependent upon the Company's achievement of certain financial targets. By manipulating the Company's accounting to create the illusion that those targets had been achieved, Messier and Hannezo created an entitlement to bonuses they would not have received if the Company's financial results had been accurately reported.

279.    As CEO, Messier was the public voice of Vivendi and was therefore in a position to communicate, as he did during conference calls and in press releases and other public documents, false and misleading statements concerning the Company's financial condition, its compliance with GAAP and the veracity of its financials. Messier signed or authorized all of the Company's SEC filings, Annual Reports and press releases during the Relevant Period. Hannezo signed many of the Company's SEC filings and Annual Reports, as alleged herein. Further, Hannezo oversaw the Company's accounting and financial reporting, was responsible for creating and approving accounting policies and procedures, and was directly involved in the preparation of the Company's financial statements. Thus, Messier and Hannezo had the ability to control the Company's accounting as well as the content of its financial statements and disclosures. Both had the motive and the opportunity, which they took, to commit fraud.

280.    Vivendi had an obvious opportunity to commit fraud, because it published and controlled the content of its own financial statements and other public statements, and because it controlled its own accounting and financial reporting functions, by which the fraud was perpetrated.

281.    Messier's and Hannezo's scienter is further evidenced by their clandestine insider trading during the Relevant Period. According to an article in *The Wall Street Journal* dated January 24, 2003, Messier and Hannezo (and other senior executives of Vivendi that were part of Messier's "dream team") exercised options and sold stock days before an abrupt, huge share

122

placement in the first weeks of 2002 by Vivendi that Messier had arranged to raise desperately

need cash.  That transaction sent Vivendi's ordinary share and ADS price crashing.

Specifically, as reported by *The Wall Street Journal*, on or about December 28, 2001, just days

after writing the "death seat" memo and before the stock sale transaction, Hannezo exercised

stock options that earned him a profit of €1.3 million or $1.4 million.  An April 11, 2003 article

in *The Wall Street Journal* reported that Vivendi acknowledged that Messier also sold 152,000

shares on December 21, 2001 and 106,669 shares on December 27, 2001.  In addition, Agnes

Touraine, head of Vivendi Universal Publishing, and Catherine Gros, chief of Vivendi's

communications department, also exercised stock options at or around the same time.  Shortly

thereafter, on or about January 7, 2002, Vivendi unexpectedly sold 55 million shares of treasury

stock in a €3.3 billion deal.  Given their top roles at the Company, Messier and Hannezo and

these other executives knew or were in a position to know about that transaction.  The market

reaction to the sale caused the Company's share price to tumble, but not before Messier,

Hannezo had the chance to exercise stock options at a profit.  It was not until April 2003 when

Messier admitted for the first time that in late 2001 he had sold a huge number of Vivendi shares,

worth at least €15 million.

## VII.    LOSS CAUSATION

282.    At all times relevant hereto, the material misrepresentations and omissions

particularized herein directly or proximately caused the damages sustained by Plaintiffs.  As

described herein, during the Relevant Period, Defendants made or caused to be made a series of

materially false or misleading statements about Vivendi's business, prospects, operations and

financial condition.  These material misstatements and omissions had the purpose and effect of

creating in the market an unrealistically positive assessment of Vivendi and its business,

123

prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all times relevant hereto. Defendants' materially false and misleading statements during the Relevant Period resulted in Plaintiffs purchasing or otherwise acquiring the Company's securities at artificially inflated prices. But for Defendants' misrepresentations and fraudulent acts, Plaintiffs would not have purchased Vivendi securities, or would not have purchased them at the artificially inflated prices at which they were trading during the Relevant Period. As the truth about Vivendi's actual business, prospects, operations and financial condition was revealed, the inflation caused by these misrepresentations was eliminated from the price of Vivendi's securities, thus causing damages to Plaintiffs.

283.    As stated above, Vivendi's stock price began to drop starting on May 3, 2002. On that date, Moody's lowered the Company's long-term debt rating to just one notch above "junk" status, citing concerns about the Company's debt load. Despite Defendants' attempt to reassure the market that Moody's was wrong, in response to Moody's rating downgrade, on May 3, 2002, the Company's ADSs dropped $1.60 down from its close of $30.67 on May 2, 2002 to a close of $29.07 on May 3, 2002. The Company's ordinary shares suffered similar declines, dropping from €33.77 on May 2, 2002 to €31.52 on May 3, 2002.

284.    Vivendi's stock continued to plunge as the market learned of the potentially devastating effects subsequent credit downgrades could have on the Company. Notably, following May 6, 2002 press accounts revealing that Vivendi could be required immediately to settle €3.5 billion worth of "return swap" derivative transactions if its credit rating were to slip any further, the Company's ADSs dropped another $0.81 to a closing price on May 6, 2002 of $28.26, while its ordinary shares dropped another €0.52 to a closing price on May 6, 2002 of €31.

124

285.    On July 2, 2002, Vivendi's debt was downgraded for a second time. This announcement caused Vivendi's ADSs to plummet nearly 21%, falling from a closing price on July 1, 2002 of $22.45 to a closing price on July 2, 2002 of $17.76, while its ordinary shares fell more than 25%, from its closing price on July 1, 2002 of €23.90 to a closing price on July 2, 2002 of €17.80. The Company's shares plunged so fast that the Paris Bourse temporarily suspended trading in Vivendi's ordinary shares.

286.    The following day, Vivendi finally disclosed to the public that the Company was facing a "short-term liquidity issue" and ousted Messier. Vivendi disclosed that it would be required to repay creditors €1.8 billion by the end of July 2002 and that €3.8 billion in credit lines were up for renegotiation. Further, credit analysts estimated that Vivendi could face a cash shortfall of €2.7 billion by the end of 2002 – an amount they feared could expand to €5.5 billion by the middle of 2003 if the Company failed quickly to secure new multibillion euro lines of credit. These announcements caused the Company's ADSs and ordinary shares to fall even further, dropping nearly another 12% from its July 2, 2002 close of $17.76 to a July 3, 2002 closing price of $15.66 and nearly another 22% from its July 2, 2002 close of €17.80 to a July 3, 2002 close of €13.90, respectively. In total, the Company's ADSs and ordinary shares fell a stunning 30% and 41.8%, respectively, in the two days following the second credit rating downgrade.

287.    On July 10, 2002, *The Wall Street Journal* reported that the COB had raided Vivendi's Paris headquarters as part of a formal investigation into the Company's financial disclosures going back to 2001. Notably, the French investigation had been opened to look into alleged "publication of false balance sheets for the tax years closing December 31, 2001 and

December 31, 2002" and the publication of false and misleading information concerning the Company's financial outlook for those years.

288.    Unfortunately for Vivendi's investors, the stunning collapses of early July 2002 only foreshadowed drops still to come. On August 14, 2002, Vivendi announced that it had suffered €12 billion net loss for the first half of 2002 and that it would take a further €11 billion goodwill write down for depreciated assets. Following this announcement, Standard & Poor's dropped Vivendi's debt to junk status. Vivendi's ADSs and ordinary shares cratered, dropping a stunning 23.9% and 25.2%, respectively – falling from $15.33 to $11.66 and from €15.90 to €11.89, respectively – in a single day.

289.    Between July 2, 2002 and August 14, 2002, Vivendi lost a stunning €6.4 billion in market capitalization.

290.    All told, Messier's more than $75 billion acquisition spree caused investors in the Company's ADSs to suffer a staggering 85% decline from their Relevant Period high of $75.50 and investors in its ordinary shares to suffer an equally stunning 83.9% decline from their Relevant Period high of €86.50.

## VIII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

291.    The statutory safe harbor provided for forward looking statements under certain circumstances does not apply to the allegedly false statements pleaded herein as many of the statements were of historical facts or existing conditions and not identified as forward-looking statements. To the extent certain statements pleaded herein were forward looking, they were not accompanied by specifically tailored, meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the forward looking statement. To the extent that the statutory safe harbor would otherwise apply to any statement pleaded,

126

Defendants are liable for those false forward looking statements because at the time each of those statements was made the speaker actually knew the statement was false.

## IX.   PRESUMPTION OF RELIANCE

292.   In connection with their claims arising under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and the common law, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine as the securities purchased by Plaintiffs traded in an open and efficient market.

293.   As set forth above, Defendants made material misrepresentations or failed to disclose material facts. These misrepresentations and omissions would tend to induce a reasonable investor to misjudge the value of the Company's securities. Plaintiffs purchased the Company's securities between the time when Defendants misrepresented material facts and the time the true facts were disclosed.

294.   The Company's ordinary shares are listed and trade on the Paris Bourse and its ADSs were listed and traded on the NYSE during the Relevant Period, both of which are highly efficient markets.

295.   As regulated issuers, Vivendi filed periodic reports with the SEC and other regulators. In addition, Vivendi was followed by securities analysts who wrote reports that were disseminated to the public. Further, Vivendi issued press releases that were carried by national and international newswires and thus were publicly available and entered the public marketplace.

296.   As a result, the market for Vivendi securities promptly digested current information from all publicly-available sources and reflected such information in the price of Vivendi's securities. Under these circumstances, all purchasers of Vivendi's securities suffered

similar injury through their purchases of the Company's securities at artificially inflated prices and a presumption of reliance applies.

## X.    TOLLING OF THE STATUTE OF LIMITATIONS

297.    Plaintiffs did not know, and could not reasonably have discovered before, at the earliest, July 2, 2002 that Vivendi's financial statements and Defendants' other public statements regarding the Company's financial condition were materially false and misleading.  On that date, Vivendi's debt, which had been downgraded to one level above "junk" status on May 3, 2002, was downgraded for a second time, causing the stock to drop 25% to a new 15-year low of €17.80.  Following his July 3, 2002 ouster, Messier continued to deny any wrongdoing, steadfastly maintaining that the Company's financial results were all "true, genuine and complete."

298.    These attempts to reassure the market, however, would ultimately prove futile. On August 14, 2002, Vivendi was at long last forced to reveal its financial woes, announcing that it had suffered a massive $12 billion loss in the first half of 2002 and that it would have to sell $10 billion in assets to reduce its debt.  Fourtou, Messier's successor, flatly admitted, "We are facing a liquidity problem."

299.    Prior to, at the earliest July 2, 2002, the statutes of limitations on Plaintiffs' claims were tolled by Defendants' active and continuing concealment of the falsity of their statements. Further, the statutes of limitations on Plaintiffs' claims were again tolled beginning on July 18, 2002, due to the filing of a securities class action complaint on that date in *Rosenbaum Partners, L.P. v. Vivendi Universal,* No. 02 Civ. 5571 (now pending as the Securities Class Action). Plaintiffs were members of the putative class in that action, which asserts claims against Vivendi

128

and Messier pursuant to Section 10(b), Rule 10b-5 and Section 20(a) of the Exchange Act.

Those claims arise out of the same facts and circumstances as the claims in this Complaint.

300.    By Order entered March 26, 2007, the Court ruled on the class plaintiffs' motion

for class certification in the Securities Class Action. The Court certified a class of all purchases

of Vivendi securities located in United States, England, France and The Netherlands.

Accordingly, the statutes of limitations on Plaintiffs' claims remained tolled between at least July

18, 2002 and March 26, 2007.

301.    All of Plaintiffs' claims have been brought within the applicable statutes of

limitations, after giving effect to tolling and the relation-back doctrine.

## XI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### Violations of Section 11 of the Securities Act
#### (Against All Defendants)

302.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth

herein, except allegations that the Defendants made the untrue statements of material facts and

omissions intentionally or recklessly. In particular, Plaintiffs do not repeat and reallege herein

any facts that are unnecessary or irrelevant for purposes of stating a claims under Section 11 of

the Securities Act, 15 U.S.C. § 77k, including allegations that may be interpreted to sound in

fraud or relating to any state of mind on the part of Defendants other than strict liability or

negligence, and Plaintiffs expressly disclaim any claim of fraud or intentional misconduct with

regard to this first claim for relief.

303.    This claim is brought against all Defendants pursuant to Section 11 of the

Securities Act, 15 U.S.C. § 77k.

129

304.    Vivendi issued ordinary shares pursuant to the registration statement contained in the Form F-4 for the Merger Transactions (hereinafter, the "Registration Statement"). All purchases of Vivendi ordinary shares are traceable to the Registration Statement.

305.    The Registration Statement contained untrue statements of material fact including, but not limited to, the financial statements of Vivendi and other statements regarding Vivendi's business operation and financial results. In addition, the Registration Statement omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including the true cash and liquidity situation that existed at Vivendi at the time the Registration Statement was issued and the GAAP violations described herein. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

306.    Vivendi issued stock pursuant to the Registration Statement, which Messier and Hannezo signed, and, accordingly, Defendants are strictly liable for the untrue statements of material fact and omissions to state material facts therein.

307.    Defendants owed Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, to ensure that the statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

308.    As alleged in detail herein, Defendants did not make a reasonable investigation of the statements contained in the Registration Statement, and did not possess reasonable grounds to believe that the Registration Statement did not contain any untrue statements of material fact or omit to state any material facts required to be stated therein or necessary to make the statements therein not misleading.

130

309. Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material fact in the Registration Statement when they purchased or acquired Vivendi's ordinary shares.

310. By reason of the foregoing, Defendants are liable to Plaintiffs for violations of Section 11 of the Securities Act.

## SECOND CLAIM FOR RELIEF
### Violations of Section 12(a)(2) of the Securities Act
### (Against All Defendants)

311. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claims under Section 12(a) of the Securities Act, 15 U.S.C. § 77l(a)(2), including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of Defendants other than strict liability or negligence, and Plaintiffs expressly disclaim any claim of fraud or intentional misconduct with regard to this second claim for relief.

312. This claim is brought against all Defendants pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2).

313. Defendants offered to sell, and did sell, in a public offering Vivendi's ordinary shares by means of the merger prospectus contained within the Form F-4 for the Merger Transactions (hereinafter, the "Merger Prospectus"). As alleged in detail herein, the Merger Prospectus contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading. The untrue statements of material fact in the Merger Prospectus included, but were not limited to, the financial statements of Vivendi and other statements regarding Vivendi's business operation and financial results. In addition, the

131

Merger Prospectus omitted to state material facts necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading, including the Company's cash and liquidity situation at the time of the Merger Transactions. The facts misstated and omitted would have been material to a reasonable person reviewing the Merger Prospectus.

314.    Defendants owed to the purchasers of Vivendi shares, including Plaintiffs, the duty to make a reasonable and diligent investigation of the statements contained in the Merger Prospectus to ensure that it was true and that there was no omission to state a material fact necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading.

315.    As alleged in detail herein, Defendants did not make a reasonable and diligent investigation and did not possess reasonable grounds to believe that the Merger Prospectus did not contain any untrue statements of material fact or omit to state any material facts required to be stated therein or necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

316.    Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the Merger Prospectus at the time they acquired Vivendi shares.

317.    By reason of the foregoing, Defendants are liable to Plaintiffs, who have been damaged thereby, for violations of Section 12(a)(2) of the Securities Act.

318.    Plaintiffs hereby tender shares of Vivendi securities to Defendants and seek rescission of their purchases to the extent that they continue to own such securities.

132

**THIRD CLAIM FOR RELIEF**
**Violations of Section 15 of the Securities Act**
**(Against Defendants Messier and Hannezo)**

319.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth

herein, except to the extent any allegations above contain any facts which are unnecessary or

irrelevant for purposes of stating a claims under Section 15 of the Securities Act, 15 U.S.C. §

77o, including allegations that may be interpreted to sound in fraud or relating to any state of

mind on the part of Defendants other than strict liability or negligence, and Plaintiffs expressly

disclaim any claim of fraud or intentional misconduct with regard to this third claim for relief.

320.    This claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §

77o, against Messier and Hannezo on behalf of Plaintiffs for damages they suffered in

connection with their purchases or acquisitions of Vivendi ordinary shares or ADSs that were

issued in or traceable to the Merger.

321.    As alleged in detail herein, Vivendi violated Section 11 of the Securities Act with

respect to the Merger Transactions by an issuing a Registration Statement that included untrue

statements of material fact and omitted to state material facts required to be stated therein or

necessary in order to make the statements therein not misleading.  The facts misstated and

omitted would have been material to a reasonable person reviewing the Registration Statement.

322.    As alleged in detail herein, Vivendi violated Section 12(a)(2) of the Securities Act

by soliciting Plaintiffs' purchases of Vivendi's ordinary shares by means of the Merger

Prospectus, which included untrue statements of material fact and/or omitted to state material

facts necessary in order to make the statements, in the light of the circumstances under which

they were made, not misleading.  In soliciting these purchases, Vivendi was motivated by its own

financial interests.  Vivendi failed to exercise reasonable care regarding the accuracy and

133

completeness of the Merger Prospectus. The facts misstated and omitted would have been material to a reasonable person reviewing the Merger Prospectus.

323.   Vivendi had a duty to disseminate accurate and truthful information with respect to Vivendi's financial condition and results of operations.

324.   Messier and Hannezo were control persons of Vivendi when the Registration Statement was filed and became effective and the Merger Prospectus was disseminated (among other reasons alleged herein) due to their positions, respectively, as CEO and Chairman, and CFO of Vivendi; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions; and their signatures on and participation in the preparation and/or dissemination of the Registration Statement and Merger Prospectus. Because of their positions of control and authority over Vivendi, Messier and Hannezo were able to, and did, control the contents of the Registration Statement and the Merger Prospectus.

325.   By virtue of the foregoing, Messier and Hannezo both had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Vivendi, including the content of its financial statements and of the Registration Statement and the Merger Prospectus.

326.   Plaintiffs purchased Vivendi ordinary shares issued in or traceable to the Merger and were damaged thereby. The Merger was conducted pursuant to the Registration Statement and the Merger Prospectus.

327.   Messier and Hannezo acted negligently and without reasonable care regarding the accuracy of the information contained in the Registration Statement and the Merger Prospectus and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

134

328.    Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the inaccurate statements and omissions in the Registration Statement and the Merger Prospectus.

329.    Plaintiffs have sustained damages as a result of the inaccurate statements and omissions in the Registration Statement and the Merger Prospectus, for which they are entitled to compensation.

### FOURTH CLAIM FOR RELIEF
### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

330.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.  This cause of action is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

331.    During the Relevant Period, Defendants made and disseminated numerous false and misleading statements that were directly attributable to them.  Defendants were provided with or had unlimited access to copies of the Company's financial statements, internal reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to, but did not, prevent the issuance of the statements or cause the statements to be corrected.

332.    As described above, Defendants carried out a fraudulent scheme and course of conduct and/or business that was intended to and did as alleged herein: (i) deceive Plaintiffs; (ii) artificially inflate and maintain the market price of Vivendi securities; and (iii) cause Plaintiffs to purchase Vivendi securities at inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein, which operated as fraud and deceit upon Plaintiffs as purchasers of Vivendi securities.

135

333.    As alleged above, Defendants acted with scienter in that they knew or were reckless in not knowing that Vivendi's press releases, public statements reported in news articles, investor conferences and analyst reports, Annual Reports, Forms 20-F, Forms 6-K, Registration Statement and other documents filed with the SEC or COB during the Relevant Period referenced above, as well as Defendants' own public statements set forth herein, were materially false and misleading as detailed above; knew that such statements or documents would be issued or disseminated to the investing public, including Plaintiffs; and knowingly or recklessly participated in a fraudulent scheme and course of conduct or business as primary violators of federal securities laws.

334.    As a direct and proximate result of Defendants' wrongful conduct in violation of Section 10(b) and Rule 10b-5, the market prices of Vivendi ordinary shares and ADSs purchased by Plaintiffs were artificially inflated.  In ignorance of this artificial inflation, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market, Plaintiffs purchased Vivendi securities at artificially inflated prices.

335.    Had Plaintiffs known the truth concerning the misrepresented and omitted facts described above, they either would not have purchased or otherwise acquired Vivendi securities at all, or would have done so only at substantially lower prices.

336.    Plaintiffs were substantially damaged as a result of their purchases of Vivendi securities at artificially inflated prices and the subsequent decline in price of those securities when the fraud was disclosed.

136

## FIFTH CLAIM FOR RELIEF
### Violation of Section 18 of the Exchange Act
### (Against All Defendants)

337.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claims under Section 18 of the Exchange Act, 15 U.S.C. § 78r, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of Defendants other than strict liability or negligence, and Plaintiffs expressly disclaim any claim of fraud or intentional misconduct with regard to this fifth claim for relief.

338.    This claim is asserted against all Defendants for violation of Section 18 of the Exchange Act, 15 U.S.C. § 78r.

339.    As set forth above, Defendants made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC by Vivendi, including the Company's filings on Form 20-F during the Relevant Period.

340.    In connection with the purchase of the Company's shares, Plaintiffs and/or their agents specifically read and relied upon the Company's SEC filings, including the Company's filings on Form 20-F during the Relevant Period.

341.    Specifically, Plaintiffs and/or their agents read and relied on the Company's financial statements in those filings and other statements regarding Vivendi's business operation and financial results, including its debt load and cash flow. Plaintiffs and/or their agents further relied on the Company's statements in those filings as being materially complete and as not omitting material information, including information about the Company's financial condition.

137

820154.1

Plaintiffs and/or their agents relied on these SEC filings not knowing that they were false and misleading.

342.    The reliance by Plaintiffs and/or their agents was reasonable.

343.    When the truth began to emerge about the false and misleading statements and omissions in the Company's documents and reports filed with the SEC, Plaintiffs were significantly damaged by the resulting drop in the value of the Company's stock.

344.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damage in connection with their purchases of the Company's stock.

345.    By virtue of the foregoing, Defendants have violated Section 18 of the Exchange Act.

### SIXTH CLAIM FOR RELIEF
#### Violation of Section 20(a) of the Exchange Act
#### (Against Defendants Messier and Hannezo)

346.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein. This claim for relief is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Individual Defendants.

347.    The Individual Defendants, by reason of their executive positions; their direct involvement in the day-to-day operations of Vivendi, including its financial reporting and accounting functions; their signatures on and participation in the preparation and dissemination of Vivendi's false financial statements; their false and misleading press releases and other public statements; and their direction of the Company's employees to engage in fraudulent accounting practices that caused the Company's financial statements to be false and misleading, were control persons of Vivendi. As such, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Vivendi,

138

including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.

348.    As set forth above, Vivendi participated in a fraudulent scheme and course of business or conduct, and issued false and misleading statements as a primary violator of Section 10(b) of the Exchange Act and subsections (a), (b), and (c) of Rule 10b-5 promulgated thereunder.  Additionally, Vivendi violated Section 18 of the Exchange Act by filing materially false statements with the SEC, as set forth above.  By virtue of their positions as control persons of Vivendi and their culpable participation in the Company's fraud, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act to the same extent as Vivendi for its primary violations of Sections 10(b) and 18 and Rule 10b-5.

349.    As a direct and proximate result of Vivendi's primary violations of the Exchange Act, for which the Individual Defendants are liable pursuant to Section 20(a), Plaintiffs suffered substantial damages in connection with its purchases of the Company's securities during the Relevant Period.

### SEVENTH CLAIM FOR RELIEF
**Common Law Fraud**
**(Against All Defendants)**

350.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

351.    Plaintiffs assert this cause of action against all Defendants based on common law principles of fraud.

352.    As alleged herein, each Defendant made material misrepresentations, or failed to disclose material facts, to Plaintiffs regarding Vivendi's financial condition.

139

353.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth above, or acted with reckless disregard for the truth of those representations in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Vivendi's true financial condition and future business prospects from Plaintiffs and supporting the artificially inflated price of the Company's securities.  As demonstrated by Defendants' misstatements of Vivendi's cash and liquidity positions during the Relevant Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions set forth above, were reckless in failing to obtain such information by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading.

354.    The aforesaid misrepresentations and omissions were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiffs when making investment decisions.

355.    The aforesaid misrepresentations and omissions constitute fraud and deceit under applicable law.

356.    Plaintiffs reasonably relied upon Defendants' representations when deciding to purchase and refrain from selling Vivendi's securities.  Plaintiffs or their agents read the Company's press releases, filings on Forms 20-F, and filings of Forms 6-K, including the financial statements contained therein.  Plaintiffs relied on those statements as being materially complete, and as not omitting material information.  In particular, Plaintiffs or their agents read and relied on the line items in the Company's financial statements for cash, liquidity and earnings per share.  Plaintiffs' decisions to purchase and hold Vivendi ADSs and ordinary shares

140

were based, in significant part, on Plaintiffs' analysis of these financial metrics as set forth in the Company's financial statements.

357.    At the time Vivendi's securities were purchased and held by Plaintiffs, Plaintiffs did not know of the false and/or misleading statements and omissions.  If Plaintiffs had known the true facts, they either would not have purchased Vivendi's securities or would have done so only at substantially lower prices.

358.    As a direct and proximate result of Defendants' fraud and deceit, Plaintiffs suffered damages in connection with their purchases and holding of Vivendi's securities.

## EIGHTH CLAIM FOR RELIEF
### Common Law Negligent Misrepresentation
### (Against All Defendants)

359.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under the common law of negligent misrepresentation, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of Defendants other than strict liability or negligence, and Plaintiffs expressly disclaim any claim of fraud or intentional misconduct with regard to this second claim for relief.

360.    This claim is brought by Plaintiffs against all Defendants under common law principles of negligence.

361.    Defendants made materially false and misleading statements, as set forth above, regarding, *inter alia*, the financial condition and the accounting policies and practices of the Company.

141

362.    Defendants knew, or should have known in the exercise of reasonable care, that their statements regarding the Company's financial statements and accounting policies and practices during the Relevant Period were materially false and misleading.

363.    Defendants owed Plaintiffs a duty of reasonable care in connection with the provision of information concerning the financial condition of Vivendi. Defendants Vivendi, Messier and Hannezo breached this duty by including in Vivendi's financial statements untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

364.    Plaintiffs, as investors, were entitled to rely upon, and were justified in relying upon, the representations made by Defendants, set forth above, regarding the Company's financial statements, accounting policies and practices, and compliance with GAAP. Plaintiffs relied upon the superior knowledge and expertise of Defendants and justifiably relied to their detriment on Defendants' representations when deciding to purchase and refrain from selling Vivendi's securities.

365.    As alleged above, Defendants materially misrepresented Vivendi's financial results and its compliance with GAAP throughout the Relevant Period.

366.    Plaintiffs had no knowledge of the false and misleading nature of Defendants' statements when purchasing and refraining from selling Vivendi's securities, and believed them to be true. Had Plaintiffs been aware of the true facts, they would either not have purchased Vivendi's securities, or would not have purchased the securities at inflated prices.

367.    As a direct and proximate result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price

142

of Vivendi's securities was artificially inflated and Plaintiffs sustained damages in connection

with their purchases and holding of Vivendi's securities when the price of the securities declined.

368.    Defendants' conduct constitutes the making of negligent misrepresentations

(including negligent omissions to state facts in connection with statements that were made) under

applicable state law.

## NINTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against All Defendants)

369.    Plaintiffs repeat and reallege the allegations contained in each of the foregoing

paragraphs as if fully set forth herein.

370.    Defendants' scheme to hide Vivendi's liquidity crisis and artificially inflate its

share prices through the use of improper accounting methods unjustly enriched Defendants, at

Plaintiffs' expense, by artificially inflating the price Plaintiffs paid for Vivendi securities during

the Relevant Period.

371.    Defendants' retention of the unjustly acquired amounts violates the fundamental

principles of justice, equity, and good conscience.

372.    Accordingly, Defendants should be ordered to return any funds obtained at

Plaintiffs' expense as a result of their scheme.

143

820154.1

## XII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment on their behalf and as follows:

1.      Awarding Plaintiffs compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

2.      Awarding Plaintiffs the right to rescind their Vivendi securities to the extent it continues to hold such securities;

3.      Awarding Plaintiffs on the common law fraud claim asserted above an amount of punitive or exemplary damages in an appropriate amount to accomplish the purposes and aims of such damages, in an amount to be determined at trial under appropriate procedures against Defendants;

4.      Awarding Plaintiffs the costs of this suit, including reasonable attorneys' and accountants' and experts' fees and other disbursements; and

5.      Awarding Plaintiffs such other and further relief as this Court may deem just and proper.

144

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: New York, NY
       September 18, 2007

                                    **THE SHAPIRO FIRM, LLP**

By: _____

                                      Jonathan S. Shapiro (JS-3068)
                                      Robert J. Shapiro (RS-3220)
                                      500 Fifth Avenue, 14th Floor
                                      New York, New York 10110
                                      Telephone: 212-391-6464

                                      *Local Counsel for Plaintiffs*

                                      **SCHIFFRIN BARROWAY**
                                        **TOPAZ & KESSLER, LLP**
                                      David Kessler
                                      Stuart L. Berman
                                      Darren J. Check
                                      John A. Kehoe (JK-4589)
                                      280 King of Prussia Road
                                      Radnor, Pennsylvania 19087
                                      Telephone: 610-667-7706

                                      *Counsel for Plaintiffs*

820154.1